# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **NATIONAL ASSOCIATION OF MANUFACTURERS** 1331 Pennsylvania Ave., Suite 600 Washington, D.C. 20004-1790 | ) ) ) ) | |
| and | ) ) | |
| **COALITION FOR A DEMOCRATIC WORKPLACE** 901 7th Street NW, 2nd Floor Washington, D.C. 20001 | ) ) ) ) ) | Case: 1:11-cv-01629 |
| Plaintiff, | ) | |
| v. | ) | JUDGE AMY BERMAN JACKSON |
| **NATIONAL LABOR RELATIONS BOARD, MARK PEARCE, CRAIG BECKER and BRIAN HAYES in their official capacities as Members of the Board, and LAFE SOLOMON, in his official capacity as Acting General Counsel of the Board** 1099 14th St. N.W. Washington, D.C. 20570-0001 | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

1.     This action is brought by the National Association of Manufacturers ("NAM") and the Coalition for a Democratic Workplace ("CDW") (together, "Plaintiffs") to declare unlawful and set aside the promulgation of a Final Rule by the National Labor Relations Board ("NLRB" or the "Board") entitled "Notification of Employee Rights Under the National Labor Relations Act (the "Rule"). The Rule was issued by the Board on August 30, 2011, 76 Fed. Reg. 54006. The Rule requires employers subject to the jurisdiction of the

National Labor Relations Act ("NLRA" or the "Act") to post notices informing their employees of certain rights under the Act.

2.      The Board-ordered notices set forth in the Rule are framed in such a way as to lack neutrality and unfairly encourage and promote unionization. The imposition of such a notice requirement, 75 years after passage of the Act, constitutes a massive, unprecedented and unlawful  expansion of the Board's jurisdiction. The Rule adversely affects nearly six million businesses by forcing them to promote unionization of their workforces upon pain of otherwise committing an unfair labor practice, also newly created by the Board in the Rule. The Board's promulgation of the Rule is plainly "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right", in direct violation of the National Labor Relations Act and the Administrative Procedure Act (the "APA"), 5 U.S.C. 701, et seq., and must therefore be enjoined and set aside.

## PARTIES

3.      Plaintiff, the NAM is the preeminent manufacturing association in the United States, as well as the nation's largest industrial trade association, representing small and large manufacturers in every industrial sector in all 50 states.

4.      The NAM, as well as most of the12,000 manufacturing companies represented by NAM, are employers covered under Section 2(2) of the NLRA, 29 U.S.C. § 152(2).  The NAM and a majority of its members are directly affected by the Rule issued by the Board and challenged in this action.

5.      Plaintiff CDW represents millions of businesses of all sizes from every industry and every region of the country. The CDW's membership includes hundreds of employer associations as well as individual employers and other organizations. Included within the CDW's membership and represented by the CDW are many employers who will be required

to comply with the unauthorized Rule at issue in this case. Many such member employers reside in and do business in this judicial district. As representatives of employers on whom the NLRB is attempting to impose an unprecedented and unauthorized Notice posting requirement, and as employers themselves, NAM and the Coalition have standing to bring this action.

6.      Defendant NLRB is an independent agency of the United States. The agency's jurisdiction is limited by Congress under the NLRA to conducting representation elections and investigating and adjudicating unfair labor practice charges brought by the Board's General Counsel. 29 U.S.C. § 151, *et seq*.

7.      Defendant Mark Pearce is Chairman of the Defendant Board, and Defendants Craig Becker and Brian Hayes are members of the Board. Defendant Lafe Solomon is Acting General Counsel of the Board. They are each sued in their official capacities pursuant to 5 U.S.C. § 703.

## JURISDICTION AND VENUE

8.      The Court has Federal Question jurisdiction in this action pursuant to 28 U.S.C. § 1331 (1993) because this action arises under the provisions of the NLRA, 29 U.S.C. § 151, *et seq*. and the First Amendment to the Constitution.

9.      This Court has jurisdiction to review a final agency action by the Board under the APA, 5 U.S.C. §§ 701-706, 5 U.S.C. § 703 and 28 U.S.C. §§ 1331 and 1337.

10.     Venue is proper in this district under 28 U.S.C. § 1391(e) because the Board is an agency of the United States, its headquarters are located in the District of Columbia, and a substantial part of the acts and omissions giving rise to the claims in this action, including issuance of the challenged Rule, occurred or failed to occur at the Board's headquarters. The Plaintiffs principal offices are also located in the District of Columbia as are a number of their member employers.

11.     The Court is authorized to award declaratory and injunctive relief under the

APA, 5 U.S.C. §§ 701-706 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

## FACTS

12.     On December 22, 2010, the Board published a Notice of Proposed Rulemaking in

the Federal Register, stating therein an intention to impose the notice posting requirement that

ultimately became the Rule. 75 Fed. Reg. 80410. The Board purported to act under its

authority granted by Section 6 of the Act, 29 U.S.C. § 156, to promulgate such rules as are

necessary to carry out the provisions of the Act.  As further explained below, however, there

are no provisions of the Act which are carried out by the Rule as issued by the Board and the

Act's provisions in fact do not authorize the Rule.

13.     After considering public comments on the proposed rule, the Board issued the

Rule on August 30, 2011. The Rule was published in the Federal Register on August 30,

2011, at 76 Fed. Reg. 54006 (2011). The Rule is to be codified at 29 C.F.R. Part 104. A copy

of the Rule is attached hereto and incorporated by reference.

14.     The Rule constitutes a final agency action.

15.     The effective date of the Rule is November 14, 2011.

## FIRST CAUSE OF ACTION

16.     Plaintiffs  re-allege and incorporate by reference the allegations in paragraphs

1-15 as if fully rewritten herein.

17.     In both the Notice of Proposed Rulemaking and the Final Rule, the Board cites

Section 6, 29 U.S.C. § 156 of the NLRA as authority to promulgate and issue the Rule.

18.     Section 104.20(a) of the Rule provides in pertinent part that "[a]ll employers

subject to the NLRA must post notices to employees, in conspicuous places, informing them

of their NLRA rights, together with Board contact information and information containing

basic enforcement procedures, in the language set forth in the Appendix to Subpart A of this Part." ("Notice"). The Rule also provides for electronic posting of the Notice. The Appendix to Subpart A of 29 C.F.R. Part 104 of the Rule sets forth the text of the Notice.

19.     Neither Section 6 nor any other sections of the NLRA contain any provisions granting the Board the authority to promulgate and issue a specific rule requiring employers to post a notification of employee rights under the NLRA. The Rule, therefore, has been promulgated in excess of the Board's statutory authority under the NLRA.  The Rule is also arbitrary and capricious.

20.     The Rule must therefore be held unlawful and set aside under the APA, 5 U.S.C. §§ 706(2)(A) and 706(2)(C).

21.     Unless implementation of the Rule is enjoined, Plaintiffs, their members and all other employers subject to the Board's jurisdiction will suffer immediate, irreparable harm for which no adequate remedy at law exists.

22.     Enjoining the Rule is in the public interest and presents no harm to the Board.

## SECOND CAUSE OF ACTION

23.     Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-22 as if fully rewritten herein.

24.     The Board's authority to administer the provisions of the NLRA is triggered only when a representation petition is filed pursuant to Section 9(c)(1), 29 U.S.C. § 159(c)(1) or an unfair labor practice charge is filed and processed pursuant to Section 10(b) 29, U.S.C. § 160(b).

25.     Neither Section 6 nor any other section of the NLRA contains any specific provision granting the Board the authority to assert jurisdiction over any employer absent the filing of a representation petition or unfair labor practice charge.

26.     Neither Section 6 nor any other section of the NLRA grants the Board the authority to require an employer to post any notice in the absence of the filing of a representation petition under Section 9(c)(1) of the NLRA or an unfair labor practice charge under Section 10(b) of the NLRA against such employer. The Rule, therefore, has been promulgated in excess of the Board's statutory authority under the NLRA.

27.     The Rule must therefore be held unlawful and set aside under the APA, 5 U.S.C. § 706(2)(C).

28.     Unless implementation of the Rule is enjoined, Plaintiffs, their members and all other employers subject to the Board's jurisdiction will suffer immediate, irreparable harm for which no adequate remedy at law exists.

29.     Enjoining the Rule is in the public interest and presents no harm to the Board.

### THIRD CAUSE OF ACTION

30.     Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-29 as if fully rewritten herein.

31.     Section 104.210 of the Rule states in pertinent part that "[f]ailure by [employers] to post the employee notice may be found to interfere with, restrain, or coerce employees in the exercise of their rights guaranteed by NLRA § 7, 29 U.S.C. 157, in violation of NLRA § 8(a)(1), 29 U.S.C. 158(a)(1)." Section 104.210 of the Rule further provides that "the Board will determine whether an employer is in compliance [with the Rule] when a person files an unfair labor practice charge alleging that the employer has failed to post the employee notice required [under Subpart B of the Rule]."

32.     Section 104.210 of the Rule purports to create a new unfair labor practice where an employer covered under the NLRA fails to post a Notice.

33.     The Board has no authority under Section 6 or any other provision of the NLRA to create and promulgate a new unfair labor practice where an employer covered under the NLRA fails to post a Notice. The Rule, therefore, has been promulgated in excess of the Board's statutory authority under the NLRA.

34.     The Rule must therefore be held unlawful and set aside under the APA, 5 U.S.C. § 706(2)(C).

35.     Unless implementation of the Rule is enjoined, Plaintiffs, their members and all other employers subject to the Board's jurisdiction will suffer immediate, irreparable harm for which no adequate remedy at law exists.

36.     Enjoining the Rule is in the public interest and presents no harm to the Board.

**FOURTH CAUSE OF ACTION**

37.     Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-36 as if fully rewritten herein.

38.     Section 102.214(a) of the Rule provides for the tolling of the statute of limitations for unfair labor practice charges. Section 102.214(a) provides in pertinent part that "[w]hen an employee files an unfair labor practice charge the Board may find it appropriate to excuse the employee from the requirement that charges be filed within six (6) months after the occurrence of the allegedly unlawful conduct if the employer has failed to post the required employee notice unless the employee has received actual or constructive notice that the conduct complained of is unlawful."

39.     Section 10(b) of the NLRA, 29 U.S.C. § 160(b), however, provides in pertinent part that "[n]o complaint shall issue based upon any unfair labor practice charge occurring more than six (6) months prior to the filing of the charge with the Board and service of a copy thereof upon a person against whom such charge is made unless the person aggrieved thereby

was prevented from filing such charge by reason of service in the armed forces, in which event the six (6) month period shall be computed from the day of his discharge."

40.     The tolling of the statute of limitations as provided for in Section 104.214(a) of the Rule is not limited to charges filed where the aggrieved person was prevented from filing such charge by reason of service in the armed forces.

41.     Section 102.214(a) purports to toll the six (6) month statute of limitations for filing an unfair labor practice charge set forth in Section 10(b) of the NLRA, 29 U.S.C. 160(b) where an employer covered by the NLRA fails to post a Notice.

42.     The Board has no authority under Section 6 or any other provision of the NLRA to promulgate and issue a Rule tolling the statute of limitations for filing an unfair labor practice charge. The Rule, therefore, has been promulgated in excess of the Board's statutory authority under the NLRA.

43.     The promulgation and issuance of Section 104.214(a) of the Rule also violates Section 10(b) of the NLRA, 29 U.S.C. § 160(b).

44.     The Rule must therefore be held unlawful and set aside under the APA, 5 U.S.C. § 706(2)(C).

45.     Unless implementation of the Rule is enjoined, Plaintiffs, their members and all other employers subject to the Board's jurisdiction will suffer immediate, irreparable harm for which no adequate remedy at law exists.

46.     Enjoining the Rule is in the public interest and presents no harm to the Board.

## FIFTH CAUSE OF ACTION

47.     Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-46 as if fully rewritten herein.

48.    The Rule's requirement that all employers post the Notice, the creation of a new unfair labor practice and the tolling of the statute of limitations contained in § 10(b) of the NLRA, 29U.S.C. § 160(b) all are in excess of the powers delegated by the Board by Congress and contrary to the specific provisions of the NLRA.

49.    The Rule must therefore be held unlawful and set aside as an executive agency action in excess of its delegated powers.

50.    Unless implementation of the Rule in enjoined, Plaintiffs, their members and all other employers subject to the Board's jurisdiction will suffer immediate, irreparable harm for which no adequate remedy at law exists.

51.    Enjoining the Rule is in the public interest and presents no harm to the Board.

### SIXTH CAUSE OF ACTION

52.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-51as if fully rewritten herein.

53.    The Rule requires Plaintiffs and all employers subject to the Board's jurisdiction to post the Notice containing certain specific information regarding employee rights.

54.    Failure to post the Notice subjects Plaintiffs and all employers within the Board's jurisdiction to prosecution for unfair labor practice charges.  Thus, the Rule compels Plaintiffs and all employers subject to the Board's jurisdiction to engage in speech they would not otherwise issue in violation of their rights under the First Amendment and Section 8(c) of the Act, 29 U.S.C. § 158(c) to refrain from speaking or expressing certain views.

55.    The Board's promulgation and enforcement of the Rule absent statutory authority is contrary to Section 8(c) of the Act, 29 U.S.C. § 158(c) and will coerce speech by Plaintiffs, their members and all other employers subject to the Board's jurisdiction in violation of the First Amendment to the Constitution.

56.     The Rule must therefore be held unlawful and set aside under the First Amendment, Section 8(c), 29 U.S.C. § 158(c) and the APA, 5 U.S.C. §§ 706(2)(A) and 706(2)(C).

57.     Unless implementation of the Rule is enjoined, Plaintiffs, their members and all other employers subject to the Board's jurisdiction will suffer immediate, irreparable harm for which no adequate remedy at law exists.

58.     Enjoining the Rule is in the public interest and presents no harm to the Board.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request this Court enter judgment against Defendant:

A.     Declaring that the Board exceeded its authority under Section 6 of the NLRA to require employers to post the Notice.

B.     Declaring that the Board exceeded its authority under Section 9(c)(1) of the NLRA by requiring employers who the Board has not found to have committed an unfair labor practice or with respect to whom a representation petition has not been filed to post the Notice.

C.     Declaring that the Board violated Section 10(b) of the NLRA by providing for the tolling of the statute of limitations for filing an unfair labor practice charge pursuant to Section 102.214(a) of the Rule.

D.     Declaring that the Board has no authority under Section 6 or any other provision of the NLRA to require employers to post the Notice electronically.

E.     Declaring that under the APA the Rule is null and void *ab initio* and in its entirety.

F.      Preliminarily and permanently enjoining the Board from implementation,

enforcement and application of the Rule.

G.      Awarding Plaintiffs their attorney's fees and costs of this litigation.

H.      Granting such other and further relief as this Court deems just and appropriate.

Respectfully submitted,


/s/Peter N. Kirsanow
Peter N. Kirsanow (0034196)
Maynard A. Buck (0022423)
Patrick O. Peters (0079539)
Kristen M. Cady (0086614)
Benesch Friedlander Coplan & Aronoff LLP
200 Public Square, Ste 2300
Cleveland, OH 44114-2378
Tel: 216-363-4500
Fax: 216-363-4588
E-mail: pkirsanow@beneschlaw.com


/s/ William G. Miossi
William G. Miossi (D.C. Bar #445265)
Gregory F. Jacob (D.C. Bar #474639)
Winston & Strawn
1700 K St., N.W.
Washington, D.C. 20006
Tel: 202-282-5000
Fax: 202-282-5100
E-mail: gjacob@winston.com

*Counsel for the National Association of Manufacturers*


/s/ Maurice Baskin
Maurice Baskin (D.C. Bar #248898)
Venable LLP
575 7th St., N.W.
Washington, D.C. 20004
Tel: (202) 344-4823
Fax: (202) 344-8300
mbaskin@venable.com

*Counsel for the Coalition For A Democratic Workplace*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that the foregoing was filed electronically on the 23rd day of September, 2011 in accordance with the Court's Electronic Filing Guidelines.  Notice of this filing will be sent to all parties by operation of the Court's Electronic Filing System.  Parties may access this filing through the Court's Filing System.

<i>/s/ William G. Miossi</i><br>William G. Miossi (D.C. Bar # 445265)

This site displays a prototype of a "Web 2.0" version of the daily Federal Register. It is not an official legal edition of the Federal Register, and does not replace the official print version or the official electronic version on GPO's Federal Digital System (FDsys.gov).

The articles posted on this site are XML renditions of published Federal Register documents. Each document posted on the site includes a link to the corresponding official PDF file on FDsys.gov. This prototype edition of the daily Federal Register on FederalRegister.gov will remain an unofficial informational resource until the Administrative Committee of the Federal Register (ACFR) issues a regulation granting it official legal status. For complete information about, and access to, our official publications and services, go to the OFR.gov website.

The OFR/GPO partnership is committed to presenting accurate and reliable regulatory information on FederalRegister.gov with the objective of establishing the XML-based Federal Register as an ACFR-sanctioned publication in the future. While every effort has been made to ensure that the material on FederalRegister.gov is accurately displayed, consistent with the official SGML-based PDF version on FDsys.gov, those relying on it for legal research should verify their results against an official edition of the Federal Register. Until the ACFR grants it official status, the XML rendition of the daily Federal Register on FederalRegister.gov does not provide legal notice to the public or judicial notice to the courts.

# The Federal Register

## The Daily Journal of the United States Government

Rule

# Notification of Employee Rights Under the National Labor Relations Act

A Rule by the National Labor Relations Board on 08/30/2011

# Summary

On December 22, 2010, the National Labor Relations Board (Board) issued a proposed rule requiring employers, including labor organizations in their capacity as employers, subject to the National Labor Relations Act (NLRA) to post notices informing their employees of their rights as employees under the NLRA. This final rule sets forth the Board's review of and responses to comments on the proposal and incorporates any changes made to the rule in response to those comments.

The Board believes that many employees protected by the NLRA are unaware of their rights under the statute and that the rule will increase knowledge of the NLRA among employees, in order to better enable the exercise of rights under the statute. A beneficial side effect may well be the promotion of statutory compliance by employers and unions.

The final rule establishes the size, form, and content of the notice, and sets forth provisions regarding the enforcement of the rule.

# Table of Contents

- DATES:
- FOR FURTHER INFORMATION CONTACT:
- SUPPLEMENTARY INFORMATION:
- I. Background on the Rulemaking
- II. Authority
- A. The Board's Section 6 Rulemaking Authority
- B. The Board's Statutory Authority To Issue This Rule
- 1. Limitations on the Board's Rulemaking Authority Implied by Sections 9 and 10 of the Act
- 2. The First Amendment and Section 8(c) of the NLRA
- 3. Lack of Contemporaneity With the Enactment of the NLRA
- 4. Comparison With Other Statutes That Contain Notice-Posting Requirements
- 5. The Teamsters 357 Decision
- 6. Miscellaneous Matters
- C. Factual Support for the Rule
- III. Summary of Final Rule and Discussion of Related Comments
- Subpart A—Definitions, Requirements for Employee Notice, and Exceptions From Coverage Definitions
- A. The Definitions
- B. Requirements for Employee Notice
- 1. Content Requirements
- a. Comments Regarding the Introduction
- b. Comments Regarding Affirmative Statement of Rights
- i. The Right To Organize and the Right To Form, Join and Assist a Union
- ii. The Right To Bargain Collectively
- iii. The Right To Discuss With Co-Workers or Union
- iv. The Right To Strike and Picket
- v. The Right To Refrain From Union or Other Protected Concerted Activity
- vi. Other Comments
- c. The Examples of Unlawful Employer Conduct in the Notice
- i. No-Solicitation and No-Distribution Rules
- ii. Questioning Employees About Union Activity
- iii. Taking Adverse Action Against Employees for Engaging in Union-Related Activity
- iv. Threats To Close
- v. Promising Benefits
- vi. Prohibitions on Union Insignia
- vii. Spying or Videotaping
- viii. Other Suggested Additions to Illegal Employer Conduct

- d. Examples of Illegal Union Activity
- e. Collective-Bargaining Provision
- f. Coverage Provision
- 2. Posting Issues
- a. Location of Posting
- b. Size and Form Requirements
- c. Language Issues
- d. Electronic Posting
- e. Compliance With the Department of Labor's Rule
- 3. Exceptions
- Subpart B—Enforcement and Complaint Procedures
- A. Noncompliance as an Unfair Labor Practice
- B. Tolling the Section 10(b) Statute of Limitations
- C. Failure To Post as Evidence of Unlawful Motive
- D. Other Comments
- Subpart C—Ancillary Matters
- IV. Dissenting View of Member Brian E. Hayes
- No Statutory Authority for the Proposed Rule
- The Rule Is Arbitrary and Capricious
- Executive Order 13496
- Conclusion 189
- V. Regulatory Procedures
- A. Regulatory Flexibility Act
- B. Paperwork Reduction Act (PRA) 209
- C. Congressional Review Act (CRA) 211
- List of Subjects in 29 CFR Part 104
- Text of Final Rule
- PART 104—NOTIFICATION OF EMPLOYEE RIGHTS; OBLIGATIONS OF EMPLOYERS
- Subpart A—Definitions, Requirements for Employee Notice, and Exceptions and Exemptions
- Subpart B—General Enforcement and Complaint Procedures
- Subpart C—Ancillary Matters
- Authority:
- Subpart A—Definitions, Requirements for Employee Notice, and Exceptions and Exemptions
- Appendix to Subpart A—Text of Employee Notice
- "EMPLOYEE RIGHTS UNDER THE NATIONAL LABOR RELATIONS ACT
- Subpart B—General Enforcement and Complaint Procedures
- Subpart C—Ancillary Matters

- Footnotes

# Tables

- Table to § 104.204

# DATES:

This rule will be effective on November 14, 2011.

# FOR FURTHER INFORMATION CONTACT:

Lester A. Heltzer, Executive Secretary, National Labor Relations Board, 1099 14th Street, NW., Washington, DC 20570, (202) 273-1067 (this is not a toll-free number), 1-866-315-6572 (TTY/TDD).

# SUPPLEMENTARY INFORMATION:

# I. Background on the Rulemaking

The NLRA, enacted in 1935, is the Federal statute that regulates most private sector labor-management relations in the United States.[1] Section 7 of the NLRA, 29 U.S.C. 157, guarantees that

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities[.]

In Section 1, 29 U.S.C. 151, Congress explained why it was necessary for those rights to be protected:

The denial by some employers of the right of employees to organize and the refusal by some employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessary effect of burdening or obstructing commerce[.] * * *

* * * * *

Experience has proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury, impairment, or interruption, and promotes the flow of

commerce by removing certain recognized sources of industrial strife and unrest, by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and by restoring equality of bargaining power between employers and employees.

\* \* \* \* \*

It is declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

Thus, Congress plainly stated that, in its judgment, protecting the rights of employees to form and join unions and to engage in collective bargaining would benefit not only the employees themselves, but the nation as a whole. The Board was established to ensure that employers and, later, unions respect the exercise of employees' rights under the NLRA. [2]

For employees to fully exercise their NLRA rights, however, they must know that those rights exist and that the Board protects those rights. As the Board explained in its Notice of Proposed Rulemaking (NPRM), 75 FR 80410, it has reason to think that most do not. [3] The Board suggested a number of reasons why such a knowledge gap could exist—the low percentage of employees who are represented by unions, and thus lack an important source of information about NLRA rights; the increasing proportion of immigrants in the work force, who are unlikely to be familiar with their workplace rights; and lack of information about labor law and labor relations on the part of high school students who are about to enter the labor force. [4]

Of greatest concern to the Board, however, is the fact that, except in very limited circumstances, no one is required to inform employees of their NLRA rights. [5] The Board is almost unique among agencies and departments administering major Federal labor and employment laws in not requiring employers routinely to post notices at their workplaces informing employees of their statutory rights. [6] Given this common practice of workplace notice-posting, it is reasonable for the Board to infer that a posting requirement will increase employees' awareness of their rights under the NLRA. [7] Further support for that position is President Obama's recent Executive Order 13496, issued on January 30, 2009, which stressed the need for employees to be informed of their NLRA rights. Executive Order 13496 requires Federal contractors and subcontractors to include in their Government contracts specific provisions requiring them to post notices of employees' NLRA rights. On May 20, 2010, the Department of Labor issued a Final Rule implementing the order effective June 21, 2010. 75 FR 28368, 29 CFR part 471.

After due consideration, the Board has decided to require that employees of all employers subject to the NLRA be informed of their NLRA rights. Informing employees of their statutory rights is central to advancing the NLRA's promise of "full freedom of association, self-organization, and designation of representatives of their own choosing." NLRA Section 1, 29 U.S.C. 151. It is fundamental to employees' exercise of their rights that the employees know both their basic rights and where they can go to seek help in understanding those rights. Notice of the right of self-organization, to form, join, or assist labor organizations, to bargain collectively, to engage in other concerted activities, and to refrain from such activities, and of the Board's role in protecting those statutory rights is necessary to effectuate the provisions of the NLRA.

The Board believes that the workplace itself is the most appropriate place for communicating with employees about their basic statutory rights as employees. Cf. Eastex, Inc. v. NLRB, 437 U.S. 556, 574 (1978) ("[T]he plant is a particularly appropriate place for the distribution of [NLRA] material.").

Accordingly, and pursuant to its rulemaking authority under Section 6 of the NLRA, the Board proposed a new rule requiring all employers subject to the NLRA to post a copy of a notice advising employees of their rights under the NLRA and providing information pertaining to the enforcement of those rights. 75 FR 80411. For the reasons discussed more fully below, the Board tentatively determined that the content of the notice should be the same as that of the notice required under the Department of Labor's notice posting rule, 29 CFR part 471. Id. at 80412. Also, as discussed at length below, the Board proposed that failure to post the notice would be found to be an unfair labor practice—i.e., to interfere with, restrain, or coerce employees in the exercise of their NLRA rights, in violation of Section 8(a)(1) of the NLRA. Id. at 80414. The Board also proposed that failure to post the notice could lead to tolling of the 6-month statute of limitations for filing unfair labor practice charges, and that knowing and willful failure to post the notice could be considered as evidence of unlawful motive in unfair labor practice cases. Id. The Board explained that the burden of compliance would be minimal—the notices would be made available at no charge by the Board (both electronically and in hard copy), and employers would only be required to post the notices in places where they customarily post notices to employees; the rule would contain no reporting or recordkeeping requirements. Id. at 80412. Finally, the Board expressed its position that it was not required to prepare an initial regulatory flexibility analysis of the proposed rule under the Regulatory Flexibility Act, 5 U.S.C. 601 et seq., and that the notice posting requirement was not subject to the Paperwork Reduction Act, 44 U.S.C. 3501 et seq. Id. at 80415-80416.

The Board invited comments on its legal authority to issue the rule, the content of the notice, the requirements for posting the notice, the proposed enforcement scheme, the definitions of terms in the proposed rule, and on its positions concerning the Regulatory Flexibility Act and the Paperwork Reduction Act. The Board stated that comments would be accepted for 60 days following the publication of the NPRM in the Federal Register, or until February 22, 2011. The Board received

6,560 comments by February 22. However, many late-filed comments were also submitted, and the Board decided to accept all comments that it received on or before March 23.[8]

In all, 7,034 comments were received from employers, employees, unions, employer organizations, worker assistance organizations, and other concerned organizations and individuals, including two members of Congress. The majority of comments, as well as Board Member Hayes' dissent, oppose the rule or aspects of it; many opposing comments contain suggestions for improvement in the event the Board issues a final rule. Many comments, however, support the rule; a few of those suggest changes to clarify or strengthen the rule. The Board wishes to express its appreciation to all those who took the time to submit thoughtful and helpful comments and suggestions concerning the proposed rule.[9]

After careful consideration of the comments received, the Board has decided to issue a final rule that is similar to that proposed in the NPRM, but with some changes suggested by commenters. The most significant change in the final rule is the deletion of the requirement that employers distribute the notice via email, voice mail, text messaging or related electronic communications if they customarily communicate with their employees in that manner. Other significant changes include clarifications of the employee notice detailing employee rights protected by the NLRA and unlawful conduct on the part of unions; clarification of the rule's requirements for posting notices in foreign languages; allowing employers to post notices in black and white as well as in color; and exemption of the U.S. Postal Service from coverage of the rule. The Board's responses to the comments, and the changes in the rule and in the wording of the required notice of employee rights occasioned by the comments, are explained below. (In his dissent, Board Member Hayes raises a number of points that are also made in some of the comments. The Board's responses to those comments should be understood as responding to the dissent as well.)[10]

# II. Authority

Section 6 of the NLRA, 29 U.S.C. 156, provides that "The Board shall have authority from time to time to make, amend, and rescind, in the manner prescribed by the Administrative Procedure Act [5 U.S.C. 553], such rules and regulations as may be necessary to carry out the provisions of this Act." As discussed in detail below, the Board interprets Section 6 as authorizing the rule.

## A. The Board's Section 6 Rulemaking Authority

Numerous comments dispute the Board's statutory authority to enact the proposed rule. Many note the fact that the Board's rulemaking is constrained by Congressional intent as evidenced in its enabling statute. For instance, the American Trucking Association quotes a Ninth Circuit case explaining that Section 6 "does not authorize the Board to promulgate rules and regulations which have the effect of enlarging its authority beyond the scope intended by Congress,"[11] and similarly,

the Motor & Equipment Manufacturers Association asserts, "A regulation cannot stand if it is contrary to the statute."[12] The Board agrees that it may not exercise its rulemaking authority in a way contrary to that intended by Congress, but for the reasons discussed below it also does not believe that it has done so in this rule.

Several comments assert that because NLRA Section 6 is written in general, rather than specific, terms, the Board is not empowered to enact the proposed rule. For example, Associated Builders and Contractors argues that "the lack of express statutory language under Section 6 of the NLRA to require the posting of a notice of any kind `is a strong indicator, if not dispositive, that the Board lacks the authority to impose such a requirement * * *.' "[13] And the Heritage Foundation likewise argues that the Board's reliance upon its general Section 6 rulemaking authority does not suffice to meet the Administrative Procedure Act's requirement that the NPRM must "reference the legal authority under which the rule is proposed."[14]

The Board believes that these comments are in error because the courts' construction of other statutes' general rulemaking authority, as well as Section 6 in particular, fully support its reading of this statutory provision. In fact, earlier this year, the Supreme Court issued a decision in Mayo Foundation for Medical Education and Research v. United States [15] (discussed more fully below), unanimously reaffirming the principle that a general grant of rulemaking authority fully suffices to confer legislative (or binding) rulemaking authority upon an agency.

Even prior to Mayo, a long line of both non-NLRA and NLRA cases supported reading Section 6 in the manner suggested by the Board. Over forty years ago, in Thorpe v. Housing Authority, [16] the Supreme Court found that the expansive grant of rulemaking authority in Section 8 of the Housing Act was sufficient to grant legislative rulemaking power to the Department of Housing and Urban Development. The Court further noted that "[s]uch broad rule-making powers have been granted to numerous other federal administrative bodies in substantially the same language."[17] A few years later, in Mourning v. Family Publication Services, [18] the Court reaffirmed its stance in Thorpe:

Where the empowering provision of a statute states simply that the agency may `make * * * such rules and regulations as may be necessary to carry out the provisions of this Act,' we have held that the validity of a regulation promulgated thereunder will be sustained so long as it is `reasonably related to the purposes of the enabling legislation.'[19]

Following the Supreme Court's lead, key circuit decisions then extended the notion that broad grants of rulemaking authority conveyed legislative rulemaking power.[20] Although the Board had historically chosen to make policy by adjudications, the Supreme Court, consistent with the non-NLRA case law, used a pair of Board enforcement cases to unanimously emphasize the existence of the Board's legislative rulemaking authority, NLRB v. Wyman-Gordon Co. [21] and NLRB v. Bell Aerospace. [22]

In 1991, after the Board enacted a rule involving health care units, the Supreme Court unanimously upheld that rule in American Hospital Association v. NLRB. [23] The Supreme Court found that that the general grant of rulemaking authority contained in Section 6 of the Act "was unquestionably sufficient to authorize the rule at issue in this case unless limited by some other provision in the Act." [24] As in AHA, there is no such limitation here on the Board's authority to enact the proposed Rule, as explained further below. As Senator Tom Harkin and Representative George Miller [25] emphasized in their comment, the Supreme Court in AHA examined "the structure and the policy of the NLRA," in order to conclude:

As a matter of statutory drafting, if Congress had intended to curtail in a particular area the broad rulemaking authority granted in § 6, we would have expected it to do so in language expressly describing an exception from that section or at least referring specifically to the section. [26]

Thus, the Court could not have been clearer that unless the Board is "expressly" limited in some manner, Section 6 empowers the Board to make "such rules and regulations as may be necessary to carry out the provisions of this Act." This point was underscored in a Wagner Act-era Senate hearing, as cited by Americans for Limited Government (ALG), in which it was acknowledged that the language of Section 6 indeed grants "broad powers" to the Board. [27]

And in January of this year, a unanimous Supreme Court, in Mayo Foundation for Medical Education and Research v. United States, affirmed this key principle that a broad grant of statutory rulemaking authority conveys authority to adopt legislative rules. [28] Mayo concerned in part the question of how much deference a Treasury Department tax regulation should receive. In Mayo, an amicus argued that the Treasury Department's interpretation should receive less deference because it was issued under a general grant of rulemaking authority, as opposed to an interpretation issued under a specific grant of authority. [29] The Court responded by first explaining its earlier holding in U.S. v. Mead, that Chevron deference is appropriate "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." [30] Then, in significant part, the Court observed:

Our inquiry in that regard does not turn on whether Congress's delegation of authority was general or specific.

* * * * *

The Department issued the full-time employee rule pursuant to the explicit authorization to "prescribe all needful rules and regulations for the enforcement" of the Internal Revenue Code. 26 U.S.C. 7805(a). We have found such "express congressional authorizations to engage in the process of rulemaking" to be "a very good indicator of delegation meriting Chevron treatment." [31]

And so, all nine members of the Supreme Court agreed on the following key principle: an express, albeit general, grant of rulemaking authority is fully sufficient for an agency to receive Chevron deference for its rulemaking. It follows that a broad grant of rulemaking authority will suffice for the agency to engage in legislative rulemaking in the first place. Thus, the Supreme Court's rulings continue to fully support a broad construction of Section 6.

Disputing this conclusion, ALG asserts that Section 6 was intended to be used "primarily" for procedural rulemaking, and cites a Senate report from the Wagner Act's legislative history. That Senate report explains: "[i]n no case do the rules have the force of law in the sense that criminal penalties or fines accrue for their violation, and it seems sufficient that the rules prescribed must be `necessary to carry out the provisions' of the act." [32] The Board disagrees. The cited language merely proclaims the obvious, that no criminal penalties or fines accrue for violating the Board's rules. However, laws such as the NLRA that do not impose criminal penalties or fines for their violation can also have the "force of law" (which is perhaps why the Senate report used the limiting phrase "in the sense of"). The Supreme Court has previously recognized that final Agency orders under Sections 10 (e) and (f) of the Act, despite their non-self enforcing nature, have "the force and effect of law." [33] So too, do the Board's rules have the force and effect of law, as held by the Supreme Court in AHA. [34]

Several comments discuss whether Board Rule 103.20, which mandates the posting of an election notice in a workplace three working days prior to a representation election, should be considered analogous to the proposed rule. The United Food and Commercial Workers International Union (UFCW) comments that the election rule is, like the proposed rule, only minimally burdensome and further noted that it has never been challenged. [35] ALG disagrees that the election rule should be considered analogous here, because although in the election context a notice posting is the most feasible means to inform employees about an upcoming election that is occurring at a specific place and time, that is not the case in the NLRA rights context, in which employees can just search the Internet to find out more information. The Board agrees with the UFCW that posting a notice is a minimally burdensome way to ensure that employees receive certain information, although obviously, the proposed notice will reach many more employers over a much longer period of time than do election notices. And ALG's acknowledgment that a notice posting in the workplace is in fact sometimes the most feasible means to inform employees of important information supports the Board's belief, explained below, that workplace notice posting is a more efficient way of informing employees of their NLRA rights than relying on information available on the Internet.

A few comments argue that the Board is a law enforcement agency only, and should not be engaging in rulemaking for that reason. One comment asserts that "Congress did not intend to "empower the NLRB to be a rulemaking body, but rather an investigatory/enforcement agent of the NLRA." [36] The Board responds that by enacting Section 6, Congress plainly and explicitly intended to, and did, "empower the NLRB to be a rulemaking body." And, as shown above, AHA

conclusively found that the Board is empowered to use its rulemaking powers, as the Court had previously indicated in Wyman-Gordon and Bell Aerospace. [37]

A joint comment submitted by Douglas Holtz-Eakin and Sam Batkins argues against the Board's assertion of Section 6 authority here by asserting that "the Supreme Court has circumscribed NLRB rulemaking in the past: `The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress.' " However, that comment neglects to provide the citation for that quotation, American Ship Building Co. v. NLRB, [38] which was not a rulemaking case but an adjudication. In any event, the Board does not agree that this rule presumes to make a major policy decision properly made by Congress alone. As explained in subsection B, Statutory Authority, below, the Board believes that it has been Congressionally authorized to make this regulatory decision in the interests of carrying out the provisions of the Act.

Many comments argue that the Board should heed the use of the word "necessary" in Section 6. For instance, the Portland Cement Association comments that Section 6 requires the Board to demonstrate that: (1) The specific rule being proposed is, in fact, necessary, and (2) the adoption of the proposed rule will carry out one or more specific provisions of the Act. [39] The Board believes, for the reasons expressed in subsection C, Factual Support, below, that the requisite showing of necessity has been made. And, as explained below, the adoption of the proposed rule is consistent with Section 1 and will help effectuate Sections 7, 8, 9 and 10 of the NLRA.

The Board, however, disagrees with the Motor & Equipment Manufacturers Association's assertion based upon the case of West Virginia State Board of Education v. Barnette [40] that the Board needs to show "a grave and immediate danger" before enacting a rule. First, that case held that that very rigorous standard of review is required only where a First Amendment freedom is alleged to have been infringed. The Court further noted that where the First Amendment is not implicated, the government may regulate an area so long as it has a "rational basis" for doing so. As explained in subsection B, Statutory Authority, below, this rule infringes upon no First Amendment interests, and consequently, the rule should be judged on a standard similar to the "rational basis" test laid out in Barnette. It was in fact just such a deferential standard which the Supreme Court used to examine the Board's health care rule in AHA. There, the Court found that even if it read Section 9 to find any ambiguity, it still would have deferred to the Board's "reasonable interpretation of the statutory text," and found the Board authorized under Sections 6 and 9 to enact the health care bargaining unit rule at issue. [41] No "grave and immediate danger" was found to be required prior to the Board enacting that rule. This ruling was also consistent with the Supreme Court's earlier holdings in Thorpe and Mourning, in which regulations promulgated under broadly phrased grants of authority needed to be only "reasonably related to the purposes of the enabling legislation." [42] For the reasons shown below, that standard is more than met in the present rule.

# B. The Board's Statutory Authority To Issue This Rule

The National Labor Relations Act does not directly address an employer's obligation to post a notice of its employees' rights arising under the Act or the consequences an employer may face for failing to do so. However, as stated, NLRA Section 6 empowers the Board to promulgate legislative rules "as may be necessary to carry out the provisions" of the Act. **29 U.S.C. 156**. A determination of necessity under Section 6 made by the Board, as administrator of the NLRA, is entitled to deference. See Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 86 (2002).

Furthermore, even in the absence of express rulemaking authority, "the power of an administrative agency to administer a congressionally created * * * program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress."Morton v. Ruiz, 415 U.S. 199, 231 (1974). Under the well-known test articulated by the Supreme Court in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), courts will defer to the Board's reasonable interpretation of a gap left by Congress in the NLRA.

An examination of the provisions of the whole law demonstrate how the notice-posting rule is a legitimate exercise of both legislative rulemaking authority under Section 6 and implied gap-filling authority under Chevron, 467 U.S. at 843. Section 1 of the NLRA explains that Congress deliberately chose the means of "encouraging the practice and procedure of collective bargaining" and "protecting the exercise of workers of full freedom of association, self-organization, and designation of representatives of their own choosing" in order to combat the substantial burdens on commerce caused by certain employer and labor union practices as well as by the inherent "inequality of bargaining power between employees * * * and employers." **29 U.S.C. 151**.[43] Section 7 therefore sets forth the core rights of employees "to self-organization"; "to form, join, or assist labor organizations"; "to bargain collectively"; and "to engage in other concerted activities"; as well as the right "to refrain from any or all such activities."Id.§ 157. Section 8 defines and prohibits union and employer "unfair labor practices" that infringe on employees' Section 7 rights, id.§ 158, and Section 10 authorizes the Board to adjudicate unfair labor practice claims, id.§ 160, subject to the NLRA's procedural six-month statute of limitations, see Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 395 n.11 (1982). Finally, Section 9 authorizes the Board to conduct representation elections and issue certifications. **29 U.S.C. 159**.

Notably, the NLRA does not give the Board or its General Counsel roving investigatory powers. Although the Board is specifically empowered to "prevent" unfair labor practices, id.§ 160(a), "[t]he Board may not act until an unfair labor practice charge is filed * * * alleging a violation of the Act." 2 The Developing Labor Law 2683 (John E. Higgins, Jr. ed., 5th ed. 2006). In addition, certification "procedures are set in motion with the filing of a representation petition."Id. at 2662. In both instances, the initiating document is filed by a private party. Id. at 2683 (citing **29 CFR 102.9**); id. at 2662-63 (citing **29 U.S.C. 159**(c)(1)(A), (B), and (e)(1)).

Enforcement of the NLRA and effectuation of Congress's national labor policy therefore depend on the existence of outside actors who are not only aware of their rights but also know where they may seek to vindicate them within appropriate timeframes. The Department of Labor made a similar finding in an analogous rulemaking proceeding under the Fair Labor Standards Act: "effective enforcement of the [FLSA] depends to a great extent upon knowledge on the part of covered employees of the provisions of the act and the applicability of such provisions to them, and a greater degree of compliance with the act has been effected in situations where employees are aware of their rights under the law." 14 FR 7516, 7516 (Dec. 16, 1949). Given the direct relationship between employees' timely awareness of their rights under the NLRA and the Board's ability to protect and enforce those rights, this rule is "necessary" for purposes of Section 6.

Aside from the rule's manifest necessity, the notice posting requirement fills a Chevron-type gap in the NLRA's statutory scheme. Thus, as discussed, the purpose of Section 1, as implemented in Sections 7 and 8, is to encourage the free exercise and enforcement of the Act's provisions, and fulfillment of that purpose depends on the private initiative of employees and employers to commence Board representation proceedings pursuant to Section 9 and Board unfair labor practice proceedings pursuant to Section 10. The effective working of the NLRA's administrative machinery therefore presupposes that workers and their employers have knowledge of the rights afforded by the statute and the means for their timely enforcement. The statute, however, has no provision with respect to making that knowledge available, a subject about which the statute is completely silent.

This statutory gap has always been present but was of less significance in earlier years when the density of union organization was greater, since, as is widely recognized, unions have been a traditional source of information about the NLRA's provisions. See Lechmere, Inc. v. NLRB, 502 U.S. 527, 531-32 (1992) (reaffirming that the Section 7 rights of employees interested in union organization depend to some extent on their having access to unions); Harlan Fuel Co., 8 N.L.R.B. 25, 32 (1938) (holding that the rights guaranteed to employees by Section 7 include "full freedom to receive aid, advice and information from others concerning [their self-organization] rights"); cf. Chamber of Commerce of the United States v. Brown, 554 U.S. 60, 68 (2008) (observing that Section 7 "implies an underlying right to receive information"). Moreover, as rates of unionization have declined, employees are less likely to have experience with collective bargaining or to be in contact with other employees who have had such experience. The statutory gap is thus now important to the Board's administration of the NLRA and its role in enforcing employees' rights.

As the Supreme Court has observed,

The responsibility to adapt the Act to changing patterns of industrial life is entrusted to the Board. * * * It is the province of the Board, not the courts, to determine whether or not the "need" [for a Board rule] exists in light of changing industrial practices and the Board's cumulative experience in dealing with labor-management relations. For the Board has the "special function of applying the

general provisions of the Act to the complexities of industrial life," and its special competence in this field is the justification for the deference accorded its determination.

NLRB v. J. Weingarten, Inc., 420 U.S. 251, 266 (1975) (citations omitted). Consistent with this understanding of the Board's role, the notice-posting regulations represent an attempt to "adapt the Act" in light of recent realities and "the Board's cumulative experience."Id. The rule is wholly consistent with the aims of the NLRA, and the "need" for it now is heightened given the "changing patterns of industrial life."Id.

For all these reasons, this rule is entitled to deference regardless of how it is characterized because it is "reasonably related to the purposes of the enabling legislation,"Thorpe, 393 U.S. at 280-81, and constitutes a " `reasonable interpretation' of the enacted text,"Mayo, 131 S. Ct. at 714 (quoting Chevron, 467 U.S. at 844).

In response to the NPRM, a number of arguments have been made challenging the Board's statutory authority to promulgate the notice posting rule. As explained below, the Board does not find merit in any of these arguments.

## 1. Limitations on the Board's Rulemaking Authority Implied by Sections 9 and 10 of the Act

Of the comments that address the Board's statutory authority to issue this rule, many express agreement with the dissenting views of Member Hayes that were published in the NPRM. Member Hayes criticized the basis for the rule and questioned the Board's statutory authority to promulgate and enforce it. See 75 FR 80415. He specifically referred to Section 10 as an obstacle to the proposed rule, because it "indicate[d] to [him] that the Board clearly lacks the authority to order affirmative notice-posting action in the absence of an unfair labor practice charge filed by an outside party."Id.

Many comments submitted in response to the NPRM, such as those of the Texas Association for Home Care & Hospice and those of the Independent Bakers Association, interpret Section 10 to prohibit the Board from ordering any affirmative act that does not address the consequences of an unfair labor practice. Although this proposition may be true when the Board acts through adjudication—the administrative function to which Section 10 directly applies—it does not perforce apply when the Board specifies affirmative requirements via rulemaking under Section 6. See Clifton v. FEC, 114 F.3d 1309, 1312 (1st Cir. 1997) ("Agencies are often allowed through rulemaking to regulate beyond the express substantive directives of the statute, so long as the statute is not contradicted.") (citing Mourning). If it did, then the Board's longstanding rule mandating that employers post an election notice three days before a representation election would be subject to challenge on that ground. See 29 CFR 103.20; see also Pannier Corp., Graphics Div. v. NLRB, 120 F.3d 603, 606-07 (6th Cir. 1997) (rejecting an as-applied challenge to § 103.20). Furthermore, under

American Hospital Association, the Board's exercise of its broad rulemaking authority under Section 6 is presumed to be authorized unless elsewhere in the Act there is "language expressly describing an exception from that section or at least referring specifically to the section." 499 U.S. at 613. Section 10 does not refer to the Board's Section 6 authority.

Some comments, such as those of the Council on Labor Law Equality (COLLE), contend that the Board has no authority whatsoever to administer the NLRA unless a representation petition or unfair labor practice charge has been filed under Sections 9 or 10, respectively. The Board declines to adopt such a narrow view of its own authority. Certainly, the Board cannot issue certifications or unfair labor practice orders via rulemaking proceedings. But that is not what this rule does. As explained above, by promulgating the notice-posting rule, the Board is taking a modest step that is "necessary to carry out the provisions" of the Act, 29 U.S.C. 156, and that also fills a statutory gap left by Congress in the NLRA.

Moreover, the argument advanced by COLLE and others fails to appreciate that the Board's authority to administer the Act is not strictly limited to those means specifically set forth in the NLRA. Rather, as the Supreme Court has recognized, the NLRA impliedly authorizes the Board to take appropriate measures "to prevent frustration of the purposes of the Act."NLRB v. Nash-Finch Co., 404 U.S. 138, 142 (1971). By way of example, the Supreme Court pointed out that its decisions had recognized the Board's implied authority to petition for writs of prohibition against premature invocation of the review jurisdiction of the courts of appeals, see In re NLRB, 304 U.S. 486, 496 (1938); to institute contempt proceedings for violation of enforced Board orders, see Amalgamated Util. Workers v. Con. Edison Co., 309 U.S. 261 (1940); and to file claims in bankruptcy for Board-awarded backpay, see Nathanson v. NLRB, 344 U.S. 25 (1952). Relying on that precedent in Nash-Finch Co., the Supreme Court concluded that the Board also had implied authority "to enjoin state action where [the Board's] federal power preempts the field." 404 U.S. at 144. Like these judicially recognized powers, the notice-posting requirement that is the subject of this rulemaking has not been specifically provided for by Congress. But the cited cases demonstrate that Congress need not expressly list a power for the Board to legitimately exercise it. Indeed, the notice-posting requirement is not even an implied power of the Board in the same sense as those previously mentioned. Rather, it is the product of the Board's exercise of express rulemaking authority and inherent gap-filling authority, both of which have been delegated to the Board by Congress.

## 2. The First Amendment and Section 8(c) of the NLRA

A handful of commenters argue that the notice-posting requirement violates the First Amendment to the Constitution, Section 8(c) of the NLRA, or both. For example, the Center on National Labor Policy, Inc. maintains that "compelling an employer to post its property with a Notice that asserts the statutory `rights' and employer obligations, runs counter to constitutional views long protected by the Supreme Court." The Center also argues that the "proposed poster would impede the employer's statutory right to express itself on its own property." Along these same lines, the

National Right to Work Legal Defense Foundation, Inc. and others on whose behalf it writes contend that "the Board's proposal for forced speech favoring unionization directly conflicts with the First Amendment and longstanding federal labor policy under Section 8(c) that employers and unions should be able to choose themselves what to say about unionization." These concerns were echoed by the National Association of Wholesaler-Distributors. In addition, two attorneys affiliated with Pilchak Cohen & Tice, P.C., which they describe as "a management-side labor and employment law firm," argue that the notice-posting requirement "tramples upon employers' Free Speech rights by regulating the content of information that employers are required to tell employees and by compelling them to post the Notice containing pro-union NLRA rights, when it is almost assuredly not the employers' prerogative to do so." The Independent Association of Bakers goes further and characterizes the regulation as an unconstitutional "gag order" that "prohibits the employer from telling the truth about the impact a union might pose to his business." The Board rejects these arguments.

As an initial matter, requiring a notice of employee rights to be posted does not violate the First Amendment, which protects the freedom of speech. Indeed, this rule does not involve employer speech at all. The government, not the employer, will produce and supply posters informing employees of their legal rights. The government has sole responsibility for the content of those posters, and the poster explicitly states that it is an "official Government Notice"; nothing in the poster is attributed to the employer. In fact, an employer has no obligation beyond putting up this government poster. These same considerations were present in Lake Butler Apparel Co. v. Secretary of Labor, 519 F.2d 84, 89 (5th Cir. 1975), where the Fifth Circuit rejected as "nonsensical" an employer's First Amendment challenge to the Occupational Safety and Health Act requirement that it post an "information sign" similar to the one at issue here. As in Lake Butler, an employer subject to the Board's rule retains the right to "differ with the wisdom of * * * this requirement even to the point * * * of challenging its validity. * * * But the First Amendment which gives him the full right to contest validity to the bitter end cannot justify his refusal to post a notice * * * thought to be essential."Id.; see also Stockwell Mfg. Co. v. Usery, 536 F.2d 1306, 1309-10 (10th Cir. 1976) (dicta) (rejecting a constitutional challenge to a requirement that an employer post a copy of an OSHA citation).

But even if the Board's notice-posting requirement is construed to compel employer speech, the Supreme Court has recognized that governments have "substantial leeway in determining appropriate information disclosure requirements for business corporations."Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n, 475 U.S. 1, 15 n.12 (1985). This discretion is particularly wide when the government requires information disclosures relevant to the employment relationship. Thus, as the D.C. Circuit has observed, "an employer's right to silence is sharply constrained in the labor context, and leaves it subject to a variety of burdens to post notices of rights and risks."UAW-Labor Employment & Training Corp. v. Chao, 325 F.3d 360, 365 (D.C. Cir. 2003) (UAW v. Chao) (citing Lake Butler, 519 F.2d at 89). Accordingly, the Board's notice-posting requirement is not susceptible to a First Amendment challenge.[44]

The Board is equally satisfied that the rule does not violate NLRA Section 8(c), **29 U.S.C. 158**(c), which creates a safe harbor for noncoercive speech in the unfair labor practice area. Specifically, Section 8(c) shields from unfair labor practice liability "[t]he expressing of any views, argument or opinion," provided that "such expression contains no threat of reprisal or force or promise of benefit."Id. (emphasis added). A government poster containing accurate, factual information about employees' legal rights "merely states what the law requires."Lake Butler, 519 F.2d at 89. For that reason, "[t]he posting of the notice does not by any stretch of the imagination reflect one way or the other on the views of the employer."Id. [45]

But even if the new rule is understood to compel employer speech, Section 8(c) "`merely implements the First Amendment.'"Brown, 554 U.S. at 67 (quoting NLRB v. Gissel Packing Co., 395 U.S. 575, 617 (1969)). Thus, if a First Amendment challenge to the rule must fail, so too must a challenge based on Section 8(c). Such was the holding of the D.C. Circuit in UAW v. Chao. There, the court was presented with a preemption argument, grounded in Section 8(c), challenging a Federal procurement regulation that required contractors to post a notice informing their employees of certain NLRA rights. The D.C. Circuit interpreted Section 8(c) as coextensive with the scope of free speech rights protected by the First Amendment and upheld the procurement regulation in light of well-established free speech jurisprudence in the labor context. See 325 F.3d at 365.

### 3. Lack of Contemporaneity With the Enactment of the NLRA

Several comments attack the notice-posting regulation for its lack of contemporaneity with the enactment of the NLRA. For example, many comments criticize the regulation by noting that "this is a new rule interpreted into the Act 75 years after its passage." The Board rejects these contentions for two reasons.

First, the Supreme Court has repeatedly "instructed that `neither antiquity nor contemporaneity with [a] statute is a condition of [a regulation's] validity.'"Mayo, 131 S. Ct. at 712 (alterations in original) (quoting Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 740 (1996)); see also Smiley, 517 U.S. at 740 (deferring to a regulation "issued more than 100 years after the enactment" of the statutory provision that the regulation construed). Second, the argument fails to consider that much has changed since 1935, the year the NLRA was enacted. Unionization rates are one example. As pointed out in the NPRM and as confirmed by comments submitted by the Association of Corporate Counsel's Employment and Labor Law Committee, unionization rates increased during the early years of the Act, peaking at around 35 percent of the workforce in the mid-1950s. But since then, the share of the workforce represented by labor unions has plummeted to approximately 8 percent. As a result, fewer employees today have direct, everyday access to an important source of information regarding NLRA rights and the Board's ability to enforce those rights.

As noted above, "[t]he responsibility to adapt the Act to changing patterns of industrial life is entrusted to the Board."J. Weingarten, Inc., 420 U.S. at 266. It would therefore be an abdication of

that responsibility for the Board to decline to adopt this rule simply because of its recent vintage. Accordingly, the Board finds such arguments unpersuasive.

## 4. Comparison With Other Statutes That Contain Notice-Posting Requirements

Many comments note, as the Board did in the NPRM, that several other labor and employment statutes enacted by Congress contain express notice-posting provisions. See **75 FR 80411** (listing such statutes). Though a few such comments, such as those of the International Brotherhood of Teamsters, applaud the Board for "fill[ing] this glaring and indefensible gap," the bulk of these comments instead argue that the lack of a parallel statutory provision in the NLRA negates the existence of Board authority to issue this rule.

The Board notes that inferences gleaned from side-by-side comparisons to other statutes have diminished force when an agency uses its gap-filling authority under Chevron. There are many possible reasons why Congress did not include an express notice-posting provision in the NLRA. "Perhaps that body consciously desired the [agency] to strike the balance at this level * * *; perhaps it simply did not consider the question at this level; and perhaps Congress was unable to forge a coalition on either side of the question * * *."Chevron, 467 U.S. at 865. But, "[f]or judicial purposes, it matters not which of these things occurred."Id. Indeed, the central premise behind Chevron and its progeny is that agencies should be allowed reasonable latitude to fill gaps arising from congressional silence or ambiguity. Accordingly, "the contrast between Congress's mandate in one context with its silence in another suggests not a prohibition but simply a decision not to mandate any solution in the second context, i.e., to leave the question to agency discretion."Cheney R.R. Co. v. ICC, 902 F.2d 66, 69 (D.C. Cir. 1990) (labeling the expressio unius est exclusio alterius canon "an especially feeble helper" in Chevron cases).

Arguments contrasting the NLRA with other federal enactments that contain notice-posting requirements might have some persuasive force if there were evidence that Congress had considered and rejected inserting such a requirement into the Act. However, nothing in the legislative history of the Act so indicates. Indeed, there is not the slightest hint that the omission of a notice-posting requirement was the product of legislative compromise and therefore implies congressional rejection of the idea. Cf. Ind. Prot. & Advocacy Servs. v. Ind. Family & Soc. Servs. Admin., 603 F.3d 365, 384-85 (7th Cir. 2010) (en banc) (Posner, J., concurring) (inferring a private right of action from statutory silence in a case where such silence was not the product of "legislative compromise"). For these reasons, the Board rejects the Motor and Equipment Manufacturers Association's unsupported suggestion that there has been an affirmative "legislative determination not to include a posting requirement by employers that have not violated the Act."

A number of comments point out that Congress included a general notice-posting provision in the Railway Labor Act (RLA), which predates the NLRA. Given the relative proximity of these two enactments, some comments regard the absence of a notice-posting provision in the NLRA as

strong evidence that Congress did not intend for there to be one. For reasons just explained, the Board does not find a side-by-side comparison with the RLA availing. In addition, the Board notes that although the NLRA and the RLA share several common features, the NLRA was not perfectly modeled after the RLA. See Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co., 353 U.S. 30, 31 n.2 (1957) ("The relationship of labor and management in the railroad industry has developed on a pattern different from other industries. The fundamental premises and principles of the Railway Labor Act are not the same as those which form the basis of the National Labor Relations Act * * *.").

Finally, the Board notes that other federal departments and agencies have not understood Congress's failure to include an express provision containing a notice-posting requirement in a federal labor or employment statute as a bar to such a regulatory requirement. Like the NLRA, the Fair Labor Standards Act (FLSA), which was passed in 1938, does not contain a provision requiring employers to post a notice of pertinent employee rights. Yet the Department of Labor adopted a notice requirement now codified at __29 CFR 516.4__. Furthermore, the Board is unaware of any challenge to the Labor Department's authority to promulgate or enforce the FLSA notice requirement, which has been in effect for over 60 years. See 14 FR 7516 (Dec. 16, 1949), promulgating __29 CFR 516.18__, the predecessor to __29 CFR 516.4__.

## 5. The Teamsters 357 Decision

In response to the NPRM, the U.S. Chamber of Commerce submitted a comment that questions "how the proposal can be said to be consistent with" the Supreme Court's decision in Local 357, International Brotherhood of Teamsters v. NLRB, 365 U.S. 667 (1961). Specifically, the Chamber accuses the Board of ignoring the Court's admonition in that case warning that "[w]here * * * Congress has aimed its sanctions only at specific discriminatory practices, the Board cannot go farther and establish a broader, more pervasive regulatory scheme."Id. at 675. The Chamber reads this statement out of context.

To understand why the Board disagrees with the Chamber's view, further explanation of Teamsters 357 is necessary. In that case, the Supreme Court rejected the Board's conclusion that a union had committed an unfair labor practice by operating an exclusive hiring hall pursuant to an agreement that contained a nondiscrimination clause but not three additional clauses that the Board had previously declared in its Mountain Pacific decision to be necessary to prevent " 'unlawful encouragement of union membership.' "Id. at 671 (quoting Mountain Pacific Chapter, 119 NLRB 883, 897 (1958)). The Court first noted that Congress had examined the operation of hiring halls and had decided not to ban them. Id. at 673-74. Next, the Court observed that NLRA Section 8(a)(3) " `does not outlaw all encouragement or discouragement of membership in labor organizations; only such as is accomplished by discrimination is prohibited.' "Id. at 674-75 (emphasis added) (quoting Radio Officers' Union v. NLRB, 347 U.S. 17, 42-43 (1954)). Since the hiring hall agreement at issue in Teamsters 357"specifically provide[d] that there will be no discrimination * * * because of

the presence or absence of union membership," the Court determined that the Board was attempting to protect against nondiscriminatory encouragement of union membership. Id. at 675. This was impermissible because "[w]here * * * Congress has aimed its sanctions only at specific discriminatory practices, the Board cannot go farther and establish a broader, more pervasive regulatory scheme."Id. at 676.

Properly understood, Teamsters 357 does not preclude the Board from issuing the notice posting rule. The union had not committed an unfair labor practice in that case because its hiring hall agreement did not encourage or discourage union membership by "discrimination."See id. at 674-75. By faulting the union for not including in its agreement clauses that the Board's Mountain Pacific rule had declared necessary to prevent " `unlawful encouragement of union membership,' "id. at 671 (quoting Mountain Pacific Chapter, 119 NLRB at 897), the Board had attempted to regulate hiring halls in a manner that was facially inconsistent with the discrimination requirement embedded in NLRA Section 8(a)(3) and (b)(2). Accordingly, the Chamber makes too much of the Court's statement prohibiting the Board from "establish[ing] a broader, more pervasive regulatory scheme" when "specific discriminatory practices" have already been outlawed. Id. at 676. By that, the Court simply meant to remind the Board that it may not administratively amend Section 8(a)(3) and (b)(2) to prohibit nondiscriminatory activity that might be viewed as undesirable because those statutory sections are clearly aimed only at "specific discriminatory practices."Id. [46]

This rulemaking does not involve those provisions of the NLRA that Teamsters 357 addressed. Accordingly, the Board does not view that case as controlling the outcome of this proceeding.

## 6. Miscellaneous Matters

The Center on National Labor Policy, Inc., argues that the Board "must be mindful of the Supreme Court's admonition in Lechmere[, Inc.] v. NLRB, 502 U.S. 527, 534 (1992), that an employer possesses First Amendment rights to its property." The Board disagrees that the property rights discussed in Lechmere emanate from the First Amendment, see Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 217 n.21 (1994) ("The right of employers to exclude union organizers from their private property emanates from state common law * * *."), and to the extent that the Center's reference to the First Amendment asserts a conflict between these regulations and employers' right to free speech, that argument is rejected for reasons explained above. After quoting extensively from Lechmere, the Center next contends that "if a union has no access to company property to communicate with employees, neither does the Board without Section 10(c) authority." The Board rejects this argument because it fails to recognize the important substantive difference between the conduct at issue in Lechmere, which involved " `trespassory organizational activity' " by nonemployees on the employer's grounds, id. at 535 (quoting Sears, Roebuck & Co. v. San Diego Dist. Council of Carpenters, 436 U.S. 180, 205 (1978)), and the regulations here which involve nothing more than the employer's responsibility to post an official notice of legal rights.

The Portland Cement Association (PCA) comments that the Board's failure to place the three law review articles that the Board cited to the NPRM [47] in the administrative docket is arbitrary and capricious. Although the Board provided the legal citations for these articles, PCA believes that it should not have to pay an electronic legal reporting service to access the material. The Board has placed these articles in the hard copy docket, but has not uploaded these articles to the electronic docket at **http://www.regulations.gov**, because such an action could violate copyright laws. [48]

Finally, one comment contends that requiring employers to set aside wall space for posting the notices violates the Takings Clause of the Fifth Amendment to the U.S. Constitution. The comment cites no authority for this proposition, which would seem to invalidate the notice-posting requirements under all other Federal and state workplace statutes. Accordingly, the Board rejects this contention.

In conclusion, the Board believe that it has fully demonstrated that it possesses sufficient statutory authority to enact the final rule, and therefore that it is not "in excess of statutory jurisdiction" or "short of statutory right" within the meaning of the Administrative Procedure Act, Section 706(2) (C), **5 U.S.C. 706**(2)(C).

## C. Factual Support for the Rule

As stated above, the Board found that the notice posting rule is needed because it believes that many employees are unaware of their NLRA rights and therefore cannot effectively exercise those rights. The Board based this finding on several factors: the comparatively small percentage of private sector employees who are represented by unions and thus have ready access to information about the NLRA; the high percentage of immigrants in the labor force, who are likely to be unfamiliar with workplace rights in the United States; studies indicating that employees and high school students about to enter the work force are generally uninformed about labor law; and the absence of a requirement that, except in very limited circumstances, employers or anyone else inform employees about their NLRA rights. **75 FR 80411**.

A large number of comments contend that the Board failed to demonstrate the necessity of the notice posting rule. They challenge each of the premises (except the last) underlying the Board's belief that employees are generally unaware of their NLRA rights.

Many comments assert that, contrary to the Board's belief, the right to join a union is widely known and understood by employees. For example:

—I believe the majority of employees know about labor unions and how to form a union, and this poster is unnecessary. [49]

—[I]t is hard to imagine that there are many in the US who do not know that they can try to join a union.

—The fact of the matter is that if a group of employees are upset enough with their current management that they feel they need union representation, they already know what they need to do as a recourse. And if they do not immediately know how to respond, there are plenty of resources for them.[50]

—We, the employees, know the unions exist, * * * If the employees want to know about unions, they should research it themselves. It is not as though the information is not readily available.

Some posit that comparatively few private sector employees are represented by unions not because employees do not know that they can join unions, but because they have consciously rejected union representation for any number of reasons (e.g., they do not believe that unions can help them; they do not want to pay union dues; they deem union representation unnecessary in light of other workplace protection statutes). For example:

—Is it not just as probable that people clearly understand unions, and they have decided they want no part of them?

—Labor unions charge approximately 1.3% of pre-tax earnings for monthly dues. Many workers, especially those who lost their good paying jobs during this recession and have found new jobs at $10.00-$11.00 per hour wages, need the dues money themselves, in order to support their families.

—Membership is down because so many of the good things unions fought for a long time ago have been legislated, at either the Federal or State level, and so the need for unions has declined.[51]

—[M]ost employees are very aware of their rights to unionize and many employees choose not to do so because of the rights they already have under our federal and state laws.

—In fact, one could say that the NLRA and other employment laws have succeeded to the degree that unions are NOT necessary in today's work environment.[52]

A few comments question the Board's belief that immigrant workers are unfamiliar with their workplace rights.[53] Several comments argue that the NLRA has been in effect for nearly 76 years, which is sufficient time for employees to learn about its provisions.[54]

A number of comments argue that the studies cited in the NPRM are from the late 1980s and early 1990s and are therefore out of date[55] (and also, some say, poorly supported).[56] Moreover, those studies, whatever their value when published, predate the wide use of the internet. Now there are many online sources of information concerning unions and union organizing, including the Board's own Web site. According to these comments, it should not be necessary to require employers to

post notices of NLRA rights because employees who are interested in learning about unions can quickly and easily find such information online.[57] One comment, like some others, argues that "If it is so important that employees know their rights under the NLRB it should be the government or union whose responsibility it is to inform them."[58] Two comments suggest that the Board conduct a mass media informational campaign to that end, and one notes that the Board has in fact recently increased its public information efforts.[59] One comment urges the Board to conduct a study to ascertain current employees' level of NLRA knowledge before imposing a notice posting requirement.

In contrast, as discussed in more detail below, numerous comments from individuals, union organizers, attorneys representing unions, and worker assistance organizations agree with the Board that most employees are unfamiliar with their NLRA rights. Immigrant rights organizations state that immigrant workers largely do not know about their rights.

After careful consideration of the comments on both sides of this issue, the Board believes that many employees are unaware of their NLRA rights and that a notice posting requirement is a reasonable means of promoting greater knowledge among employees. To the extent that employees' general level of knowledge is uncertain, the Board believes that the potential benefit of a notice posting requirement outweighs the modest cost to employers. Certainly, the Board has been presented with no evidence persuasively demonstrating that knowledge of NLRA rights is widespread among employees.

The comments asserting that the right to join a union is widely known cite little, if any, support for that assertion. By contrast, many of the comments contending that employees are unfamiliar with their NLRA rights base their statements on personal experience or on extensive experience representing or otherwise assisting employees. Many individual workers, commenting on the rule, indicate their personal experiences with the lack of NLRA knowledge and concurrent strong support for the rule. For example:

—Even though most of my coworkers and supervisors were highly intelligent people, it is my experience that most workers are almost totally unaware of their rights under the NLRA.

—Knowing that there is a federal agency out there that will protect the rights of working people to organize is essential to the exercise of those rights.

—I had no idea that I had the right to join a union, and was often told by my employer that I could not do so. * * * I think employers should be required to post notices so that all employees may make an informed decision about their rights to join a union.[60]

—Workers have rights and they have the right to know them.[61]

—[T]here is a lot of ignorance among young workers and veteran workers alike with regard to knowledge of their right to organize. This is not a cure for employer intimidation, * * * but it is a step in the right direction.

—As an employee at will, I was not aware of my rights to form a union or any rights that I may have had under the NLRA.[62]

—I worked in the construction materials testing industry for about eight years. During that time I had no idea I had the right to join a union.[63]

—As a working class citizen, I am well aware of just how rare it is for my fellow workers to know their rights. For that reason, this is a rule that is extremely overdue. * * *.

A sampling of comments from labor attorneys, workers' organizations, and labor organizations is consistent with these employees' comments:

—It is my experience that upwards of 95% of employees have no idea what their rights are with respect to labor unions.[64]

—In fact, I have had many employees over the years tell me that their employers have told them that they do not allow unions at their workplace.[65]

—Workers today do not know what their rights are under the NLRA. As a Union organizer with more than 20 years of experience, without exception, every worker I encounter thinks that it is perfectly legal for their employer to fire them simply for saying the word union, or even to speak with other employees at work about general working conditions. The protections afforded workers to engage in protected concerted activity around workplace issues is unknown to the majority of workers today.[66]

—It is the experience of [Service Employees International Union (SEIU) Local 615] that many employees are woefully unaware of their rights under the NLRA and that that lack of knowledge makes employees vulnerable when they desire to address their wages and working conditions with the employers.[67]

—I have participated in hundreds of organizing campaigns involving thousands of employees. In my experience, most people had no idea what their rights were to organize or join unions.[68]

Some unions also assert that even unionized employees often do not have a clear understanding of the NLRA. One union staff representative writes that "there seems to be a disconnect, most of our membership does not know a thing about NLRA."[69] Another union steward comments similarly:

I saw how union members were often unaware of their rights unless the union specifically did outreach and member education, or unless the employee ran into a problem and came to a steward for assistance. * * *

Notice to employees, however, could provide a starting point for those employees to try to assert rights that they currently have on paper but often do not have in practice.

Several immigrant workers' organizations comment on the difficulty that this population has in understanding their rights and accessing the proper help when needed.[70] These organizations note that laws in the immigrants' home countries may be quite different from those of the United States, and the high barrier that lack of fluency in English creates in making these persons aware of their rights under the NLRA.[71] These organizations also contend that because guestworkers in particular can work only for the employer that requested their visa, they are extremely vulnerable to labor violations, and that these employers routinely misrepresent the existence of NLRA rights.[72] The National Day Laborers Organizing Network claims that "most workers are not aware of their right to organize."

One immigrant construction worker, commenting favorably on the proposed rule, explains that she learned English after coming to the United States from Poland: "While working as a testing technician, I had no idea I had the right to join a union." She writes:

I think a government written notice posted in the workplace would be a critical source of information for employees who want to join a union. Especially in this industry where many people like myself are foreign born, there is a language barrier that adds to the difficulty in understanding our legal rights. I take government posted notices seriously and believe other people do as well.[73]

Significantly, the Board received numerous comments opposing the rule precisely because the commenters believe that the notice will increase the level of knowledge about the NLRA on the part of employees. Specifically, they predict that the rule will lead to increased unionization and create alleged adverse effects on employers and the economy generally. For example, Baker and Daniels LLP comments that as more employees become aware of their NLRA rights, they will file more unfair labor practice charges and elect unions to serve as their collective-bargaining representatives. But fear that employees may exercise their statutory rights is not a valid reason for not informing them of their rights.

Moreover, the NLRA protects the right to join a union and to refrain from doing so and the notice so states. In addition, the NLRA confers and protects other rights besides the right to join or refrain from joining unions. Section 7 provides that employees have the right "to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection[.]" Such protected concerted activities include concertedly complaining or petitioning to management concerning their terms and conditions of employment;[74] concertedly petitioning government

concerning matters of mutual interest in the workplace;[75] and concertedly refusing to work under poor working conditions.[76] Few if any of the comments contending that employees know about their NLRA rights assert that employees are aware of the right to engage in such protected concerted activities in the nonunion setting. By contrast, as shown above, many comments favoring the rule report that nonunion employees are especially unlikely to be aware of their NLRA rights.

Although some comments contend that the articles cited by the Board in support of its belief that employees are largely unaware of the NLRA rights are old and inadequately supported,[77] they cite no more recent or better supported studies to the contrary. In addition, the percentage of the private sector workforce represented by unions has declined from about 12 percent in 1989, about the time the articles cited in the NPRM were published, to 8 percent presently;[78] thus, to the extent that lack of contact with unions contributed to lack of knowledge of NLRA rights 20 years ago, it probably is even more of a factor today.[79]

In support of their contention that NLRA rights are widely known among employees, several comments observe that the Board's processes for holding representation elections and investigating and remedying unfair labor practices are invoked tens of thousands of time a year.[80] That is true. However, the civilian work force includes some 108 million workers potentially subject to the NLRA.[81] Thus, the number of employees who invoke the Board's processes make up only a small percentage of the covered workforce. Accordingly, the Board does not consider the number of times the Board's processes are invoked to be persuasive evidence that workers generally are aware of their NLRA rights.

Finally, remarks in multiple opposing comments strongly suggest that the commenters themselves do not understand the basic provisions of the NLRA:

—If my employees want to join a union they need to look for a job in a union company.[82]

—[a]nytime one of our independent tradesmen would like to join the union they are free to apply and be hired by a union contractor.

—If a person so desires to be employed by a union company, they should take their ass to a union company and apply for a union job.

—Belonging to a union is a privilege and a preference—not a right.[83]

—If they don't like the way I treat them, then go get another job. That is what capitalism is about. [84]

—We are not anti-union; but feel as Americans, we must protect our right not to be signatory to a third party in our business.[85]

—If one desires to be a part of a union, he or she is free to apply to those companies that operate with that form of relationship.[86]

—I also believe employees already have such notice by understanding they retain the right to change employers whenever they so choose.[87]

These comments reinforce the Board's belief that, in addition to informing employees of their NLRA rights so that they may better exercise those rights, posting the notice may have the beneficial side effect of informing employers concerning the NLRA's requirements.[88]

As to the contention that information concerning unions is widely available on the internet, including on the Board's Web site, the Board responds that not all employees have ready access to the internet. Moreover, it is reasonable to assume that an employee who has no idea that he or she has a right to join a union, attempt to organize his employer's workforce, or engage in other protected concerted activities, would be less likely to seek such information than one who is aware of such rights and wants to learn more about them.[89] The Board is pleased that it has received a large number of inquiries at its Web site seeking information concerning NLRA rights, but it is under no illusion that that information will reach more than a small fraction of the workforce in the foreseeable future.

Several comments assert that, in any event, requiring the posting of notices will not be effective in informing employees of their rights, because employees will simply ignore the notices, as the comments contend they ignore other workplace postings. "Posters are an ineffective means of educating workers and are rarely read by employees."[90] Other comments argue that adding one more notice to the many that are already mandated under other statutes will simply create more "visual clutter" that contributes to employees' disinclination to pay attention to posted notices. As one employer stated, "My bulletin boards are filled with required notifications that nobody reads. In the past 15 years, not one of our 200 employees has ever asked about any of these required postings. I have never seen anyone ever read one of them."[91] Another wrote, "Employers are already required to post so many notices that these notices have lost any semblance of effectiveness as a governmental communication channel."

To these comments, the Board responds that the experiences of the commenters is apparently not universal; other comments cited above contend that employees are more knowledgeable about their rights under statutes requiring the posting of notices summarizing those rights than about their NLRA rights. Moreover, not every employee has to read workplace notices for those notices to be effective. If only one employee of a particular employer reads the Board's notice and conveys what he or she has read to the other employees, that may be enough to pique their interest in learning more about their NLRA rights. In addition, the Board is mandating electronic notice to employees on an internet or intranet site, when the employer customarily communicates with its employees about personnel rules or policies in that way, in order to reach those who read paper notices and

those who read electronic postings. As for the comment that argues that the Board can use public service announcements or advertising to reach employees, the Board believes that it makes much more sense to seek to reach directly the persons to whom the Act applies, in the location where they are most likely to hear about their other employment rights, the workplace. [92]

Some comments argue that the Board's notice posting rule does not go far enough to effectuate the NLRA. One labor attorney argues that the Board should require annual trainings for supervisors and captive audience meetings where employees are read their rights by supervisors and Board agents and the employees would have to acknowledge receiving those notices. [93] The same comment suggests banning captive audience meetings by employers. The comment concludes that the NPRM "doesn't go anywhere near far enough. It is, however, an important and worthwhile advancement." [94] Another comment also suggests that annual, mandatory training classes for employees would be desirable. [95] The Board believes that this Rule strikes the proper balance in communicating necessary information about the NLRA to employees.

For all the foregoing reasons, the Board is persuaded that many private sector employees are unaware of their NLRA rights. [96]

# III. Summary of Final Rule and Discussion of Related Comments

The Board's rule, which requires employers subject to the NLRA to post notices of employee rights under the NLRA, will be set forth in Chapter 1, Part 104 of Volume 29 of the Code of Federal Regulations (CFR). Subpart A of the rule sets out definitions; prescribes the size, form, and content of the employee notice; and lists the categories of employers that are not covered by the rule. Subpart B sets out standards and procedures related to allegations of noncompliance and enforcement of the rule. The discussion below is organized in the same manner and explains the Board's reasoning in adopting the standards and procedures contained in the regulatory text, including the Board's responses to the comments received.

# Subpart A—Definitions, Requirements for Employee Notice, and Exceptions From Coverage Definitions

## A. The Definitions

For the most part, the definitions proposed in the rule are taken from those appearing in Section 2 of the NLRA, 29 U.S.C. 152. No comments were received concerning those definitions, and they are unchanged in the final rule. A number of comments were received concerning the definition of other terms appearing in the rule. Those comments are addressed below.

# B. Requirements for Employee Notice

## 1. Content Requirements

The notice contains a summary of employee rights established under the NLRA. As explained above, the Board believes that requiring notice of employee rights is necessary to carry out the provisions of the NLRA. Accordingly, § 104.202 of the proposed rule requires employers subject to the NLRA to post and maintain the notice in conspicuous places, including all places where notices to employees are customarily posted, and to take reasonable steps to ensure that the notices are not altered, defaced, or covered by any other material, or otherwise rendered unreadable.

As stated in the NPRM, the Board considered the substantive content and level of detail the notice should contain regarding NLRA rights. In arriving at the content of the notice of employee rights, the Board proposed to adopt the language of the Department of Labor's final rule requiring Federal contractors to post notices of employees' NLRA rights. **29 CFR part 471**. In the NPRM, the Board explained that it tentatively agreed with the Department of Labor that neither quoting the statement of employee rights contained in Section 7 of the NLRA nor briefly summarizing those rights in the notice would be likely to effectively inform employees of their rights. Rather, the language of the notice should include a more detailed description of employee rights derived from Board and court decisions implementing those rights. The Board also stated that it saw merit in the Department of Labor's judgment that including in the notice examples, again derived from Board and court decisions, of conduct that violates the NLRA will assist employees in understanding their rights. **75 FR 80412**.

Prior to issuing the NPRM, the Board carefully reviewed the content of the notice required under the Department of Labor's final rule, which was modified in response to comments from numerous sources, and tentatively concluded that that notice explains employee rights accurately and effectively without going into excessive or confusing detail. The Board therefore found it unnecessary, for purposes of the proposed rulemaking, to modify the language of the notice in the Department of Labor's final rule. Moreover, the Board reasoned that because the notice of employee rights would be the same under the Board's proposed rule as under the Department of Labor's rule, Federal contractors that have posted the Department of Labor's required notice would have complied with the Board's rule and, so long as that notice is posted, would not have to post a second notice. Id.

The proposed notice contained examples of general circumstances that constitute violations of employee rights under the NLRA. Thus, the Board proposed a notice that provided employees with more than a rudimentary overview of their rights under the NLRA, in a user-friendly format, while simultaneously not overwhelming employees with information that is unnecessary and distracting in the limited format of a notice. As explained below, the Board also tentatively agreed with the Department of Labor that it is unnecessary for the notice to include specifically the right of employees who are not union members and who are covered by a contractual union-security clause

to refuse to pay union dues and fees for any purpose other than collective bargaining, contract administration, or grievance adjustment. See Communications Workers v. Beck, 487 U.S. 735 (1988). Id. at 80412-80413.

The Board specifically invited comment on the statement of employee rights proposed for inclusion in the required notice to employees. In particular, the Board requested comment on whether the notice contains sufficient information of employee rights under the NLRA; whether it effectively conveys that information to employees; and whether it achieves the desired balance between providing an overview of employee rights under the Act and limiting unnecessary and distracting information. Id. at 80413.

The proposed Appendix to Subpart A included Board contact information and basic enforcement procedures to enable employees to learn more about their NLRA rights and how to enforce them. Thus, the required notice confirmed that unlawful conduct will not be permitted, provided information about the Board and about filing a charge with the Board, and stated that the Board will prosecute violators of the NLRA. The notice also indicated that there is a 6-month statute of limitations for filing charges with the Board alleging violations and provided Board contact information. The Board invited suggested additions or deletions to these provisions that would improve the content of the notice of employee rights. Id.

The content of the proposed notice received more comments than any other single topic in the proposed rule. But of the thousands of comments that address the content of the notice, the majority are either very general, or identical or nearly identical form letters or "postcard" comments sent in response to comment initiatives by various interest groups, including those representing employers, unions, and employee rights organizations. Many comments from both individuals and organizations offer general support for the content of the proposed notice, stating that employee awareness of basic legal rights will promote a fair and just workplace, improve employee morale, and foster workforce stability, among other benefits.[97] More specifically, one comment asserts that the proposed notice "contains an accurate, understandable and balanced presentation of rights."[98] The United Transportation Union contends that the "notice presents an understandable, concise and extremely informative recitation of workers' rights, without getting bogged down in extraneous language, incomprehensible legalese or innumerable caveats and exceptions."

Other comments were less supportive of the content of the proposed notice and the notice-posting requirement in general. A significant number of comments, including those from many individuals, employers, and employer industry and interest groups, argue that the content of the notice is not balanced, and appears to promote unionization instead of employee freedom of association. In particular, many comments state that Section 7 of the NLRA includes the right to refrain from union activity, but claim that this right is given little attention in comparison to other rights in the proposed notice. Several comments also argue that the proposed notice excludes rights associated with an anti-union position, including the right to seek decertification of a bargaining representative,

the right to abstain from union membership in "right-to-work" states, and rights associated with the Supreme Court's decision in Communications Workers v. Beck. [99] Comments also suggest that the notice should include a warning to employees that unionizing will result in a loss of the right to negotiate directly with their employer. [100] Many of these comments argue that a neutral government position on unionization would be more inclusive of anti-union rights. [101]

A number of comments address the issue of complexity, and argue that the Board's attempt to summarize the law is flawed because the Board's decisional law is too complex to condense into a single workplace notice. [102] Some of the comments addressing this issue note that NLRA law has been developed over 75 years, and involves interpretations by both the NLRB and the Federal courts, sometimes with conflicting results. The Chamber of Commerce cites the "NLRB's Basic Guide to the National Labor Relations Act: General Principles of Law Under the Statute and Procedures of the National Labor Relations Board" (Basic Guide to the NLRA) (1997), available at **http://www.nlrb.gov/publications/brochures**, to make their point about legal complexity. In the Foreword to the Basic Guide to the NLRA, the Board's General Counsel states that "[a]ny effort to state basic principles of law in a simple way is a challenging and unenviable task. This is especially true about labor law, a relatively complex field of law." The thrust of these comments about legal complexity was that the NLRA is complex, dynamic, and nuanced, and any attempt to summarize it in a workplace notice will result in an oversimplification of the law and lead to confusion, misunderstanding, inconsistencies, and some say, heightened labor-management antagonism. Moreover, some comments express concern that Board member turnover could result in changes to the law, which may require frequent updates to the notice. [103]

Many comments suggest that the required notice should include only the specific rights contained in Section 7 of the NLRA or, at most, the rights and obligations stated in employee advisories on the NLRB's Web site. The comments favoring a more general notice suggest that the detailed list of rights far exceeds the "short and plain" description of rights that the Board has found sufficient to "clearly and effectively inform employees of their rights under the Act" in unfair labor practice cases. [104] See Ishikawa Gasket America, Inc., 337 NLRB 175 (2001), enfd. 354 F.3d 534 (6th Cir. 2004). A comment from Fisher & Phillips LLP argues that, under the Board's current remedial practices, only an employer that egregiously violates the Act on numerous occasions is required to post such an inclusive list of rights.

Finally, a number of comments suggest that the notice should include a list of employer rights, namely the right to distribute anti-union literature and the right to discuss the company's position regarding unions.

In addition to the general comments about the proposed notice, many comments offer suggestions for specific revisions to individual provisions within the five sections of the proposed notice: the introduction, the statement of affirmative rights, the examples of unlawful conduct, the collective-

bargaining provision, and the coverage information. The following discussion presents the comments related to individual provisions of the notice, followed by the Board's decisions regarding the content of the final notice made in response to those comments.

## a. Comments Regarding the Introduction

The introduction to the notice of rights in the proposed rule stated:

The National Labor Relations Act (NLRA) guarantees the right of employees to organize and bargain collectively with their employers, and to engage in other protected concerted activity. Employees covered by the NLRB are protected from certain types of employer and union misconduct. This Notice gives you general information about your rights, and about the obligations of employers under the NLRA. Contact the National Labor Relations Board (NLRB), the Federal agency that investigates and resolves complaints under the NLRA, using the contact information supplied below, if you have any questions about specific rights that may apply in your particular workplace.

75 FR 80418-80419 (footnote omitted).

The Board received a few suggestions for changes to the introduction of the notice. The first comment suggests including language stating that employees are required to contact their "executive manager" or "administrative team" before contacting the NLRB and suggests that the NLRB refuse to process employees' complaints until the employees first raise the issue with his or her "management team." The second comment, from COLLE, urges the Board to add language in the introduction alerting employees that they also have the right to refrain from engaging in union activity. The comment suggests that by not including the right to refrain from union activity in the introduction, the Board is showing a bias toward union organizing. The comment argues that a more neutral notice would include both the right to engage and not engage in union activity at the beginning of the document, rather than wait to first mention the right to refrain in the affirmative rights section.

The Board does not agree with the proposal that employees be required to contact management officials as a prerequisite to contacting the Board. Such a procedural requirement is not contemplated in the NLRA and could discourage employees from exercising or vindicating their rights.

The Board agrees, however, that the introduction should include both the rights to engage in union and other concerted activity and the right to refrain from doing so. The Board believes that adding the right to refrain to the introduction will aid in the Board's approach to present a balanced and neutral statement of rights. Accordingly, the first sentence in the introduction to the notice in the final rule will state:

The National Labor Relations Act (NLRA) guarantees the right of employees to organize and bargain collectively with their employers, and to engage in other protected concerted activity or to refrain from engaging in any of the above activity.

## b. Comments Regarding Affirmative Statement of Rights

The proposed notice contains the following statement of affirmative rights:Under the NLRA, you have the right to:

Organize a union to negotiate with your employer concerning your wages, hours, and other terms and conditions of employment.

Form, join or assist a union.

Bargain collectively through representatives of employees' own choosing for a contract with your employer setting your wages, benefits, hours, and other working conditions.

Discuss your terms and conditions of employment or union organizing with your co-workers or a union.

Take action with one or more co-workers to improve your working conditions by, among other means, raising work-related complaints directly with your employer or with a government agency, and seeking help from a union.

Strike and picket, depending on the purpose or means of the strike or the picketing.

Choose not to do any of these activities, including joining or remaining a member of a union.

75 FR 80419.

The majority of comments addressing the affirmative rights section were general and did not specifically address the language of the individual provisions. Generally, labor organizations and employee advocate groups favor the Board's language. A comment from the United Food and Commercial Workers International Union asserts that the approach "achieves an appropriate balance between providing sufficiently clear information about employee's basic statutory rights and limiting unnecessary and confusing information about peripheral rights." On the other hand, comments from employer groups do not favor the Board's language. More specifically, employer groups argue that the notice is biased toward union organizing. Generally, the comments argue that the right to refrain from engaging in union activity should have a more prominent place on the notice, rather than being the last of the rights listed on the poster. Many of these comments contend that the notice should include the right not to engage in specific union-related activities.

Other comments about the notice's statement of affirmative rights are directed at individual provisions of the notice. A discussion of those comments is set out in more detail below.

## i. The Right To Organize and the Right To Form, Join and Assist a Union

A few comments generally state that the notice should include the consequences of exercising the right to organize, join or form a union.[105] For example, several comments argue that employees should be informed that if they join a union they give up the right to deal directly with their employers. Another comment argues that employees should be informed of the cost of organizing a union, including the cost of dues and the potential for the company to shut down because of increased labor costs associated with a unionized workforce. Other comments suggest including language informing employees that they can be fired for not paying their union dues.

The Board rejects those suggestions. The notice is intended to inform employees of the rights that they have under the NLRA and does not include the benefits or consequences of exercising any of the enumerated rights. Adding the consequences of one right would require revising the entire notice to include potential consequences—both positive and negative—of all the protected rights. For example, the notice would need to include the consequences of refraining from joining a union, such as not being permitted to vote on contract ratifications or attend union membership meetings. The necessary additions to the notice would create a notice that is not a concise list of rights, but more likely a pamphlet-sized list of rights and explanations. In addition, the consequences of unionization are unique to each unionized workplace, so it would be impossible to include a list of general consequences that could apply uniformly to all unionized workplaces. If employees have questions about the implications of any of their rights, they can contact an NLRB regional office.

Assisted Living Federation of America (ALFA) suggests that the affirmative rights section should be revised to reflect the anti-union position. For example, rather than the current provision that states that employees have a right to "[o]rganize a union to negotiate with your employer concerning your wages, hours, and other terms and conditions of employment," the comment suggests the following provision: "you have the right to organize with other employees in opposition to a particular union or unions." And "you have the right to: refuse to form, join, or assist a union, including the right to refuse to sign a union card, attend a union meeting or supply a union with information concerning you, your co-worker or your job," rather than "[you have the right to] [f]orm, join or assist a union." The Board disagrees. The Board's proposed notice language reflects the language of the NLRA itself, which specifically grants affirmative rights, including nearly all of those listed in the notice. Also, the notice, like the NLRA, states that employees have the right to refrain from engaging in all of the listed activities. The Board therefore sees no need to recast the notice to further emphasize the right to oppose unions.

## ii. The Right To Bargain Collectively

Two comments suggest that the collective-bargaining provision is misleading and vague. The first comment, from COLLE, argues that the provision is misleading because it fails to acknowledge that an employer does not have an obligation under the NLRA to consent to the establishment of a collective-bargaining agreement, but instead only has the statutory duty to "meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. 158(d). The comment also argues that the failure to reach an agreement is not per se unlawful, and the finding of an unfair labor practice depends on whether the parties engaged in good-faith bargaining. This comment suggests that the notice should instead note that the NLRA requires parties to bargain in good faith but does not compel agreement or the making of concessions, and that, in some instances, a bargaining impasse will result, permitting the parties to exercise their economic weapons, such as strikes or lockouts. The second comment, made generally by more than a few organizations and individuals, suggests that the notice add a statement indicating that employers and unions have an obligation to bargain in good faith.

The Board finds it unnecessary to add the suggested amplifications. For one thing, the notice does state that employers and unions have a duty to bargain in good faith, "in a genuine effort to reach a written, binding agreement setting your terms and conditions of employment." In the Board's view, the statement that the parties must make a "genuine effort" to reach agreement necessarily implies that they are not, in the end, required to reach one. The Board deems the notice language to be adequate on this point. Finally, for the reasons already discussed, the Board rejects the contention that the notice should discuss the implications or consequences of unsuccessful bargaining.

## iii. The Right To Discuss With Co-Workers or Union

A comment from the National Immigration Law Center suggests that the use of the phrase "terms and conditions of employment" is unclear especially to employees who are unaware of their rights under the NLRA. The comment recommends that, in order to clarify, the Board add the phrase "including wages and benefits." The suggested language would read, "you have the right to: discuss your terms and conditions of employment, including wages and benefits, or union organizing with your co-workers or a union."

The Board agrees that adding the suggested language would clarify the provision. The list of affirmative rights uses the terms "wages, hours, and other terms and conditions of employment" to describe what unions may negotiate. The notice then uses the terms "wages, benefits, hours, and other working conditions" to describe the right to bargain collectively for a contract. Those statements make it clear that "terms and conditions of employment" includes wages and benefits. But then immediately following those two statements, the notice states that employees may discuss "terms and conditions of employment," but does not include any clarifying language. In order, to create a more uniform notice and clarify the extent to which employees may discuss their terms and

conditions of employment the final notice will read, "Under the NLRA, you have a right to: Discuss your wages and benefits and other terms and conditions of employment or union organizing with your co-workers or a union."

### iv. The Right To Strike and Picket

The notice's reference to the right to strike and picket received a few comments from law firms and other organizations representing employers' interests. The comments suggest that the provision is flawed because of the absence of further limitations, exceptions, and distinctions.[106] Generally, the comments argue that not all strikes and pickets are protected. COLLE argues that the notice should inform employees of the limitations of strikes encompassed by "depending on the purpose or means of the strike or pickets"—for example, whether the strike is for recognition or bargaining, whether the strike has a secondary purpose, whether picketing involves a reserved gate, whether the strike is a sit-down or minority strike, whether the conduct is a slowdown and not a full withholding of work, whether the strike is partial or intermittent, whether the strike involves violence, and whether the strike is an unfair labor practice strike or an economic strike. ALFA argues that employees should be informed that if the employer is a healthcare institution, "employees do not have the right to participate in a union-initiated strike or picket unless the union has provided the employer and federal and state mediation agencies with the required 10 days notice."

The Board disagrees. By necessity, an 11x17-inch notice cannot contain an exhaustive list of limitations on and exceptions to the rights to strike and picket, as suggested by employers. However, because exercising the right to strike can significantly affect the livelihood of employees, the Board considers it important to alert employees that there are some limitations to exercising this right. The Board is satisfied that the general caveat, "depending on the purpose or means of the strike or the picketing," together with the instruction to contact the NLRB with specific questions about the application of rights in certain situations, provides sufficient guidance to employees about the exercise of their rights while still staying within the constraints set by a necessarily brief employee notice.

### v. The Right To Refrain From Union or Other Protected Concerted Activity

All the comments that discuss the right to refrain from engaging in union activity criticize what they contend to be its lack of prominence. ALFA accuses the Board of "burying" the provision by placing it last, below the other rights to engage in union and other concerted activity. The U.S. Chamber of Commerce suggests that the notice include "or not" after each of the enumerated rights. For example, "you have the right to: form join or assist a union, or not." (Emphasis added.) Other suggested revisions to amplify the prominence of the provision include stating that employees have the right to refrain from protected, concerted activities and/or union activities; stating that employees' right to refrain includes the right to actively oppose unionization, to not sign union authorization cards, to request a secret ballot election, to not be a member of a union or pay dues

or fees (addressed further below), or to decertify a union (also addressed below); and stating that employees have the right to be fairly represented even if not a member of the union. One employer suggests that if the notice retains its current emphasis favoring union activity and disfavoring the freedom to refrain from such activity, employers will need to post their own notices that emphasize and elaborate on the right to refrain.

The Board received at least four comments that argue that the notice, as written, may make employees believe that the employer is encouraging unionization. Two of those comments suggest that an employer is protected from compelled speech by Section 8(c) of the NLRA. (The Board has already rejected the latter argument; see section II, subsection B, "Statutory Authority," above.)

The contention that the right to refrain from engaging in union activity is "buried" in the list of other affirmative rights or that the Board is biased in favor of unionization because of the choice of placement is without merit. The list of rights in the proposed notice is patterned after the list of rights in Section 7 of the NLRA, **29 U.S.C. 157**. Section 7 lists the right to refrain last, after stating several other affirmative rights before it. In addition, the Board's remedial notices list the right to refrain last. See Ishikawa Gasket America, Inc., above. So does the Board's Notice of Election. In addition, the notice required by this rule states that it is illegal for an employer to take adverse action against an employee "because [the employee] choose[s] not to engage in any such [union-related] activity." The Board has revised the introduction of the notice to include the right to refrain—this addition further highlights an employee's right to refrain from union activity. Finally, the Board believes that people understand a right as different from an obligation and thus will, for example, understand that the right to organize a union includes the right not to do so. Accordingly, the Board concludes that the notice sufficiently addresses the right to refrain among the list of statutory rights. In addressing the numerous comments questioning the Board's neutrality, the Board points out that in Section 1 of the NLRA, Congress declared that it is the policy of the United States to mitigate or eliminate obstructions to the free flow of commerce "by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." **29 U.S.C. 151**. Thus, by its own terms, the NLRA encourages collective bargaining and the exercise of the other affirmative rights guaranteed by the statute. In doing so, however, the NLRA seeks to ensure employee choice both to participate in union or other protected concerted activity and to refrain from doing so.

Turning to the issues of whether the notice creates the impression that the employer is encouraging unionization and whether an employer can be compelled to post the notice which contains information the employer would otherwise not share with employees, the Board disagrees with both arguments. First, the notice clearly states that it is from the government. Second, in light of the other workplace notice employees are accustomed to seeing, employees will understand that the notice is a communication to workers from the government, not from the employer. Finally, as

discussed above, NLRA Section 8(c) protects employers' right to express any "views, argument, or opinion" "if such expression contains no threat of reprisal or force or promise of benefit." The rule does not affect this right. Therefore, if an employer is concerned that employees will get the wrong impression, it may legally express its opinion regarding unionization as long as it does so in a noncoercive manner.

Critics of the notice contend that the notice should contain a number of additional rights and also explanations of when and how an employee may opt out of paying union dues. Thus, most employer groups argue that the notice should contain a statement regarding the right to decertify a union. A number of those comments state that the notice should provide detailed guidance on the process for decertifying a union. Others suggest that the notice should contain instructions for deauthorizing a union security clause. A majority of employers and individuals who filed comments on the content of the notice urge the Board to include a notice of employee rights under Communications Workers v. Beck. Baker & McKenzie suggests adding a provision informing employees that for religious purposes an employee may opt out of paying dues to a union.[107] A few comments also suggest that the notice add any rights that employees may have in "right-to-work" states. As indicated previously, numerous comments suggest the inclusion of other rights of employees who do not desire union representation. Baker & McKenzie suggests a list of 26 additional affirmative rights, most of which only affect employees in a unionized setting and are derived from the Labor-Management Reporting and Disclosure Act, the Labor-Management Relations Act, or other Federal labor statutes enforced by the Department of Labor. The proposed list also includes some rights covered by the NLRA such as "the right to sign or refuse to sign an authorization card," "the right to discuss the advantages and disadvantages of union representation or membership with the employer," and "the right to receive information from the employer regarding the advantages and disadvantages of union representation."

The Board has determined that the inclusion of these additional items is unnecessary. As discussed above, the NLRA itself contains only a general statement that employees have the right not to participate in union and/or other protected concerted activities. Section 19 does specifically set forth the right of certain religious objectors to pay the equivalent of union dues to a tax-exempt charity; however, this right is implicated only when an employer and union have entered into a union-security arrangement. Because the notice does not mention or explain such arrangements, the Board finds no reason to list this narrow exception to union-security requirements. In sum, the Board is not persuaded that the notice needs to expand further on the right to refrain by including a list of specific ways in which employees can elect not to participate or opt out of paying union dues. Employees who desire more information regarding the right not to participate can contact the Board.

The Board does not believe that further explication of this point is necessary. However, because so many comments argue that the notice should include the right to decertify a union and rights under

Communication Workers v. Beck, the Board has decided to explain specifically why it disagrees with each contention.

Concerning the right to decertify, the notice states that employees have the right not to engage in union activity, "including joining or remaining a member of a union." Moreover, the notice does not mention the right to seek Board certification of a union. Indeed, contrary to the numerous comments suggesting that the proposed notice is a "roadmap" for union organizing, the notice does not even mention the right to petition for a union representation election, possibly leading to union certification; rather, it merely states that employees have the right to "organize a union" and "form, join or assist a union." The notice does not give any further instructions on how an employee can exercise those rights. Similarly, the notice states that employees may choose not to remain a member of a union without further instructions on how to exercise that right. To include instructions for exercising one right and not the other would upset the balanced recitation of rights. If employees have questions concerning how they can exercise their rights, the notice encourages them to contact the Board.

The Board has also determined that the addition of Beck rights in the final notice is unnecessary. Those rights apply only to employees who are represented by unions under collective-bargaining agreements containing union-security provisions. As stated in the NPRM, unions that seek to obligate employees to pay dues and fees under those provisions are required to inform those employees of their Beck rights. See California Saw & Knife Works, above, 320 NLRB at 233. See 75 FR at 80412-80413. The Board was presented with no evidence during this rulemaking that suggests that unions are not generally complying with their notice obligations. In addition, the Notice of Election, which is posted days before employees vote on whether to be represented by a union, contains an explanation of Beck rights. Moreover, as the Board stated in the NPRM, only about 8 percent of all private sector employees are represented by unions, and by no means are all of them subject to union-security clauses. Accordingly, the number of employees to whom Beck applies is significantly smaller than the number of employees in the private sector covered by the NLRA. Id. at 80413. Indeed, in the "right-to-work" states, where union-security clauses are prohibited, no employees are covered by union security clauses, with the possible exception of employees who work in a Federal enclave where state laws do not apply. Accordingly, because Beck does not apply to the overwhelming majority of employees in today's private sector workplace, and because unions already are obliged to inform the employees to whom it does apply of their Beck rights, the Board is not including Beck notification in the final notice.

The Board also disagrees with the comment from Baker McKenzie contending that an exhaustive list of additional rights should be included in the notice. In addition to the reasons discussed above, the Board finds that it would not be appropriate to include those rights, most of which are rights of union members vis-à-vis their unions. For example, the comment suggests including the "right for each union member to insist that his/her dues and initiation fees not be increased * * * except by a majority vote by secret ballot * * *," the "right of each employee in a bargaining unit to receive a

copy of the collective bargaining agreement," and the "right to nominate candidates, to vote in elections of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon business properly before the meeting." Those rights are not found in the NLRA, but instead arise from other Federal labor laws not administered by the NLRB. See Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. 401 et seq (LMRDA). The Board finds that it would be inappropriate to include those additional rights in a notice informing employees of their rights under the NLRA.

## vi. Other Comments

The Board has also considered, but rejected, the contention that the notice contain simply a "short and plain" description of rights such as that used in remedial notices. See Ishikawa Gasket America, Inc., above. The two notices have different purposes: one looks back; the other, forward. As explained in the NPRM, the principal purpose of a remedial notice is to inform employees of unlawful conduct that has taken place and what is being done to remedy that conduct. Accordingly, although a remedial notice contains only a brief summary of NLRA rights, it also contains examples of unlawful actions that have been committed. To the extent that such a notice generally increases employees' awareness of their rights, the unlawful conduct detailed adds to that awareness. The proposed notice, by contrast, is a notice intended to make employees aware of their NLRA rights generally. It normally will not be posted against a background of already-committed unfair labor practices; it therefore needs to contain a summary both of NLRA rights and examples of unlawful conduct in order to inform employees effectively of the extent of their NLRA rights and of the availability of remedies for violations of those rights. Moreover, as the Board explained in the NPRM, the general notice of rights posted in the pre-election notice is sufficient because at least one union along with the employer is on the scene to enlighten employees of their rights under the NLRA. 75 FR 80412 fn.19.

The fundamental rights described in the notice are well established and have been unchanged for much of the Board's history. Accordingly, the Board does not share the concern expressed in some comments that a new notice will have to be posted each time the composition of the Board changes.

Finally, the Board rejects the contention that the notice should address certain rights of employers. The notice is intended to inform employees of their rights, not those of their employers.

For all the foregoing reasons, the Board finds it unnecessary to modify the section of the notice summarizing employees' NLRA rights.

## c. The Examples of Unlawful Employer Conduct in the Notice

The proposed notice contained the following examples of unlawful conduct:

Under the NLRA, it is illegal for your employer to:

Prohibit you from soliciting for a union during non-work time, such as before or after work or during break times; or from distributing union literature during non-work time, in non-work areas, such as parking lots or break rooms.

Question you about your union support or activities in a manner that discourages you from engaging in that activity.

Fire, demote, or transfer you, or reduce your hours or change your shift, or otherwise take adverse action against you, or threaten to take any of these actions, because you join or support a union, or because you engage in concerted activity for mutual aid and protection, or because you choose not to engage in any such activity.

Threaten to close your workplace if workers choose a union to represent them.

Promise or grant promotions, pay raises, or other benefits to discourage or encourage union support.

Prohibit you from wearing union hats, buttons, t-shirts, and pins in the workplace except under special circumstances.

Spy on or videotape peaceful union activities and gatherings or pretend to do so. <u>75 FR 80419</u>.

The Board received limited comments on six of the seven examples of unlawful employer conduct. As a general matter, some comments contend that the number of examples of employer misconduct is disproportionate compared to the examples of union misconduct.[108] Most of the comments refer to the number of paragraphs devoted to illegal employer conduct (7) and the number of paragraphs devoted to illegal union conduct (5). Several comments indicate that when one compares the employer misconduct listed in Section 8(a) of the NLRA with union misconduct listed in Section 8 (b), no such imbalance appears in the text of the statute. Several comments provide additional examples of union misconduct that they say should be included.

As with the notice's statement of affirmative rights, some of the individual provisions in this section of the notice received numerous comments and suggestions for improvement. The vast majority of the comments about the specific provisions are from representatives of employers. Those comments generally contend that the provisions are overgeneralizations and do not articulate the legal standard for evaluating allegations of unlawful conduct or indicate factual scenarios in which certain employer conduct may be lawful.

After reviewing all of the comments, the Board has decided to revise one of the examples of unlawful employer conduct contained in the NPRM. The Board concludes that the other provisions,

as proposed, are accurate and informative and, as with the notice as a whole, strike an appropriate balance between being simultaneously instructive and succinct.

Furthermore, the Board sees no reason to add or subtract from the employer or union illegal activity to make the two sections contain an equal number of paragraphs. The comment that argues that no imbalance exists in the statute is correct, but the majority of violations under Section 8(b) concern union conduct vis-à-vis employers, not conduct that impairs employees' rights. The notice of rights is intended to summarize employer and union violations against employees; accordingly, there is no need to alter the list to include unlawful union activity against employers.

### i. No-Solicitation and No-Distribution Rules

The Board received a few comments that were critical of the proposed notice language stating that an employer cannot lawfully prohibit employees from "soliciting for the union during non-work time or distributing union literature during non-work time, in non-work areas." The Service Employees International Union comments that "solicitation" has a narrow meaning and involves asking someone to join the union by signing an authorization card, which is subject to the restrictions suggested in the notice. The comment submits that the notice should state that an employer cannot prohibit employees from "talking" about a union. The comment suggests that "talking" is both more accurate and is easier for employees to understand than "soliciting."

The remaining comments criticize the provision for failing to note any limitations on employees' rights to solicit and distribute, such as the limited rights of off-duty employees, and limitations in retail and health care establishments. One comment, in particular, suggests the notice should advise healthcare employees that they do not enjoy a protected right to solicit in immediate patient care areas or where their activity might disturb patients. See Beth Israel Hosp. v. NLRB, 437 U.S. 483 (1978). The comment proposes to include a qualification that a hospital or other health care employer may prohibit all solicitation in immediate patient care areas or outside those areas when necessary to avoid disrupting health care operations or disturbing patients. Another comment suggests that the law in this area is so complex that no meaningful but succinct provision can be constructed, and therefore recommends deleting it entirely.

The Board disagrees with those comments. The Board appreciates that under case law, employees' right to engage in solicitation and distribution of literature is qualified in certain settings and accordingly that employers may, in some situations, legally prohibit solicitation or distribution of literature even during employees' nonworking time. Given the variety of circumstances in which the right to solicit and distribute may be limited, however, the Board has determined that limitations on the size and format of the notice preclude the inclusion of factual situations in which an employer may lawfully limit such activity. As stated above, employees may contact the NLRB with specific questions about the lawfulness of their employers' rules governing solicitation and literature distribution.

Turning to the suggestion that the notice should be modified to remove the reference to union solicitation in favor of a reference only to the right to engage in union talk, the Board agrees in part. The Board distinguishes between soliciting for a union, which generally means encouraging a co-worker to participate in supporting a union, and union talk, which generally refers to discussions about the advantages and disadvantages of unionization. Scripps Memorial Hosp., 347 NLRB 52 (2006). The right to talk about terms and conditions of employment, which would necessarily include union talk, is encompassed more specifically by the "discussion" provision in the affirmative rights section of the notice. That provision indicates that employees have the right to "discuss your terms and conditions of employment or union organizing with your co-workers or a union." In order to maintain consistency and clarity throughout the notice, the Board agrees that some change is necessary to the solicitation provision. Accordingly, the final notice will state that it is illegal for an employer to "prohibit you from talking about or soliciting for a union during non-work time, such as before or after work or during break times; or from distributing union literature during non-work time, in non-work areas, such as parking lots or break rooms."

## ii. Questioning Employees About Union Activity

The Board received one comment concerning this provision, suggesting that it was confusing. The Board believes the existing language is sufficiently clear.

## iii. Taking Adverse Action Against Employees for Engaging in Union-Related Activity

The Board did not receive any specific comments regarding this provision.

## iv. Threats To Close

A few comments from employer groups criticize the perceived overgeneralization of this provision. Those comments note that, as with unlawful interrogation, a threat to close is evaluated under a totality of circumstances, and that an employer is permitted to state the effects of unionization on the company so long as the statement is based on demonstrably probable consequences of unionization.

The Board agrees that the law in this general area is complex and that predictions of plant closure based on demonstrably probable consequences of unionization may be lawful. NLRB v. Gissel Packing Co., 395 U.S. 575, 618 (1969). However, the example in the proposed notice is not such a prediction; rather, the notice states that it is unlawful for an employer to "threaten to close your workplace if workers choose a union to represent them." Such a statement, which clearly indicates that the employer will close the plant in retaliation against the employees for choosing union representation, is unlawful. Id. at 618-619. Thus, the Board finds it unnecessary to modify or delete this provision of the notice.

### v. Promising Benefits

The Board received one comment addressing this provision. The comment argues that the provision is "troubling" because it may be interpreted by a reader to mean "anytime their employer seeks to make such improvements it discourages union support because improved wages and benefits may reduce employee's interest in a union." The Board does not think such an interpretation would be reasonable, because it is contrary to the plain language of the notice. The notice states that promises or grants of benefits "to discourage or encourage union support" are unlawful. It would make little sense to use such language if the Board had meant that any promises or grants of benefits were unlawful, rather than only those with the unlawful stated purposes. And stating that such promises or grants to * * * encourage union support are unlawful necessarily implies that not all promises and grants of benefits discourage union support.

### vi. Prohibitions on Union Insignia

A few comments suggest that the provision fails to illuminate the conditions under which "special circumstances" may exist, including in hotels or retail establishments where the insignia may interfere with the employer's public image, or when the insignia is profane or vulgar. Another comment indicates that the provision is overly broad because it does not reflect that a violation depends on the work environment and the content of the insignia. All the comments addressing this provision suggest either adding more detail to the provision to narrow its meaning, or striking the provision entirely.

Again, the Board disagrees. Employees have a statutorily protected right to wear union insignia unless the employer is able to demonstrate "special circumstances" that justify a prohibition. Republic Aviation Corp. v. NLRB, 324 U.S. 793 (1945). For reasons of format, the notice cannot accommodate those comments suggesting that this provision specify cases in which the Board has found "special circumstances," such as where insignia might interfere with production or safety; where it conveys a message that is obscene or disparages a company's product or service; where it interferes with an employer's attempts to have its employees project a specific image to customers; where it hinders production; where it causes disciplinary problems in the plant; where it is in an immediate patient care areas; or where it would have any other consequences that would constitute special circumstances under settled precedent. NLRB v. Mead Corp., 73 F.3d 74, 79 (6th Cir. 1996), enfg. Escanaba Paper Co., 314 NLRB 732 (1994).

Given the lengthy list of potential special circumstances, the addition of one or two examples of special circumstances might mislead or confuse employees into thinking that the right to wear union insignia in all other circumstances was absolute. And including an entire list of special circumstances, concerning both the wearing of union insignia and other matters (e.g., striking and picketing, soliciting and distributing union literature), would make it impossible to summarize NLRA rights on an 11x17 inch poster. In any event, the Board finds that the general caveat that special

circumstances may defeat the application of the general rule, coupled with the advice to employees to contact the NLRB with specific questions about particular issues, achieves the balance required for an employee notice of rights about wearing union insignia in the workplace.

### vii. Spying or Videotaping

Aside from the few comments that suggest the provision be stricken, only one comment specifically addresses the content of this provision. The comment states that the language is confusing because a "supervisor might believe it would be permissible to photograph or tape record a union meeting. Another might say that their video camera doesn't use tape so it's okay to use." The Board has determined that no change is necessary. In the Board's view, it is unlikely that a reasonable supervisor would construe this notice language (which also says that it is unlawful to "spy on" employees' peaceful union activities) as indicating that it is unlawful to videotape, but lawful to tape record or photograph, such activities. Supervisors are free to contact the Board if they are unsure whether a contemplated response to union activity might be unlawful.

### viii. Other Suggested Additions to Illegal Employer Conduct

The Heritage Foundation suggests that the Board add language to the notice informing employees that if they choose to be represented by a union, their employer may not give them raises or bonuses for good performance without first bargaining with the union. The comment suggests that the Board add the following provision "if a union represents you and your co-workers, give you a pay raise or a bonus, or reduce or dock your pay, without negotiating with the union." The Board rejects this suggestion for the same reason it rejects other comments contending that the notice should include the consequences of unionization in the summary of NLRA rights, above.

The National Immigration Law Center suggests that the Board add the following to the notice poster:

Under the NLRA, it is illegal for your employer to: Report you or threaten to report you to Immigration and Customs Enforcement (ICE) or to other law enforcement authorities in order to intimidate or retaliate against you because you join or support a union, or because you engage in concerted activity for mutual aid and protection.

The Board finds it unnecessary to add this statement. The notice states that it is unlawful for an employer to "fire, demote, or transfer you, or reduce your hours or change your shift, or otherwise take adverse action against you, or threaten to take any of these actions, because you join or support a union, or because you engage in concerted activity for mutual aid and protection (emphasis added) [.]" Reporting or threatening to report an employee in the manner described in the comment would be a form of adverse action or threat thereof, and the Board believes that it would be understood as such.

## d. Examples of Illegal Union Activity

The proposed notice contained the following examples of unlawful union conduct:

Under the NLRA, it is illegal for a union or for the union that represents you in bargaining with your employer to:

Threaten you that you will lose your job unless you support the union.

Refuse to process a grievance because you have criticized union officials or because you are not a member of the union.

Use or maintain discriminatory standards or procedures in making job referrals from a hiring hall.

Cause or attempt to cause an employer to discriminate against you because of your union-related activity.

Take other adverse action against you based on whether you have joined or support the union.

75 FR 80419.

There were only a few comments addressing specific changes to the language in this section of the notice. ALFA criticizes the provision that states that a union may not "threaten you that you will lose your job unless you support the union," because the proposed language "fails to capture Section 8(b)(1)(A)'s broader prohibition against restraint and coercion." The comment suggests revising the language to state that a union may not "[r]estrain or coerce you in the exercise of your right to refrain from joining a union by threatening to inflict bodily harm or following you to your home and refusing to leave unless you sign a union card." That comment also suggests adding a provision stating that it is unlawful for a union to "promise to waive your union initiation fee if you agree to sign a union card before a vote is taken."

Another comment argues that the illegal union conduct portion of the notice fails to fully inform employees of their rights as union members. [109] In contrast, another comment states a different position—that the list of illegal union conduct "ostensibly relates only to restraint or coercion by a union in a unionized environment." [110] The comment further states that the Board should have included examples of "union restraint or coercion in an organizing setting" but gives no specific examples.

ALFA suggests three changes to the unlawful union activity section. First, rather than say that the union may not "threaten you that you will lose your job," a more comprehensive statement would be "threaten, harass, or coerce you in order to gain your support for the union." The Board agrees, except as regards "harass," which is sometimes used to characterize almost any sort of union solicitation. Accordingly, the statement will be modified to read "threaten or coerce you in order to

gain your support for the union." Second, the comment suggests changing "cause or attempt to cause an employer to discriminate against you" to "discriminate or attempt to discriminate against you because you don't support a union." The Board disagrees, because the suggested change would shift the focus of the provision away from the sort of conduct contemplated in the rule. See NLRA Section 8(b)(2), 29 U.S.C. 158(b)(2). Third, the comment suggests changing "take other adverse action against you based on whether you have joined or support the union" to "take adverse action against you because you have not joined or do not support the union." The Board agrees and will modify this provision of the notice accordingly.

Baker & McKenzie urges that a variety of other examples of unlawful union conduct be added to the notice, including requiring nonmembers to pay a fee to receive contract benefits, disciplining members for engaging in activity adverse to a union-represented grievant, disciplining members for refusing to engage in unprotected activity, engaging in careless grievance handling, failing to notify employees of their Beck rights, requiring employees to agree to dues checkoff instead of direct payment, discriminatorily applying hiring hall rules, and conditioning continued employment on the payment of a fine or dues in "right-to-work" states.

As with the examples of unlawful employer activity, the Board concludes that the provisions concerning unlawful union activity, as proposed, are accurate and informative, and, as with the notice as a whole, strike an appropriate balance between being simultaneously instructive and succinct. Moreover, the Board finds it unnecessary to include additional examples of unlawful conduct so that the lists of employer and union activity are the same length because the notice describes the central forms of unlawful conduct engaged in by each type of entity. Still less is it necessary to add a host of additional examples of unlawful union conduct, with the result that the list of such conduct would be much longer than the list of unlawful employer conduct. In the Board's view, the list of unlawful union conduct in the proposed notice fairly informs employees of the types of conduct that a union is prohibited from engaging in without providing unnecessary or confusing examples. Employees may contact the NLRB if they believe a union has violated the NLRA.

### e. Collective-Bargaining Provision

The collective-bargaining provision of the NPRM states that "if you and your co-workers select a union to act as your collective bargaining representatives, your employer and the union are required to bargain in good faith and in a genuine effort to reach a written, binding agreement setting your terms and conditions of employment. The union is required to fairly represent you in bargaining and enforcing the agreement." 75 FR 80419.

The Board received only a few comments on this provision of the notice. Notably, COLLE requests the inclusion of a limitation on the provision that employees have the right to bargain collectively, in order to clarify that the employer's obligation is only to bargain in good faith and not necessarily to

reach an agreement. A second comment suggests that the notice inform employees that they have the right to "sue a union for unfairly representing the employee in bargaining, contract administration, or a discrimination matter."

The Board has decided that no changes are necessary to the duty to bargain paragraph. The Board is satisfied that the proposed collective-bargaining provision provides sufficient guidance to employees about the exercise of these rights while still staying within the constraints set by a necessarily brief employee notice. As to the first comment, the notice states that an employer and union have a duty to "bargain in good faith and in a genuine effort to reach a written, binding agreement." As discussed above, by referring to a "genuine effort" to reach agreement, the notice necessarily implies that the parties are not obliged to actually reach one. The duty to bargain in good faith has many components. See NLRB v. Katz, 369 U.S. 736 (1962). And the suggestion that employers do not have to agree to certain proposals, although correct, does not account for the line of cases that suggest that an important ingredient in good faith bargaining is a willingness to compromise. See Phelps Dodge, 337 NLRB 455 (2002).

Turning to the suggestion that the notice include language informing employees of their right to "sue" the union if it fails to represent them fairly, the Board has concluded that the notice sufficiently apprises employees of their right to fair representation and of their right to file unfair labor practice charges with the Board should a union fail to fulfill that duty. The rights that employees have to sue unions directly in court without coming to the Board are beyond the scope of this rulemaking.

## f. Coverage Provision

In regard to coverage under the NLRA, the proposed notice states:

The National Labor Relations Act covers most private-sector employers. Excluded from coverage under the NLRA are public-sector employees, agricultural and domestic workers, independent contractors, workers employed by a parent or spouse, employees of air and rail carriers covered by the Railway Labor Act, and supervisors (although supervisors that have been discriminated against for refusing to violate the NLRA may be covered). 75 FR 80419.

A comment from the National Immigration Law Center suggests adding the following language: "The NLRA protects the above-enumerated rights of all employees, irrespective of their immigration status. That protection extends to employees without work authorization, though certain remedies in those circumstances may be limited. Employers cannot threaten you or intimidate you on the basis of you immigration status to prevent you from joining or supporting a union, or engaging in concerted activity for mutual aid and protection."

The Board has decided not to amend the coverage provision in the final notice. Although the Board understands that many immigrant employees may be unsure whether they are covered by the NLRA,

the notice does not include a list of covered employees. Including specific coverage of immigrants, but not other classes of employees, may cause confusion for many employees. Currently, the language in the notice tracks statutory language and provides only the list of employees excluded from coverage. As a result, those employees not listed under the exclusions will reasonably believe they are covered employees under the statute. Any employees who are unsure of their status should contact a regional office of the NLRB.

The final notice as modified is set forth in the Appendix to Subpart A of this rule.

## 2. Posting Issues

The Board proposed that the notice to employees shall be at least 11 inches by 17 inches in size, and in such colors and type size and style as the Board shall prescribe. The proposed rule further provides that employers that choose to print the notice after downloading it from the Board's Web site must print in color, and the printed notice shall be at least 11 inches by 17 inches in size.

Proposed § 104.202(d) requires all covered employers to post the employee notice physically "in conspicuous places, including all places where notices to employees are customarily posted." Employers must take steps to ensure that the notice is not altered, defaced, or covered with other material. Proposed § 104.202(e) states that the Board will print the notice poster and provide copies to employers on request. It also states that employers may download copies of the poster from the Board's Web site, http://www.nlrb.gov, for their use. It further provides that employers may reproduce exact duplicates of the poster supplied by the Board, and that they may also use commercial poster services to provide the employee notice consolidated onto one poster with other Federally mandated labor and employment notices, as long as consolidation does not alter the size, color, or content of the poster provided by the Board. Finally, employers that have significant numbers of employees who are not proficient in English will be required to post notices of employee rights in the language or languages spoken by significant numbers of those employees. The Board will make available posters containing the necessary translations.

In addition to requiring physical posting of paper notices, proposed § 104.202(f) requires that notices be distributed electronically, such as by e-mail, posting on an intranet or an internet site, and/or other electronic means, if the employer customarily communicates with its employees by such means.[111] An employer that customarily posts notices to its employees on an intranet or internet site must display the required employee notice on such a site prominently—i.e., no less prominently than other notices to employees. The Board proposed to give employers two options to satisfy this requirement. An employer may either download the notice itself and post it in the manner described above, or post, in the same manner, a link to the Board's Web site that contains the full text of the required employee notice. In the latter case, the proposed rule states that the link must contain the prescribed introductory language from the poster, which appears in Appendix to Subpart A, below. An employer that customarily communicates with its employees by e-mail will

satisfy the electronic posting requirement by sending its employees an e-mail message containing the link described above.

The proposed rule provides that, where a significant number of an employer's employees are not proficient in English, the employer must provide the required electronic notice in the language the employees speak. This requirement can be met either by downloading and posting, as required in § 104.202(f), the translated version of the notice supplied by the Board, or by prominently displaying, as required in § 104.202(f), a link to the Board's Web site that contains the full text of the poster in the language the employees speak. The Board will provide translations of that link. **75 FR 80417**.

Section 104.203 of the proposed rule provides that Federal contractors may comply with the requirements of the rule by posting the notices to employees required under the Department of Labor's notice-posting rule, **29 CFR part 471**. Id.

The Board solicited comments on its proposed requirements for both physical and electronic notice posting. In addition, the Board solicited comments on whether it should prescribe standards regarding the size, clarity, location, and brightness of the electronic link, including how to prescribe electronic postings that are at least as large, clear, and conspicuous as the employer's other postings.

The Board received numerous comments concerning the technical requirements for posting the notices of employee rights. Those comments address the locations where notices would be physically posted, physical characteristics of the posters, requirements for posting in languages other than English, details of the requirement for electronic posting of notices by employers that customarily communicate with their employees electronically, and "safe harbor" provisions for Federal contractors that are already posting the Department of Labor's notice of NLRA rights.

## a. Location of Posting

Section 104.202(d) of the proposed rule requires that the notice be posted "in conspicuous places, including all places where notices to employees are customarily posted." Some employers and their representatives, including law firm Baker & McKenzie, comment that the proposed rule does not define "customarily." The Board responds that the term is used in its normal meaning of "ordinarily" or "usually," as it has been used in the Board's remedial orders for decades. [112] This standard is consistent with the posting requirements in the regulations and statutes of other agencies. [113] Baker & McKenzie's comment contends that the quoted phrase should read instead "where other legally-required notices to employees are customarily posted." The Board disagrees. As under the Department of Labor's notice posting requirement, [114] the Board's final rule clarifies that the notice must be posted wherever notices to employees regarding personnel rules and policies are customarily posted and are readily seen by employees, not simply where other legally mandated notices are posted.

A number of comments from employers [115] and individuals take the position that it is time to move away from paper posters and to encourage employees to inform themselves of their rights through the Internet. Many comments object that the posting requirement will add to already cluttered bulletin boards or necessitate additional bulletin boards. [116] The Board responds to these comments above in section II, subsection C, Factual Support for the Rule. The Council of Smaller Enterprises further maintains that the requirement to ensure that the notice is conspicuous and not altered or defaced imposes an unnecessary burden on employers. Caremaster Medical Services' comment asks whether periodic inspections of the notices will be conducted and, if so, by whom. Specifically, this comment expresses concern that employers will be forced to permit union officials to enter their facilities to inspect the notices. The rule does not provide for such inspections or alter current standards regarding union access to employers' premises. Rather, the Board contemplates that an employer's failure to comply with the rule will be brought to the attention of the employer or the Board by employees or union representatives who are lawfully on the premises.

The International Union of Operating Engineers comments that the rule needs to apply to the marine construction industry, in which employees work at remote sites and do not necessarily see a posting in the office. Another comment similarly states that the rule is not practical for small employers with dispersed employees, e.g., trucking or insurance companies. [117] Similarly, one comment contends that the requirement is burdensome for construction employers, whose employees report to various worksites. [118] The Board recognizes that certain work situations, such as those mentioned in the comments, present special challenges with regard to physical posting. However, the Board concludes that these employers must nonetheless post the required notice at their work premises in accordance with the proposed rule. Electronic posting will also aid the employers in providing the notice to their employees in the manner in which they customarily communicate with them.

TLC Companies contends that professional employer organizations (PEOs) such as itself should be exempt from the rule's requirements. It explains that PEOs are "co-employers" of a client employer's employees, providing payroll and other administrative services. However, it asserts that PEOs have no control over the client employer's worksite. Accordingly, TLC Companies is concerned that a PEO could be found liable for its client's failure to post the notice. The Board contemplates that employers will be required to physically post a notice only on their own premises or at worksites where the employer has the ability to post a notice or cause a notice to be posted directed to its own employees.

Retail Industry Leaders Association asks whether the rule would apply to overseas employees of American employers. The answer to that question is generally "no"; the Board's jurisdiction does not extend to American employees engaged in permanent employment abroad in locations over which the United States has no legislative control. See Computer Sciences Raytheon, 318 NLRB 966

(1995). Employers of employees who are working abroad only temporarily are not required to post the notice in foreign workplaces.

## b. Size and Form Requirements

Many comments from organizations and individuals object to the 11x17-inch size prescribed by the proposed rule.[119] They argue that most employers do not have the capacity to make 11x17-inch color copies and will have to use commercial copy services, which some contend are expensive. A human resources official also asserts that other required notices are smaller, and that the larger poster will be more eye-catching, implying that NLRA rights are more important. Other comments support the proposed 11x17-inch size, stating that the notice should stand out and be in large print, with one comment specifying that the title should be larger.[120] The AFL-CIO argues that employers should not be permitted to download the notice from the Board's Web site if their limited printing capacity would make it less eye-catching.

A few comments contend that the prescribed size will make it difficult to include in consolidated posters of various statutory rights, as the proposed rule permits.[121] One comment urges the Board to follow the "3' rule," according to which a notice is large enough if it can be read from a distance of 3 feet,[122] and another suggests only a legibility requirement.[123] One comment states that minor deviations, such as1/4inch, should not be deemed violations.[124] Another comment expresses a concern that a large, prominent poster could cause a few unhappy employees to begin activity that could result in divisiveness in a small facility.[125]

The Board has decided to retain the 11x17-inch poster size. As the NPRM states, the Board will furnish paper copies of the notice, at no charge, to employers that ask for them. Employers that prefer to download and print the notice from the Board's Web site will have two formats available: a one-page 11x17-inch version and a two-page 81/2x11-inch version, which must be printed in landscape format and taped together to form the 11x17-inch poster. In response to the comments objecting to the added expense of obtaining color copies through outside sources, the Board has revised the rule to delete the requirement that reproductions of the notice be in color, provided that the reproductions otherwise conform to the Board-provided notice. Accordingly, the Board concludes that obtaining copies of the notice will not be difficult or expensive for employers.

The Board finds no merit to the other objections to the 11x17-inch poster size. Contrary to some comments, the Board does not believe that employees would think that NLRA rights are more important than other statutory rights, merely because the notice of NLRA rights is somewhat larger than notices prescribed under some other statutes. It would seem that, upon learning of all of their rights in the workplace, employees will determine from their understanding of the rights themselves, rather than the size of the various posters, which rights (if any) are more important to them than others. In the Board's view, adopting a subjective "3' rule" or a "legibility standard" could lead to

disagreements over whether a particular poster was "legible" or could be read at a distance of 3 feet. In addition, if, as some comments contend (without citing specifics), the size of the Board's notice will pose a problem for manufacturers of consolidated posters to include it with posters detailing other workplace rights, that would seem to be a problem best left to those manufacturers to solve.

## c. Language Issues

The proposed rule requires that, "[w]here a significant portion of an employer's workforce is not proficient in English, the employer must provide the notice in the language the employees speak." This is the same standard applied in the Department of Labor's notice of NLRA rights for federal contractors (**29 CFR 471.2**(d)) and in the notice required under the Family and Medical Leave Act (**29 CFR 825.300**(4)). Many comments support the requirement and availability of translated notices, particularly as an essential way of informing immigrant employees about their rights.[126] But several comments complain that the rule does not define "significant."[127] Baker & McKenzie proposes that the standard be 40 percent specifically of the employer's production and maintenance workforce, while the National Immigration Law Center proposes a 5 percent standard. Another comment urges that translated notices be required whenever any of the employees are not proficient in English.[128] The U.S. Chamber of Commerce asserts that a safe harbor is needed for employers when a notice in a particular language is not yet available from the Board. Moreover, a few comments contend that the Board should also provide Braille notices for vision-impaired employees, as well as audio versions for illiterate employees, and versions of the notice that are adaptable to assistive technologies.[129] One individual proposes that the rule mandate that employers read the notice to employees when they are hired and to all employees annually.

Having carefully considered the comments, the Board has decided to define "significant" in terms of foreign-language speakers as 20 percent or more of an employer's workforce. Thus, if as many as 20 percent of an employer's employees are not proficient in English but speak the same foreign language, the employer must post the notice in that language, both physically and electronically (if the employer is otherwise required to post the notice electronically). If an employer's workforce includes two or more groups constituting at least 20 percent of the workforce who speak different languages, the employer must either physically post the notice in each of those languages or, at the employer's option, post the notice in the language spoken by the largest group of employees and provide each employee in each of the other language groups a copy of the notice in the appropriate language. If such an employer is also required to post the notice electronically, it must do so in each of those languages. If some of an employer's employees speak a language not spoken by employees constituting at least 20 percent of the employer's workforce, the employer is encouraged, but not required, either to provide the notice to those employees in their respective language or languages or to direct them to the Board's Web site, http://www.nlrb.gov, where they can obtain copies of the notice in their respective languages. The Board has also decided to add to the notice instructions for obtaining foreign-language translations of the notice.

Employers will be required to request foreign-language notices from the Board or obtain them from the Board's Web site in the same manner as the English-language notice. If an employer requests from the Board a notice in a particular language in which the notice is not available, the requesting employer will not be liable for non-compliance with the rule until the notice becomes available in that language.

With respect to employees who are vision-impaired or those who are illiterate, employers may consult the Board's Regional Office on a case-by-case basis for guidance on appropriate methods of providing the required notice, including by audio recording.

### d. Electronic Posting

Many employer comments oppose the requirement for electronic notice. The Coalition for a Democratic Workplace points out that other agencies do not require both electronic and physical posting and asserts that only one method is necessary. For example, the Coalition notes that the Family and Medical Leave Act notice obligation is satisfied by electronic posting alone, and other statutes do not mention electronic posting. The National Council of Agricultural Employers urges the Board to require electronic posting only if the employer posts other statutory or regulatory notices in that fashion. Another proposes that employers be permitted to choose either physical or electronic posting. The National Association of Manufacturers remarks that the proposed rule breaks new ground for using an employer's email system to communicate information about "union membership." The U.S. Chamber of Commerce suggests that this aspect of the rule would chill employers' use of new technologies. On the other hand, the AFL-CIO and several other commenters [130] support electronic as well as physical posting; the Center for American Progress Action Fund, among others, points out that electronic communications at work are standard now.

After carefully considering these comments, the Board concludes that electronic posting will substantially assist in providing the prescribed notice to employees. As some comments state, electronic communication is now a routine practice in many workplaces and the source of much information from employers to their employees. However, the Board has clarified the final rule to mandate only that, if an employer customarily communicates personnel rules or policies to its employees in that manner, it must also do so with respect to the notice of employee rights under the NLRA. The concern that the rule will discourage employers from using new technologies is apparently not widely shared and, in the Board's view, is implausible. Although the Board recognizes that some other statutes and regulations do not require electronic notice, it notes that they generally predated the routine use of electronic communications in the workplace. Having only recently begun ordering electronic posting of remedial notices, [131] the Board has limited experience in this area, and employers are encouraged to contact the local Regional Office with questions about this provision. The Board does not agree that employers should be permitted to choose whether to provide physical or electronic notice, because some employers could select the less effective of these alternatives, thus undermining the purpose of the rule. Finally, the rights stated in the notice are not

accurately described as pertaining solely to union membership, and the notice is not intended to promote union membership or union representation. Rather, the notice addresses a broad range of employee legal rights under the NLRA, which involve protected concerted activity as well as union activity in both organized and unorganized workplaces, and also the right to refrain from any such activity.

Many employer comments note that the proposed rule also does not define "customarily" as it pertains to electronic posting in § 104.202(f), i.e., the type and degree of communication that triggers the requirement.[132] Numerous employers also participated in a postcard campaign objecting, among other things, that employers use a wide variety of technology to communicate with employees and that the rule could require them to use all methods to convey the notice.[133] For example, they ask whether an employer that occasionally uses text messaging or Twitter to communicate with employees would have to use those technologies and, if so, how they would be able to comply with the rule, in view of the length restrictions of these media. The U.S. Chamber of Commerce raises the same issue regarding faxing, voice mail, and instant messaging. The National Roofing Contractors Association notes that some employers use email to communicate with certain employees, while other employees have no access to email during their work day. As to email communication itself, an individual observes that many employees change jobs every 3 to 4 years, and an email reaches only those in the workforce at a specific time. The same comment notes that the proposed rule does not state when or how often email notice should be provided. Three Georgetown law students recommend that the rule mandate email as well as intranet notice to employees when it goes into effect and written notice to new employees within a week of their starting employment.

The Board responds that, as discussed above regarding the location of posting, "customarily" is used in its normal meaning. This provision of the rule would not apply to an employer that only occasionally uses electronic means to communicate with employees. However, in view of the numerous comments expressing concern over the proposed rule's email posting requirements, the Board has decided not to require employers to provide the notice to employees by means of email and the other forms of electronic communication listed in the previous paragraph. In the Board's judgment, the potential for confusion and the prospect of requiring repeated notifications in order to reach new employees outweigh the benefits that could be derived at the margin from such notifications. All employers subject to the rule will be required to post the notice physically in their facilities; and employers who customarily post notices to employees regarding personnel rules or policies on an internet or intranet site will be required to post the Board's notice on those sites as well. Moreover, those notices (unlike the Board's election and remedial notices) must remain posted; thus, it is reasonable to expect that even though some employees may not see the notices immediately, more and more will see them and learn about their NLRA rights as time goes by. Accordingly, the only electronic postings required under the final rule will be those on internet or intranet sites.

Many comments address the characteristics of electronic posting, as prescribed in § 104.202(f). In the NPRM, the Board proposed not to prescribe the size, clarity, location, or brightness of an electronic notice or link to the notice, but rather require that it be at least as prominent as other electronic notices to employees, as the Department of Labor's rule requires. No comments suggest more specific requirements; the Michigan Health & Hospital Association argues that such requirements would result in inadvertent noncompliance. The Board has decided to adopt the Department of Labor's approach, as proposed in the NPRM.

Baker & McKenzie urges that the title of the link in the proposed rule be changed to "Employee Rights under the National Labor Relations Act" rather than "Important Notice about Employees Rights to Organize and Bargain Collectively with Their Employers." The Board agrees and has revised the rule accordingly.

A comment from Vigilant states that a link to the Board's Web site, which is one means of electronic posting, should not be required to include the introductory language of the notice. The Board agrees, noting that the Department of Labor takes this approach, and will not require that electronic links to the Board's Web site include the introductory language.

For the foregoing reasons, the Board has decided to retain the posting requirements as proposed in the NPRM, modified as indicated above.

## e. Compliance With the Department of Labor's Rule

Several comments opposing the proposed rule urge that, if the rule becomes final, the Board should retain the "safe harbor" provided for Federal contractors that comply with the Department of Labor's notice posting rule.[134] However, the U.S. Chamber of Commerce states that some employers post the Department of Labor's notice at facilities where it is not required or where Federal contract work is performed only sporadically. It questions whether such employers must replace the Department of Labor's notice with the Board's when no contract work is being performed, or whether they can comply with the Board's rule by leaving the Department of Labor's notice in place. The Chamber proposes that employers be allowed to choose to maintain the Department of Labor's notice, although another comment asserts that employees might think that the notice is no longer applicable because of the lack of a current contract. Another comment raises the possibility that either the Board or the Department of Labor could decide to change its notice and emphasized that they need to be identical in order to provide the safe harbor. The Board responds that a Federal contractor that complies with the Department of Labor's notice-posting rule will be deemed in compliance with the Board's requirement.[135]

## 3. Exceptions

The rule applies only to employers that are subject to the NLRA. Under NLRA Section 2(2), "employer" excludes the United States government, any wholly owned government corporation, any Federal Reserve Bank, any State or political subdivision, and any person subject to the Railway Labor Act, 45 U.S.C. 151 et seq. 29 U.S.C. 152(2). Thus, under the proposed rule, those excluded entities are not required to post the notice of employee rights. The proposed rule also does not apply to entities that employ only individuals who are not considered "employees" under the NLRA. See Subpart A, below; 29 U.S.C. 152(3). Finally, the proposed rule does not apply to entities over which the Board has been found not to have jurisdiction, or over which the Board has chosen through regulation or adjudication not to assert jurisdiction.[136] The Board proposed that all employers covered under the NLRA would be subject to the notice posting rule. 75 FR 80413.

The Coalition for a Democratic Workplace argues that the final rule cannot be applied to religiously-affiliated employers. The Coalition argues that assertion of jurisdiction would "substantially burden [such employers'] exercise of religion in violation of both the First Amendment and the Religious Freedom Restoration Act." Similarly, Seyfarth Shaw contends that religiously-affiliated healthcare institutions should be excluded from coverage if they are nonprofit and hold themselves out to the public as being religious.

The Board examines jurisdictional issues on a case-by-case basis, and the Board's jurisdiction jurisprudence is highly complex. The Board has asserted jurisdiction over some religiously-affiliated employers in the past, but has declined to assert jurisdiction over other religiously-affiliated employers. See, e.g., Ecclesiastical Maintenance Service, 320 NLRB 70 (1995), and St. Edmund's High School, 337 NLRB 1260 (2002). In Ukiah Valley Medical Center, the Board found that neither the First Amendment nor the Religious Restoration Act precludes the Board from asserting jurisdiction over a religiously-affiliated employer. 332 NLRB 602 (2000). If an employer is unsure whether the Board has jurisdiction over its operations, it may contact the Board's regional office.

In its comment, the United Stated Postal Service points out that it has different statutory rules from those covering other private sector employees. Labor relations in the Postal Service are governed by Chapter 12 of the Postal Reorganization Act of 1970, 39 U.S.C. 1201 et seq. Section 1209(a) of the Postal Reorganization Act generally makes the NLRA applicable to all employee-management relations "to the extent not inconsistent with the provisions of this title." As raised by the comment, there are indeed several areas in which the Postal Reorganization Act is inconsistent with the NLRA. The principal differences are that an agency shop is prohibited (id. section 1209(a)) and that postal employees may not strike. Id. Section 410(b)(1)(incorporating 5 U.S.C. 7311).

In light of these differences, the Board agrees that a postal worker-specific notice is necessary. The Board, however, does not wish to create a notice without the benefit of specific public comment on

this issue. Accordingly, the Board will exclude the United States Postal Service from coverage under the final rule; the Board may, at a later date, request comments on a postal worker-specific notice.

# Subpart B—Enforcement and Complaint Procedures

Subpart B of the rule contains procedures for enforcement of the employee notice-posting requirement. In crafting Subpart B, the Board was mindful of the need to identify an effective remedy for noncompliance with the notice-posting requirement. The Board gave careful consideration to several alternative approaches to enforcing the rule's notice-posting requirements. Those alternatives, not all of which are mutually exclusive, were (1) Finding the failure to post the required notices to be an unfair labor practice; (2) tolling the statute of limitations for filing unfair labor practice charges against employers that fail to post the notices; (3) considering the willful failure to post the notices as evidence of unlawful motive in unfair labor practice cases; (4) voluntary compliance. **75 FR 80413**-80414.

As explained in the NPRM, the Board considered but tentatively rejected relying solely on voluntary compliance. This option logically would appear to be the least conducive to an effective enforcement of the notice-posting requirement, and the Board's limited experience with voluntary posting of notices of employee rights seems to confirm this. When an election petition is filed, the Board's Regional Office sends the employer Form NLRB-5492, Notice to Employees, together with a leaflet containing significant "Rights of Employees." See the Board's Casehandling Manual, Part Two—Representation Proceedings, Section 11008.5, found on the Board's Web site, **http://www.nlrb.gov**. The Regional Office also asks employers to post the notice of employee rights in the workplace; however, the Board's experience is that the notices are seldom posted. Id. at 80414. Moreover, because the notice is voluntary and there is no enforcement scheme, there is no remedy to fix the problem when the notice is not posted. The Board has found nothing in the comments to the NPRM that would give it reason to believe that voluntary compliance would be any more effective under the present notice rule. Therefore, the Board has decided not to rely on voluntary compliance. Instead the final rule provides that failing to post the notice may be found to be an unfair labor practice and may also, in appropriate circumstances, be grounds for tolling the statute of limitations. In addition, a knowing and willful failure to post employee notices may be found to be evidence of unlawful motive in an unfair labor practice case. (As the Board also explained in the NPRM, it did not consider imposing monetary fines for noncompliance, because the Board lacks the statutory authority to impose "penalties or fines." See, e.g., Republic Steel Corp. v. NLRB, 311 U.S. 7, 10-12 (1940).) These provisions have two purposes: to ensure that any violations of the notice-posting requirement that occur may be remedied where necessary, and to describe how violations of the notice-posting requirement may affect other Board proceedings.[137]

The Board received several hundred comments regarding the proposed means of enforcing the notice posting requirement. Those that favor implementing the rule also favor the proposed

enforcement mechanisms.<sup>[138]</sup> Those opposing the rule generally oppose all three enforcement mechanisms.

# A. Noncompliance as an Unfair Labor Practice

The rule requires employers to inform employees of their NLRA rights because the Board believes that employees must know their rights in order to exercise them effectively. Accordingly, the Board may find that an employer that fails or refuses to post the required notice of employee rights violates Section 8(a)(1) of the NLRA, **29 U.S.C. 158**(a)(1) by "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of the rights guaranteed in section 7 (**29 U.S.C. 157**)."

As it explained in the NPRM, the Board expects that most employers that fail to post the required notice will do so simply because they are unaware of the rule, and that when it is called to their attention, they will comply without the need for formal administrative action or litigation. When that is not the case, the Board's customary procedures for investigating and adjudicating alleged unfair labor practices may be invoked. See NLRA Sections 10 and 11, **29 U.S.C. 160**, 161; **29 CFR part 102**, subpart B.[139] When the Board finds a violation, it will customarily order the employer to cease and desist and to post the notice of employee rights as well as a remedial notice. [140] **75 FR 80414**.

The comments opposing this proposal make three principal arguments. First, only Congress, not the Board, has the authority to "create a new unfair labor practice."[141] Second, even if the Board possesses such authority, it has not identified the Section 7 rights that would be interfered with by an employer's failure to post the notice.[142] Third, "interfer[ing] with, restrain[ing], or coerc[ing]" employees within the meaning of NLRA Section 8(a)(1) necessarily involves action, not failure to act; therefore, failure to post the notice cannot violate Section 8(a)(1).[143] The Board finds no merit in any of these contentions.

To begin with, it is incorrect to say that the Board lacks the authority to find that failure to post the notice violates Section 8(a)(1) without Congressional approval. It is true, as the Society for Human Resource Management states, that "Section 10(a) of the Act specifically limits the NLRB's powers to preventing only the unfair labor practices listed in Section 8 of the Act. Section 8 is silent regarding any notice posting requirement (emphasis in original)." However, as the Supreme Court remarked long ago,

The [NLRA] did not undertake the impossible task of specifying in precise and unmistakable language each incident which would constitute an unfair labor practice. On the contrary that Act left to the Board the work of applying the Act's general prohibitory language in the light of the infinite combinations of events which might be charged as violative of its terms. Thus a "rigid scheme of remedies" is avoided and administrative flexibility within appropriate statutory limitations obtained to accomplish the dominant purpose of the legislation.

Republic Aviation Corporation v. NLRB, 324 U.S. 793, 798 (1945) (citation omitted). Accordingly, since its creation, the Board in interpreting Section 8(a)(1) has found numerous actions as to which "Section 8 is silent"—e.g., coercively interrogating employees about their protected concerted activities, engaging in surveillance of employees' union activities, threatening employees with retaliation for engaging in protected activities—to violate Section 8(a)(1) by "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of the rights guaranteed in section 7" of the NLRA. Section 8 is equally silent concerning unions' duty to inform employees of their rights under NLRB v. General Motors, above, and Communications Workers v. Beck, above, before attempting to obligate them pursuant to a union-security clause, yet the Board finds that a union's failure to provide that notice restrains and coerces employees in violation of Section 8(b)(1)(A). California Saw & Knife Works, above, 320 NLRB at 233, 259, 261.[144]

Because, as described in detail above, notice posting is necessary to ensure effective exercise of Section 7 rights, a refusal to post the required notice is at least an interference with employees' exercise of those rights. For these reasons, in finding that an employer's failure to post the required notice interferes with, restrains, or coerces employees in the exercise of their NLRA rights, in violation of Section 8(a)(1), the Board is acting consistently with its settled practice. Some comments claim that the Board has not identified any specific Section 7 right to justify this remedy. But such specificity is not needed, because all Section 7 rights are implicated by an employer's failure to post the required notice. As previously stated, there is a strong nexus between knowledge of Section 7 rights and their free exercise. It therefore follows that an employer's failure to post this notice, which informs employees of their Section 7 rights, reasonably tends to interfere with the exercise of such rights.

Finally, although most violations of the NLRA involve actions rather than failures to act, there are instances in which a failure to act may be found to interfere with, restrain, or coerce employees in the exercise of their Section 7 rights. Thus, a union's failure to provide the required notices under NLRB v. General Motors, above, and Communications Workers v. Beck, above, violates Section 8 (b)(1)(A) of the NLRA. California Saw & Knife Works, above, 320 NLRB at 233, 259, 261. An employer that fails or refuses to execute an agreed-to collective-bargaining agreement on request of the union violates Section 8(d), 8(a)(5) and, derivatively, Section 8(a)(1). An employer that fails to provide relevant information requested by the union that represents the employer's employees violates Section 8(a)(5) and (1). See, e.g., NLRB v. Truitt Mfg. Co., 351 U.S. 149 (1956).

The NLRA's recognition that a failure to perform a legal duty may constitute unlawful interference, coercion or restraint is not unique. Courts have expressly held that the failure to post notice required by regulation can be an "interference" with employee Family and Medical Leave Act rights. In a provision that "largely mimics th[e language of] § 8(a)(1) of the NLRA,"Bachelder v. Am. W. Airlines, 259 F. 3d 1112, 1123 (9th Cir. 2001), the FMLA states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title." 29 U.S.C. 2615(a)(1). In interpreting this language, the Department of

Labor's regulations specifically state that failure to post the required notice of FMLA rights "may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights" under section 2615(a)(1). 29 CFR 825.300(e). Courts have agreed, finding that the failure to provide FMLA notices is an "adverse action" against the employee that supports a prima facie case of interference. Greenwell v. Charles Machine Works, Inc., (W.D. Ok. April 15, 2011); Smith v. Westchester County, (S.D.N.Y. February 14, 2011). Accordingly, the Board finds no impediment to declaring that an employer's failure to post the required notice will violate Section 8(a)(1). [145]

As it explained in the NPRM, however, the Board expects that, in practice, few violations will be found for failures to post the notice. The Board anticipates that most employers that fail to post the notice will do so because they are unaware of the rule, and that when they learn about the rule, they will post the notice without the need for formal administrative action or litigation. 75 FR 80414. To that end, § 104.212(a) of the rule states that if an unfair labor practice charge is filed alleging failure to post the notice, "the Regional Director will make reasonable efforts to persuade the respondent employer to post the * * * notice expeditiously," and that "[i]f the employer does so, the Board expects that there will rarely be a need for further administrative proceedings." 75 FR 80419.

Numerous comments assert that finding the failure to post the notice to be an unfair labor practice is too harsh a remedy, especially for small employers that are more likely to be excusably unaware of the rule. [146] As just stated, in practice it should almost never be necessary for proceedings to reach that point. For the few employers that may ultimately be found to have violated Section 8(a)(1) by failing to post the notice of employee rights, the only certain consequences will be an order to cease and desist and that the notice and a remedial notice be posted; those remedies do not strike the Board as severe.

Michigan Health & Hospital Association urges that an employer be allowed to correct an initial failure to post the notice without further consequences; Fireside Distributors, Inc. agrees and asks that technical violations of the rule not be subject to a finding of a violation. The Heritage Foundation backs the same approach for inadvertent failures to post. The Board disagrees. To repeat, the Board anticipates that most employers that inadvertently fail to post the notice will do so on being informed of the posting requirement, and that in those circumstances further proceedings will rarely be required. However, the Board believes that this matter is best handled through the General Counsel's traditional exercise of prosecutorial discretion in accordance with the directions given here.

California Chamber and NCAE contend that the Board should specify the "reasonable efforts" a Regional Director will make to persuade an employer to post the notice when a charge alleging a failure to post has been filed. They propose that the rule be amended to state that the Board will send the employer at least two mailed letters, with the notice enclosed, requesting that the employer post the notice within a specified period of time, preferably 30 days. They also assert that the Board must specify the circumstances in which additional proceedings will be appropriate. The Heritage

Foundation urges that § 104.212(a) be modified to state that if an employer promptly posts the notice, "there will be no further administrative proceedings, unless the Board has information giving the Board reason to believe that the preceding failure to do so was intentional." The Board rejects these suggestions because they would create unnecessary obstacles to effective enforcement of the notice requirement. That requirement is straightforward, and compliance should be a simple matter. The Board believes that the General Counsel should have discretion to address particular cases of non-compliance efficiently and appropriately, depending upon the circumstances.

## B. Tolling the Section 10(b) Statute of Limitations

NLRA Section 10(b) provides in part that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board[.]" 29 U.S.C. 160(b). However, as the Board stated in the NPRM, the 6-month filing period does not begin to run until the charging party has actual or constructive notice of the allegedly unlawful conduct. See, e.g., John Morrell & Co., 304 NLRB 896, 899 (1991), review denied 998 F.2d 7 (D.C. Cir. 1993) (table). 75 FR 80414. This makes intuitive sense, because it would be unfair to expect charges to be filed before the charging party could reasonably have known that the law was violated. Similar concerns for fairness justify tolling the statute of limitations where an employee, although aware of the conduct in question, is excusably unaware that the conduct is unlawful because mandatory notice was not given to the employee. The Board found that widespread ignorance of NLRA rights justified requiring notice to be posted. The Board cited the observation of the U.S. Court of Appeals for the Third Circuit in a case involving the failure to post the notice required under the ADEA, that "[t]he [ADEA] posting requirement was undoubtedly created because Congress recognized that the very persons protected by the Act might be unaware of its existence."Bonham v. Dresser Industries, 569 F.2d 187, 193 (1977), cert. denied 439 U.S. 821 (1978). Accordingly, the Board proposed that tolling the 10(b) period for filing unfair labor practice charges might be appropriate where the required notice has not been posted. 75 FR 80414. For the reasons discussed below, the Board adheres to that view.

Section 10(b) is a statute of limitations, and statutes of limitations are presumed to include equitable tolling whenever the statute is silent or ambiguous on the issue. Irwin v. Dep't Veterans Affairs, 498 U.S. 89, 94-96 (1990); Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 392-98 (1982); see Young v. United States, 535 U.S. 43, 49 (2002) ("It is hornbook law that limitations periods are customarily subject to equitable tolling, unless tolling would be inconsistent with the text of the relevant statute." (quotations and citations omitted)); Hallstrom v. Tillamook County, 493 U.S. 20, 27 (1989) ("The running of such statutes is traditionally subject to equitable tolling."); Honda v. Clark, 386 U.S. 484, 501 (1967); Glus v. Brooklyn E.D. Terminal, 359 U.S. 231, 232-33 (1959) (equitable tolling of statutes of limitations is "[d]eeply rooted in our jurisprudence"); Holmberg v. Armbrecht, 327 U.S. 392, 396-97 (1946) (equitable tolling is "read into every federal statute of limitation").

In Zipes, the Supreme Court held that the timeliness provision of Title VII's charge-filing requirement was "subject to waiver, estoppel and equitable tolling." 455 U.S. at 392-98. The Supreme Court expressly analogized to the NLRA, and stated that Section10(b) was not jurisdictional: "[T]he time requirement for filing an unfair labor practice charge under the National Labor Relations Act operates as a statute of limitations subject to recognized equitable doctrines and not as a restriction of the jurisdiction of the National Labor Relations Board."Id. at n.11. Zipes strongly supports the proposed rule. The analogy between Title VII and the NLRA is well established, and neither the holding of Zipes regarding Title VII nor Zipes' characterization of 10(b) has ever been called into doubt.

Notices of employment rights are intended, in part, to advise employees of the kinds of conduct that may violate their rights so that they may seek appropriate remedies when violations occur. Failure to post required notices deprives employees of both the knowledge of their rights and of the availability of avenues of redress. Accordingly, a substantial majority of the courts of appeals—including the First, Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Eleventh Circuits—have adopted the doctrine that the failure to post required employment law notices may result in equitable tolling of the statute of limitations. Mercado v. Ritz-Carlton San Juan Hotel, 410 F.3d 41, 47-48, 95 FEP Cases 1464 (1st Cir. 2005) (Title VII); Bonham v. Dresser Industries, above, 569 F.2d at 193 (ADEA); Hammer v. Cardio Medical Products, Inc., 131 Fed. Appx. 829, 831-832 (3d Cir. 2005) (Title VII and ADEA); Vance v. Whirlpool Corp., 716 F.2d 1010 (4th Cir. 1983) (describing notice posting tolling as "the prevailing view of the courts"); Elliot v. Group Med. & Surgical Serv., 714 F.2d 556, 563-64 (5th Cir. 1983); EEOC v. Kentucky State Police Dept., 80 F.3d 1086, 1096 (6th Cir. 1996), cert. denied 519 U.S. 963 (1996); Posey v. Skyline Corp., 702 F.2d 102 (7th Cir. 1983); Schroeder v. Copley Newspaper, 879 F.2d 266 (7th Cir. 1989); Kephart v. Inst. Gas Tech., 581 F.2d 1287, 1289 (7th Cir. 1978); Beshears v. Asbill, 930 F.2d 1348 (8th Cir. 1991); McClinton v. Alabama By-Prods. Corp., 743 F.2d 1483 (11th Cir. 1984); see also Henchy v. City of Absecon, 148 F. Supp. 2d 435, 439 (D. N.J. 2001); Kamens v. Summit Stainless, Inc., 586 F. Supp. 324, 328 (E.D. Pa. 1984) (FLSA).[147] (But see Wilkerson v. Siegfried Ins. Agency, Inc., 683 F.2d 344, 347 (10th Cir. 1982) ("the simple failure to post [Title VII and ADEA] notices, without intent to actively mislead the plaintiff respecting the cause of action, does not extend the time within which a claimant must file his or her discrimination charge."))

After careful consideration, the Board is persuaded that the prevailing judicial view should apply in the NLRA context as well.[148] As an equitable concept, equitable tolling is a matter of fairness. The Board has determined that many employees are unaware of their NLRA rights and has devised a minimally burdensome means of attempting to rectify that situation—requiring employers to post workplace notices informing employees of those rights. To bar an employee who is excusably unaware of the NLRA from seeking a remedy for a violation of NLRA rights because he or she failed to file an unfair labor practice charge within the 10(b) period, when the employer did not post the required notice, would unfairly deprive the employee of the protection of the Act because of the

employer's failure to comply with its legal responsibilities. To deny equitable tolling in such circumstances "would grant to the employee a right to be informed without redress for violation."Bonham v. Dresser Industries, above, 569 F.2d at 193.—[149]

The Board received many comments opposing this proposed rule provision. Several comments assert that, when a charging party is unaware of the facts supporting the finding of an unfair labor practice, the Board tolls the 10(b) period only when the charged party has fraudulently concealed those facts from the charging party.—[150] That is not so. The Board has long held, with court approval, that the 10(b) period begins to run only when the charging party has notice that the NLRA has been violated. The party asserting the 10(b) defense has the burden to show such notice; it may do so by showing that the charging party had either actual or constructive knowledge of the alleged unfair labor practice prior to the 10(b) period. See, e.g., Broadway Volkswagen, 342 NLRB 1244, 1246 (2004), enfd. sub nom. East Bay Automotive Council v. NLRB, 483 F.2d 628, 634 (9th Cir. 2007); University Moving & Storage Co., 350 NLRB 6, 7, 18 (2007); John Morrell & Co., above, 304 NLRB at 899; Pullman Building Company, 251 NLRB 1048 (1980), enfd. 691 F.2d 507 (9th Cir. 1982) (table); Burgess Construction, 227 NLRB 765, 766 (1977), enfd. 596 F.2d 378 (9th Cir. 1978), cert. denied 440 U.S. 940 (1979). Knowledge may be imputed if the charging party would have discovered the unlawful conduct by exercising reasonable or due diligence. Broadway Volkswagen, above, 342 NLRB at 1246. Certainly, the Board has found it appropriate to toll the 10(b) period when the charging party was excusably unaware of the pertinent facts because the charged party had fraudulently concealed them; see, e.g., Burgess Construction, above, 227 NLRB at 766; but tolling is not limited to such circumstances. Pullman Building Company, above, 251 NLRB at 1048.

To the extent that the comments argue that the Board should not engage in equitable tolling of the 10(b) period when an employer has merely failed to post the notice but not engaged in fraudulent concealment,—[151] the Board disagrees. Fraudulent concealment concerns a different kind of equitable doctrine, and is not directly relevant to the notice posting equitable tolling doctrine hereby adopted. See Mercado, above, 410 F.3d at 46-47 n.8 (employer misconduct and equitable tolling doctrine form "two distinct lines of cases apply[ing] two distinct standards to two distinct bases for equitable tolling").

Some comments argue that because Section 10(b) contains a limited exception to the 6-month filing period for employees in the military, it is improper for the Board to toll the 10(b) period under other circumstances.—[152] The Board rejects this argument as foreclosed by the Supreme Court's holding in Zipes, above, and by the long line of Board and court decisions finding tolling of the 10(b) period appropriate. In any event, the exception in Section 10(b) for persons in the military provides that if the aggrieved person "was prevented from filing such charge by reason of service in the armed forces, in which event the six-month period shall be computed from the day of his discharge." This provision does not toll the six-month period during armed service; rather, it states that the six-month period begins at discharge. See Holland v. Florida, 130 S.Ct. 2549, 2561 (2010)

(rejecting argument that explicit exceptions to time limits in nonjurisdictional statute of limitations precluded equitable tolling). [153]

A number of comments contend that tolling the 10(b) period is contrary to the salutary purpose of statutes of limitations in general, and 10(b) in particular, which is "to require diligent prosecution of known claims, thereby providing finality and predictability in legal affairs and ensuring that claims will be resolved while evidence is reasonably available and fresh." [154] Black's Law Dictionary, 9th Edition, at 1546. The Board recognizes that with the passage of time evidence can be lost and witnesses die, move away, or their memories fade; it therefore will not lightly find that the 10(b) period should be tolled. However, like the courts whose decisions are cited above, the Board also recognizes that equitable tolling is a fundamental part of the statute of limitations, and that inequity results from barring an individual from seeking relief from a violation of his or her NLRA rights where the individual excusably was unaware of these rights. After all, the purpose of a statute of limitations is to "require diligent prosecution of known claims," not claims that are unknown to the injured party. As to concerns that the statute of limitations could be tolled for years, "perhaps indefinitely," [155] the Board responds that such a potential also exists under other statutes, as well as under the NLRA when a charging party is unaware of the facts giving rise to an alleged unfair labor practice. However, at this point, concerns about the unfairness of lengthy tolling periods are entirely speculative. Tolling is an equitable matter, and one factor to be considered in deciding whether equitable tolling is appropriate is whether it would prejudice the respondent. Mercado, above, 410 F.3d at 48. Accordingly, if a lengthy tolling of the 10(b) period would prejudice an employer in a given case, the Board could properly consider that factor in determining whether tolling was appropriate in that case. [156]

Several comments argue against tolling the 10(b) period because "ignorance of the law is no excuse." [157] This argument is amply refuted by the court decisions cited above, in which limitations periods under other workplace statutes were tolled because employers failed to post required notices. Most notably, the Fifth Circuit has emphasized that the failure to post a required notice "vitiates the normal assumption that an employee is aware of his rights." Elliot v. Group Med. & Surgical Serv., 714 F.2d 556, 563-64 (5th Cir. 1983). In any event, the maxim relied on is generally understood to have arisen in order to prevent individuals (usually in criminal cases) from deliberately failing to ascertain whether actions they contemplate taking would be lawful, and then pleading ignorance when accused of lawbreaking. [158] In the Board's view, this reasoning loses much of its force when applied to individuals, such as charging parties in unfair labor practice cases, who are not accused of any wrongdoing but who claim to have been injured by the unlawful actions of other parties.

The Board emphasizes, however, that failure to post the required notice will not automatically warrant a tolling remedy. If an employer proves that an employee had actual or constructive knowledge of the conduct alleged to be unlawful, as well as actual or constructive knowledge that the conduct violated the NLRA, and yet failed to timely file an unfair labor practice charge, the

Board will not toll the 10(b) period merely because of the employer's failure to post the notice. Cf. John Morrell & Co., above, 304 NLRB at 899.

The Board asked for comments concerning whether unions filing unfair labor practice charges should be deemed to have constructive knowledge of the unlawful character of the conduct at issue. All of the comments that addressed this issue answered in the affirmative.[159] Unlike most employees, unions routinely deal with issues arising under the NLRA and are therefore more familiar with the Act's provisions. Accordingly, the tolling provisions in the final rule apply only to charges filed by employees, not those filed by unions. (The Board still could toll the 10(b) period if a charging party union did not discover the facts underlying the charge within six months, if the employees reporting those events failed to alert the union within that time because they were excusably unaware of their NLRA rights.)

Several comments contend that failure to post the required notice should not toll the 10(b) period if an employee who files an unfair labor practice charge is either a union member or is represented by a union. Taft Stettinius & Hollister LLP asserts that the burden should be placed equally on unions to ensure that their organizers and members are aware of employee rights under the NLRA. California Chamber and NCAE observe that knowledge of a filing time limit is generally imputed to an individual who is represented by an attorney, see, e.g., Mercado v. Ritz-Carlton San Juan Hotel, above, 410 F.3d at 47-48; they urge that an employee who is represented by a union should be treated similarly. Conversely, three Georgetown University law students oppose the idea that union-represented employees should be deemed to have constructive knowledge of NLRA rights. They reason that some workplaces may have unrepresented as well as represented employees, and that imputing knowledge to the latter group would provide an incentive not to post the notice, thus depriving the former group of needed information. The students also suggest that some employees, though represented, may have little contact with their unions and rely on workplace notices instead of unions for relevant information.

The Board finds some merit in both sets of contentions. On the one hand, it is reasonable to assume that employees who are represented by unions are more likely to be aware of their NLRA rights than unrepresented employees. And, although being represented by a union is not the same as being represented by legal counsel, it is reasonable to assume that union officials are sufficiently conversant with the NLRA to be able to give employees effective advice as to their NLRA rights. On the other hand, some employees, though represented by unions, may in fact have little contact with their bargaining representatives for one reason or other and may, in fact, be filing charges against their representative. Thus, the Board does not find it appropriate under all circumstances to impute knowledge of NLRA rights to charge-filing employees who are union members or are represented by unions. Rather, the Board will consider evidence concerning the union's representational presence and activity in determining whether it is appropriate to toll the 10(b) period.

# C. Failure To Post as Evidence of Unlawful Motive

The Board suggested that it could consider an employer's knowing failure to post the notice as evidence of unlawful motive in an unfair labor practice proceeding in which motive is an issue. 75 FR 80414-80415. A number of comments assert that the Board cannot properly take that step.[160] To the contrary, the Board has often considered other unlawful conduct as evidence of antiunion animus in cases in which unlawful motive was an element of an unfair labor practice.[161] See, e.g., Leiser Construction, LLC, 349 NLRB 413, 417-419 (2007) (threats, coercive statements, interrogations evidence of unlawfully motivated failure to hire), enfd. 281 Fed. Appx. 781 (10th Cir. 2008) (unpublished); Shearer's Foods, 340 NLRB 1093, 1094 (2003) (plant closing threat evidence of unlawfully motivated discharge); Ferguson-Williams, Inc., 322 NLRB 695, 703, 707 (1996) (threats, interrogations, creation of impression of surveillance, evidence of unlawfully motivated discharge); Champion Rivet Co., 314 NLRB 1097, 1098 (1994) (circulating unlawful antiunion petition, refusal to recognize and bargain with union, evidence of unlawfully motivated failure to hire). Thus, it is proper for the Board to consider a knowing and willful failure to post the notice as evidence of unlawful motive.

However, the Board has noticed that it employed somewhat inconsistent language in the NPRM regarding the consideration of failure to post the notice as evidence of antiunion animus. Thus, the caption of paragraph 104.214(b) reads: "Knowing noncompliance as evidence of unlawful motive." However, the paragraph itself states that "If an employer has actual or constructive knowledge of the requirement to post the notice and fails or refuses to do so, the Board may consider such a willful refusal as evidence of unlawful motive in a case in which motive is an issue." (Emphasis added in both cases.) 75 FR at 80420. In the preamble to the NPRM, the Board referred only to knowing noncompliance as evidence of unlawful motive. 75 FR at 80414-80415. On reflection, the Board wishes to clarify this provision to state that, to be considered as evidence of unlawful motive, an employer's failure to post the notice must be both knowing and willful—i.e., the employer must have actual (as opposed to constructive) knowledge of the rule and yet refuse, on no cognizable basis, to post the notice. The Board is revising the language of the rule accordingly.

The comment that prompted these revisions urges that there should be no adverse consequences for the employer that does not post the notice because it has a good-faith (but, implicitly, erroneous) belief that it is not covered by the NLRA.[162] The Board rejects this contention as it pertains to finding the failure to post to be an unfair labor practice or grounds for tolling the 10(b) period. Failure to post the notice interferes with employees' NLRA rights regardless of the reason for the failure; good faith, though commendable, is irrelevant.[163] Additionally, tolling is concerned with fairness to the employee, and these fairness concerns are unaffected by the employer's good or bad faith; as previously noted, notice posting tolling is fundamentally different from tolling based upon employer misconduct. However, an employer that fails to post the notice only because it honestly but erroneously believes that it is not subject to the NLRB's jurisdiction does not thereby indicate

that it is hostile to employees' NLRA rights, but only that it believes that those rights do not apply in the employer's workplace. In such a case, the employer's good faith normally should preclude finding the failure to post to be willful or evidence of antiunion animus.

ACC contends that even though the rule states that only a "willful" failure to post the notice may be considered evidence of unlawful motive, in practice the Board will always infer at least constructive notice from the publication of the rule in the Federal Register and the maxim that "ignorance of the law is no excuse."[164] The Board rejects this contention. The quoted maxim means only that an employer's actual lack of knowledge of the rule would not excuse its failure to post the notice. It would, however, undercut any suggestion that the failure to post was willful and therefore indicative of unlawful motive.

Contrary to numerous comments,[165] finding a willful failure to post the notice as evidence of animus is not the same as adopting a "presumption of animus" or "presumption of unlawful motive." There is no such presumption. The Board's general counsel would have the burden of proving that a failure to post was willful. In any event, a willful failure to post would not be conclusive proof of unlawful motive, but merely evidence that could be considered, along with other evidence, in determining whether the general counsel had demonstrated unlawful motive.[166] Likewise, contrary to the contentions of ALFA and AHCA, the Board will not assume that any failure to post the notice is intentional and meant to prevent employees of learning their rights.

## D. Other Comments

The Board received many comments asserting that if the proposed enforcement scheme for failure to post the required notice is adopted, union adherents will tear down the notices in order to harass employers and, particularly, to vitiate 10(b).[167] These comments express the concern that tolling the 10(b) period will lead to a flood of unfair labor practice charges, and that, to avoid that eventuality, employers will have to incur significant costs of policing the postings and/or installing expensive tamper-proof bulletin boards.[168] In the absence of experience with such postings, the Board deems these concerns speculative at this time. If particular employers experience such difficulties, the Board will deal with them on a case-by-case basis. However, as explained above, tolling is an equitable matter, and if an employer has posted the notice and taken reasonable steps to insure that it remains posted, it is unlikely that the Board would find tolling appropriate.

California Chamber and NCAE ask the Board to specify the "additional remedies" that may be imposed in the event of a notice posting violation. 104.213(a). The Board has broad discretion in crafting remedies for violations of the NLRA. NLRB v. Seven-Up Bottling Co. of Miami, 344 U.S. 344, 346 (1953). The remedies imposed in a given case depend on the nature of the violations and the particular facts in the case. The Board declines to speculate as to every possible remedy that might be imposed in every imaginable set of circumstances.

Several comments protest that employers could be fined for failing to post the notice; several others contend that the Board should levy fines instead of imposing the proposed remedies. The Board rejects both contentions because, as explained in the NPRM, the Board does not have the authority to impose fines. 75 FR 80414, citing Republic Steel Corp. v. NLRB, 311 U.S. 7, 10-12 (1940). Another comment argues that the Board should not provide remedies for failing to post the notice because such remedies are not provided under other statutes. In fact, both remedies and sanctions are imposed under some statutes; see, e.g., 29 CFR 1601.30 (fine of $110 per offense for failing to post notice under Title VII); 29 CFR 825.300(a)(1) (same sanction for failing to post notice under FMLA); cases cited above for tolling of limitation periods for failing to post notices under several statutes.

One comment contends that the proposed remedies were proposed solely as means of deterring failures to post the notices, and are therefore inappropriate; several other comments assert that the proposed remedies are punitive. [169] Although the Board disagrees, there is language in the NPRM that may have inadvertently suggested that the enforcement mechanisms were proposed solely for deterrent purposes. The Board wishes to correct any such misimpression. As stated above, in explaining why it was proposing those mechanisms, the Board stated in its NPRM that it was "mindful of the need to identify effective incentives for compliance." 75 FR 80413. Later, referring to tolling the 10(b) period and considering a willful failure to post the notice as evidence of unlawful motive, the Board said that it "proposes the following options intended to induce compliance with the notice-posting requirement."Id. at 80414. However, the Board made those statements while explaining why it had determined not to rely entirely on employers' voluntary compliance with the rule. (The Board had had little success in persuading employers to voluntarily post notices of employee rights during the critical period leading up to a representation election.) Id. By noting that the proposed enforcement scheme would have some deterrent effect in that context, the Board did not mean to imply that it was proposing those measures solely for deterrence purposes. For the reasons discussed at length above, the Board has found that finding a failure to post the notices to violate Section 8(a)(1) and, in appropriate circumstances, to warrant tolling the 10(b) period and/or inferring unlawful motive in an unfair labor practice case are legitimate remedial measures supported by extensive Board and court precedent.

In addition, in a number of places the NPRM used the term "sanctions" in a very loose sense to refer to aspects of the proposed enforcement scheme, inadvertently suggesting that this scheme was punitive. The term "sanctions" was an inapt choice of descriptor for the enforcement scheme: the classic 8(a)(1) remedial order has long been upheld as nonpunitive; equitable tolling is concerned with fairness to employees, not punishment of misconduct, and is fully consistent with current Board doctrine; and the animus provision is little more than the common-sense extension of well-established evidentiary principles that apply to many other NLRA violations, and is also not designed to punish employers. That they may also furnish incentives for employers to comply with the notice-posting rule does not detract from their legitimacy; if it were otherwise, the Board could never impose any remedy for violations of the NLRA if the remedy had a deterrent effect. In any

event, the Board hereby disavows any suggestion from statements in the NPRM that the remedial measures were proposed solely as penalties.

Contrary to the tenor of numerous comments opposing this rule,[170] the Board is not issuing the rule in order to entrap unwary employers and make operations more difficult for them because of inadvertent or technical violations. It is doing so in order that employees may come to understand their NLRA rights through exposure to notices posted in their workplaces explaining those rights. Accordingly, the important thing is that the notices be posted. As explained above, an employer that fails to post the notice because it is unaware of the rule, but promptly posts the notice when the rule is brought to its attention, will nearly always avoid any further proceedings. Similarly, an employer that posts the notice but fails initially to comply with one of the technical posting requirements will almost always avoid further problems by correcting the error when it is called to the employer's attention. And if an employer is unsure of what the rule requires in a particular setting, it can seek and receive guidance from the Board.

The Service Employees International Union and the United Food and Commercial Workers propose that, in addition to the proposed enforcement scheme, the rule state that an employer's knowing failure to post the notice of employee rights during the critical period before a representation election shall be grounds for setting the election aside on the filing of proper objections. The Board finds that this is unnecessary, because the Board's notice of election, which must be posted by an employer three working days before an election takes place, contains a summary of employee NLRA rights and a list of several kinds of unfair labor practices, and failure to post that notice already constitutes grounds for setting an election aside.[171] In any event, during a union organizing campaign, the union can instruct members of its in-plant organizing committee to verify whether the notice required under this rule has been posted; if it has not, the union can so inform the employer and, if need be, the Board's regional office.

## Subpart C—Ancillary Matters

Several technical issues unrelated to those discussed in the two previous subparts are set out in this subpart.

## IV. Dissenting View of Member Brian E. Hayes

"Agencies may play the sorcerer's apprentice but not the sorcerer himself."[172]

Today, my colleagues conjure up a new unfair labor practice based on a new statutory obligation. They impose on as many as six million private employers the obligation to post a notice of employee rights and selected illustrative unfair labor practices. The obligation to post is deemed enforceable through Section 8(a)(1)'s proscription of interference with employees' Section 7 rights,

and the failure to post is further penalized by equitable tolling of Section 10(b)'s limitations period and the possible inference of discriminatory motivation for adverse employment actions taken in the absence of posting. While the need for a more informed constituency might be a desirable goal, it is attainable only with Congressional imprimatur. The Board's rulemaking authority, broad as it is, does not encompass the authority to promulgate a rule of this kind. Even if it did, the action taken here is arbitrary and capricious, and therefore invalid, because it is not based on substantial evidence and it lacks a reasoned analysis.

## No Statutory Authority for the Proposed Rule

The majority concedes that the "National Labor Relations Act does not directly address an employer's obligation to post a notice of its employees' rights arising under the Act or the consequences an employer may face for failing to do so." In fact, the NLRA [173] makes no mention of any such putative obligation. The majority further acknowledges that the NLRA "is almost unique among major Federal labor laws in not including an express statutory provision requiring employers routinely to post notices at their workplaces informing employees of their statutory rights." Despite the obvious import of these admissions, the majority concludes that the Board's plenary authority under Section 6 of the Act to make rules "necessary to carry out the provisions of the Act" permits promulgation of the rule they advocate. I disagree.

Congress did not give specific statutory authority to the Board to require the posting of a general rights notice when it passed the Wagner Act in 1935. Just one year earlier, however, Congress amended the Railway Labor Act ("RLA") to include an express notice-posting requirement. 45 U.S.C. 152 Eighth; Pub. L. No. 73-442, 48 Stat. 1185, 1188 (1934). As the Supreme Court noted, the RLA served as the model for the National Labor Relations Act. NLRB v. Pennsylvania Greyhound Lines, 303 U.S. 261 (1938). See also NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 44 (1937); H. J. Heinz Co. v. NLRB, 311 U.S. 514, 524-525(1941).

That Congress did not include an express notice-posting requirement when passing the Wagner Act the following year strongly implies, if not compels, the conclusion that Congress did not intend for the Board to have regulatory authority to require such a notice. Nothing in the legislative history hints of any concern by Congress about the need for employers to notify employees generally of their rights under the new enacting statute. Since 1935, despite extensive revisions in the Taft-Hartley Act amendments of 1947 and the Landrum-Griffin Act amendments of 1959, Congress has never added such authority.

On the other hand, when Congress has subsequently desired to include a general rights notice-posting requirement, it has done so expressly in other federal labor and employment laws. See Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. 2000e-10, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. 627, The Occupational Safety and Health Act, 29 U.S.C. 657 (c), the Americans with Disabilities Act (ADA), 42 U.S.C. 12115, the Family and Medical Leave Act

(FMLA), **29 U.S.C. 2619**(a), and the Uniformed Service Employment and Reemployment Rights Act (USERRA), **38 U.S.C. 4334**(a).

The majority points out that the Department of Labor (DOL) promulgated a notice-posting rule under the Fair Labor Standards Act (FLSA), although that statute does not contain a specific statutory provision on workplace postings. However, the FLSA, unlike the NLRA, imposes a data-collection and recordkeeping requirement on employers. **29 U.S.C. 211**(c). DOL's Wage and Hour Administrator promulgated the notice-posting regulation in 1949 in reliance on this requirement. It appears that the propriety of the FLSA rule has never been challenged, perhaps because, unlike the rule promulgated herein, there are no citations or penalties assessed for the failure to post. This is a significant point of distinction that warrants further discussion.

It must be constantly borne in mind that the rule promulgated today makes the failure to post the required notice a violation of the Act. The majority misleadingly seeks to decouple obligation from violation in its analysis by discussing the latter in the context of enforcement of the assertedly lawful notice-posting rule. That is nonsense. Making noncompliance an unfair labor practice is integral to the rule and, consequently, integral to an analysis of whether the notice-posting requirement is a permissible exercise of the Board's rulemaking authority. Of the aforementioned agencies that have notice-posting requirements, none of them makes the failure to post unlawful, absent additional specific statutory authorization. Only the RLA, Title VII, FMLA, and the Occupational Safety Act (OSHA) have such authorizing language. ADA, the ADEA, the FLSA, and the USERRA do not. Consequently, an employer's failure to post a notice under those statutes is not subject to sanction as unlawful.

Thus, both before and after the Wagner Act, Congress has consistently manifested by express statutory language its intent to impose a general notice-posting duty on employers with respect to the rights of employees under various federal labor laws. Only one administrative agency promulgated a notice-posting requirement in the absence of such language in its enabling statute. No agency has made the failure to comply with a notice-posting requirement unlawful absent express statutory authorization, until today.

The explicit inclusion of notice-posting provisions and permissible sanctions by Congress in other labor legislation undercuts the majority's claim that this notice-posting rule is not a "major policy decision properly made by Congress alone." Strangely, the majority does not merely contend that this pattern in comparable labor legislation fails to prove that Congress did not intend that the Board should have the rulemaking authority under Section 6 to mandate the notice posting at issue here. They conversely contend that it proves Congress must have intended to confer such authority on the Board![174]

Perhaps cognizant of the weakness of this position, the majority attempts to downplay the import of Congressional silence on the Board's authority to mandate notice posting and to enforce that

mandate through unfair labor practice sanctions. They cite Cheney R.R. Co. v. ICC, 902 F. 2d 66, 68 -69 (D.C. Cir. 1990), for the proposition that the maxim "expressio unius est exclusio alterius," which holds that the special mention of one thing indicates an intent for another thing not be included elsewhere, may not always be a useful tool for interpreting the intent of Congress. Obviously, the usefulness of this tool depends on the context of a particular statute. Independent Ins. Agents of Am., Inc. v. Hawke, 211 F.3d 638 (D.C. Cir. 2000) (applying the maxim). In my view, the absence of an express notice provision in the NLRA, and the failure to amend the Act to include one when Congress expressly included notice posting provisions in other labor statutes, shows that it did not intend to authorize the Board to promulgate this rule. [175]

Arguing to the contrary, the majority asserts that the notice-posting rule is entitled to deference under the analysis set forth in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Under Chevron, where Congress has not "directly addressed the precise question at issue,"id. at 842-843, that rulemaking authority may be used in order "to fill any gap left, implicitly or explicitly, by Congress."Id. at 843.

Even assuming that the absence of an explicit posting requirement in the NLRA is not interpreted as clear expression of Congressional intent, the majority fails to persuade that Congress delegated authority in Section 6 of the NLRA for the Board to fill a putative statutory gap by promulgating a rule that an employer commits an unfair labor practice by failing to affirmative notify its employees of their rights under the NLRA. As the Supreme Court has explained, "the ultimate question is whether Congress would have intended, and expected, courts to treat [the regulation] as within, or outside, its delegation to the agency of `gap-filling' authority."Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 173 (2007).

There is no doubt that there are many gaps and ambiguities in the NLRA that Congress intended for the Board to address, using its labor expertise, either through adjudication or rulemaking. However, the existence of ambiguity in a statute is not enough per se to warrant deference to the agency's interpretation of its authority in every respect. The ambiguity must be such as to make it appear that Congress either explicitly or implicitly delegated authority to cure that ambiguity. Am. Bar Ass'n v. FTC, 430 F.3d 457, 469 (D.C. Cir. 2005); Motion Picture Ass'n of America, Inc. v. FCC, 309 F. 3d 796, 801 (D.C. Cir. 2002) ("MPAA") ("agency's interpretation of [a] statute is not entitled to deference absent a delegation of authority from Congress to regulate in the areas at issue.").

Thus, even when an administrative agency seeks to address what it believes is a serious interpretive problem, the Supreme Court has said that the agency "may not exercise its authority `in a manner that is inconsistent with the administrative structure that Congress enacted into law.' "FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 125(2000) (quoting ETSI Pipeline Project v. Missouri, 484 U.S. 495, 517(1988)). Further, the statute at issue must be considered as a "symmetrical and coherent regulatory scheme."Gustafson v. Alloyd Co., 513 U.S. 561, 569, 115 S.Ct.

1061, 131 L.Ed.2d 1 (1995). In our case, the exercise of rulemaking authority under Section 6 is not self-effectuating; it must be shown to relate reasonably to some other provision as part of the overall statutory scheme contemplated by Congress. [176]

Nothing in the text or the regulatory structure of the NLRA suggests that the Board has the authority to promulgate the notice-posting rule at issue in order to address a gap in the statutory scheme for resolving questions concerning representation through Section 9, or in preventing, through Sections 8 and 10, specifically enumerated unfair labor practices that adversely affect employees' Section 7 rights. On the contrary, it is well-established that the Board lacks independent authority to initiate or to solicit the initiation of representation and unfair labor practice proceedings, and Section 10(a) limits the Board's powers to preventing only the unfair labor practices listed in Section 8 of the Act. Yet the majority asserts that it may exceed these limitations by requiring employers to post a notice of employee rights and illustrative unfair labor practices at all times, regardless of whether a petition had been filed or an employer has been found to have committed an unfair labor practice.

The majority's reliance on a combination of Section 7, 8, and 10 warrants special mention. They reason that an employer interferes with Section 7 rights in general, and thereby violates Section 8(a)(1), by failing to give continuous notice to employees of those rights. It may be a truism that an employee must be aware of his rights in order to exercise them, but it does not follow that it is the employer under our statutory scheme who must provide enlightenment or else incur liability for violating those rights. The new unfair labor practice created by the rule bears no reasonable relation to any unfair labor practice in the NLRA's pre-existing enforcement scheme developed over seven decades. [177] It certainly bears no relation to the few examples the majority can muster in Board precedent. The only instance with even a passing resemblance to the rights notice-posting requirement here is the requirement that a union give notice of Beck [178] and General Motors [179] rights. However, the failure to give such a notice is not per se unlawful. It becomes an unfair labor practice only when a union, without giving notice, takes the affirmative action of seeking to obligate an employee to pay fees and dues under a union-security clause. [180] Beyond that, a union has no general obligation to give employees notice of their Beck and General Motors rights; much less does it violate the NLRA by failing to do so. By contrast, the rule promulgated today imposes a continuing obligation on employers to post notice of employees' general rights and, even absent any affirmative act involving those rights, makes the failure to maintain such notice unlawful. [181]

Unlike my colleagues, I find that the Supreme Court's opinion in Local 357, Teamsters v. NLRB, 365 U.S. 667 (1961), speaks directly to this point. In that case, the Board found a hiring hall agreement unlawfully discriminatory per se because, even though it included an express anti-discrimination provision, it did not include two additional provisions that the Board declared were necessary to prevent "unlawful encouragement of union membership." The Court disagreed, stating

Perhaps the conditions which the Board attaches to hiring-hall arrangements will in time appeal to the Congress. Yet, where Congress has adopted a selective system for dealing with evils, the Board is confined to that system. National Labor Relations Board v. Drivers, etc. Local Union, 362 U.S. 274, 284-290, 80 S.Ct. 706, 712-715, 4 L.Ed.2d 710. Where, as here, Congress has aimed its sanctions only at specific discriminatory practices, the Board cannot go farther and establish a broader, more pervasive regulatory scheme. [182]

Congress in Section 8(a)(1) aimed its sanctions only at employer actions that interfere with the exercise of Section 7 rights. By this rulemaking, my colleagues go farther and establish a broader, more pervasive regulatory scheme that targets employer inaction, or silence, as unlawful interference. As Local 357 instructs, they lack the authority to do this. [183]

American Hospital Association v. NLRB, 499 U.S. 606 (1991) (AHA), upon which the majority heavily relies, illustrates a valid exercise of authority under Section 6. In AHA, the Supreme Court unanimously upheld the Board's health care unit rule, finding that Section 6's general grant of rulemaking authority "was unquestionably sufficient to authorize the rule at issue in this case unless limited by some other provision in the Act."Id. at 609-10 (emphasis added). The Court further found that the rule was clearly consistent with authority under Section 9(b) to make appropriate bargaining unit determinations. It specifically rejected the argument that language in 9(b) directing the Board to decide the appropriate bargaining unit "in each case" limited its authority to define appropriate units by rulemaking.

Congress expressly authorized the Board in Section 9(b) to determine appropriate bargaining units and the Board exercised its rulemaking authority to promulgate a rule "necessary to carry out" Section 9(b). In contrast, as previously stated, there is no reasonable basis for finding that a rule making it unlawful for employers to fail to post and maintain a notice of employee rights and selected illustrative unfair labor practices is necessary to carry out any substantive section of the NLRA. Nevertheless, the majority construes AHA as an endorsement of deference to the exercise of Section 6 rulemaking authority whenever Congress did not expressly limit this authority. This is patently incorrect. "To suggest, as the [majority] effectively does, that Chevron deference is required any time a statute does not expressly negate the existence of a claimed administrative power * * *, is both flatly unfaithful to the principles of administrative law * * * and refuted by precedent."Railway Labor Executives' Ass'n v. National Mediation Bd., 29 F.3d 655, 671 (D.C.Cir.1994) (citation omitted). Were courts "to presume a delegation of power absent an express withholding of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with Chevron and quite likely with the Constitution as well."Id.

In sum, the majority's notice rule does not address a gap that Congress delegated authority to the Board to fill, whether by rulemaking or adjudication. The Supreme Court has made clear that "[w]here Congress has in the statute given the Board a question to answer, the courts will give respect to that answer; but they must be sure the question has been asked."NLRB v. Insurance Agents' Int'l

Union, 361 U.S. 419, 432-433 (1960). The Supreme Court also has made clear: "[Congress] does not
* * * hide elephants in mouseholes."Whitman v. American Trucking Associations, 531 U.S. 457, 468
(2001).

My colleagues' action here is markedly like the Federal Trade Commission (FTC) regulation rejected
as ultra vires by the court of appeals in Am. Bar Ass'n v. FTC, supra. The FTC issued a ruling that
attorneys engaged in certain practices were financial institutions subject to the privacy provision of
the Gramm-Leach-Bliley Act (GBLA). Upon review of the detailed statutory scheme at issue, the
court found it "difficult to believe that Congress, by any remaining ambiguity, intended to undertake
the regulation [of a subject] * * * and never mentioned [it] in the statute." 430 F.3d at 469. The
court further opined that to find the FTC's interpretation to be "deference-worthy, we would have
to conclude that Congress not only had hidden a rather large elephant in a rather obscure
mousehole, but had buried the ambiguity in which the pachyderm lurks beneath an incredibly deep
mound of specificity, none of which bears the footprints of the beast or any indication that
Congress even suspected its presence."Id. No such conclusion was possible in that case. No such
conclusion is possible here. Quite simply, the Board lacks statutory authority to promulgate a rule
that imposes a new obligation on employers and creates a new unfair labor practice to enforce it.

## The Rule Is Arbitrary and Capricious

Even if the Board arguably has rulemaking authority in this area, deference is unwarranted under
Chevron and the Administrative Procedure Act if the rule promulgated is "arbitrary or capricious in
substance, or manifestly contrary to the statute."United States v. Mead Corp., 533 U.S. 218, 227
(2001). Also see AHA, 499 U.S. at 618-20 (applying arbitrary and capricious standard in its
consideration of the Board's rule on acute care hospital bargaining units). "Normally, an agency rule
would be arbitrary and capricious if the agency has relied on factors which Congress has not
intended it to consider, entirely failed to consider an important aspect of the problem, offered an
explanation for its decision that runs counter to the evidence before the agency, or is so implausible
that it could not be ascribed to a difference in view or the product of agency expertise."Motor
Vehicle Mfg. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). "[T]
he agency must examine the relevant data and articulate a satisfactory explanation for its action
including a `rational connection between the facts found and the choice made.' "Id. (quoting
Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). See also Business Roundtable et
al. v. S.E.C.,—F.3d—, 2011 WL 2936808 (D.C. Cir., July 22, 2011) (finding SEC acted arbitrarily
and capriciously by relying on insufficient empirical data supporting its rule and by completely
discounting contrary studies).

In AHA, the Board's health care bargaining units rule was supported by "the extensive record
developed during the rulemaking proceedings, as well as its experience in the adjudication of health
care cases during the 13-year period between the enactment of the health care amendments and its
notice of proposed rulemaking."AHA, 499 U.S. at 618. The Supreme Court upheld the validity of

the rule finding it "based on substantial evidence and supported by a "reasoned analysis."Id. at 619 (citing Motor Vehicle Mfrs. Ass., 463 U.S. at 57).

By contrast, the majority's articulation of the need to mandate that employers violate Section 8(a)(1) unless they post a notice of employee rights is not based on substantial evidence, nor does it provide a satisfactory explanation for the choice they have made. They contend that a mandatory notice posting rule enforceable through Section 8(a)(1) is needed because they believe that most employees are unaware of their NLRA rights and therefore cannot effectively exercise those rights. This belief is based on: (1) Some studies indicating that employees and high school students about to enter the work force are generally uninformed about labor law; (2) an influx of immigrants in the labor force who are presumably also uninformed about labor law; (3) the current low and declining percentage of union-represented employees in the private sector, which presumably means that unions are less likely to be a source of information about employee rights; and (4) the absence of any general legal requirement that employers or anyone else inform employees about their NLRA rights. 75 FR 80411.

Neither the Notice of Proposed Rulemaking nor today's notice summarizing comments in response to that notice come anywhere close to providing a substantial factual basis supporting the belief that most employees are unaware of their NLRA rights. As for the lack of high school education on this subject, we have only a few localized studies cited in a 1995 journal article by a union attorney.[184] With respect to the assumption that immigrants entering the work force, we have even less, only anecdotal accounts. For that matter, beyond the cited journal article, almost all supposed factual support for the premise that employees are generally unaware of their rights comes in comments received from individuals, union organizers, attorneys representing unions, and immigrant rights and worker assistance organizations agreeing, based on professed personal experience, that most employees (obviously not including most of the employee commenters) are unfamiliar with their NLRA rights. There are, as well, anecdotal accounts and comments from employers, employer associations and management attorneys to the opposite effect that the employees know about their rights under the Act, but my colleagues find these less persuasive.

In any event, the partisan opinions and perceptions, although worthy of consideration, ultimately fail as substantial evidence supporting the Board majority's initial premise for proposing the rule. There remains the Board's conclusion that the decline in union density provides the missing factual support. The majority explains that there was less need for a posting of information about NLRA rights when the union density was higher because "friends and family who belonged to unions" would be source of information. This is nothing more than supposition. There is no empirical evidence of a correlation between union density and access to information about employee rights, just as there are no broad-based studies supporting the suppositions about a lack of information stemming from high school curricula or the influx of immigrants in the work force.

At bottom, the inadequacy of the record to support my colleagues' factual premise is of no matter to them. In response to comments contending that the articles and studies they cite are old and inadequately supported, they glibly respond that the commenters "cite no more recent or better supported studies to the contrary," as if opponents of the proposed rule bear that burden. Of course, it is the agency's responsibility to make factual findings that support its decision and those findings must be supported by substantial evidence that must examine the relevant data and articulate a satisfactory explanation for its action. Burlington Truck Lines, 371 U.S. at 167.

Even more telling is the majority's footnote observation that there is no real need to conduct a study of the extent of employees' knowledge of NLRA rights because the notice posting rule would be justified even if only 10 percent of the workforce lacked such knowledge. This statement betrays the entire factual premise upon which the rulemaking initiative was purportedly founded and reveals a predisposition to issue the rule regardless of the facts. This is patently "arbitrary and capricious."

Even assuming, if we must, that there is some factual basis for a concern that employees lack sufficient information about their NLRA rights, the majority also fails to provide a rational explanation for why that concern dictates their choice made to address that concern. Why, for instance, was a noncompulsory information system, primarily reliant on personal union communications, sufficient when the Wagner Act was passed, but not now? The union density levels for 1935 and today are roughly the same.[185] Why at a time when the Board champions its new Web site and the Acting General Counsel continues to encourage the regional outreach programs initiated by his predecessor, do my colleagues so readily dismiss the Board's role in providing information about rights under the statute we administer? For that matter, why are the numerous employee, labor organizer, and worker advocacy groups whose comments profess awareness of these rights unable to communicate this information to those who they know lack such awareness? Is the problem one of access or message? Would a reversal of the union density trend or an increase in petition and charge filings be the only reliable indicators of increased awareness?

I would think that a reasoned explanation for the choice of a sweeping rule making it unlawful for employers to fail to post and maintain notice of employee rights would at least include some discussion of these questions and attempt to marshal more than a fragmented and inconclusive factual record to support their choice. The majority fails to do so. Their rule is patently arbitrary and capricious.

## Executive Order 13496

The majority mentions in passing Executive Order 13496[186] and the DOL implementing regulation [187] mandating that Federal contractors post a notice to employees of NLRA rights that is in most respects identical to the notice at issue here. Their consideration of this administrative action should have led them to the understanding that they lack the authority to do what the President and DOL clearly could do to advance essentially the same policy choice.

The authority to require that contractors agree to post an NLRA employee rights notice as part of doing business with the Federal government comes both from the President's authority as chief executive and the specific grant of Congressional authority in the Federal Property and Administrative Services Act, 40 U.S.C. 101 et seq. There was no need or attempt to justify the promulgation of the notice-posting rule by relying on evidence that employees lacked knowledge of their rights. Moreover, in the notice of a final rule, DOL rejected commenters' contentions that the Executive Order and implementing regulation were preempted by the Board's jurisdiction under the Garmon doctrine. [188] Necessarily, this meant that DOL believed that the rule requiring federal contractors to post the employee rights notice did not involve any rights protected by Section 7 of the Act, such as a right to receive such information from their employer, or conduct prohibited by the Act, such as the employer's failure to provide such information.

Not only does my colleagues' rulemaking action today contradict DOL's preemption analysis, but its flaws are manifest in comparison to the DOL's rule and the authority enabling it.

## Conclusion 189

Surely, no one can seriously believe that today's rule is primarily intended to inform employees of their Section 7 right to refrain from or to oppose organizational activities, collective bargaining, and union representation. My colleagues seek through promulgation of this rule to reverse the steady downward trend in union density among private sector employees in the non-agricultural American workforce. Theirs is a policy choice which they purport to effectuate with the force of law on several fronts in rulemaking and in case-by-case adjudication. In this instance, their action in declaring that employers violate the law by failing to inform employees of their Section 7 rights is both unauthorized and arbitrary and capricious. Regardless of the arguable merits of their policy choice or the broad scope of Chevron deference and the Board's rulemaking authority, I am confident that a reviewing court will soon rescue the Board from itself and restore the law to where it was before the sorcerer's apprentice sent it askew.

# V. Regulatory Procedures

## A. Regulatory Flexibility Act

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601 et seq., requires agencies promulgating final rules to prepare a final regulatory flexibility analysis and to develop alternatives wherever possible, when drafting regulations that will have a significant impact on a substantial number of small entities. The focus of the RFA is to ensure that agencies "review draft rules to assess and take appropriate account of the potential impact on small businesses, small governmental jurisdictions, and small organizations, as provided by the [RFA]." E.O. 13272, Sec. 1, 67 FR 53461 ("Proper Consideration of Small Entities in Agency Rulemaking"). However, an agency is not required to

prepare a final regulatory flexibility analysis for a final rule if the agency head certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities. 5 U.S.C. 605(b). Based on the analysis below, in which the Board has estimated the financial burdens to employers subject to the NLRA associated with complying with the requirements contained in this final rule, the Board has certified to the Chief Counsel for Advocacy of the Small Business Administration (SBA) that this rule will not have a significant economic impact on a substantial number of small entities.

The primary goal of this rule is notifying employees of their rights under the NLRA. This goal is achieved through the posting of notices by employers subject to the NLRA of the rights of employees under the NLRA. The Board will make the notices available at no cost to employers; there are no information collection, record keeping, or reporting requirements.

The Board estimates that in order to comply with this rule, each employer subject to the NLRA will spend a total of 2 hours during the first year in which the rule is in effect. This includes 30 minutes for the employer to learn where and how to post the required notices, 30 minutes to acquire the notices from the Board or its Web site, and 60 minutes to post them physically and electronically, depending on where and how the employer customarily posts notices to employees. The Board assumes that these activities will be performed by a professional or business worker, who, according to Bureau of Labor Statistics data, earned a total hourly wage of about $32.20 in March 2011, including fringe benefits.[190] The Board then multiplied this figure by 2 hours to estimate the average costs for employers to comply with this rule during the first year in which the rule is in effect. Accordingly, this rule is estimated to impose average costs of $64.40 per employer subject to the NLRA (2 hours × $32.20) during the first year.[191] These costs will decrease dramatically in subsequent years because the only employers affected will be those that did not previously satisfy their posting requirements or that have since expanded their facilities or established new ones. Because the final rule will not require employers to post the notice by email, instant messaging, text messaging, and the like, the cost of compliance should be, if anything, somewhat less than the Board previously estimated.

According to the United States Census Bureau, there were approximately 6 million businesses with employees in 2007. Of those, the SBA estimates that all but about 18,300 were small businesses with fewer than 500 employees.[192] This rule does not apply to employers that do not meet the Board's jurisdictional requirements, but the Board does not have the means to calculate the number of small businesses within the Board's jurisdiction. Accordingly, the Board assumes for purposes of this analysis that the great majority of the nearly 6 million small businesses will be affected, and further that this number is a substantial number within the meaning of 5 U.S.C. 601. However, as discussed below, because the economic impact on those employers is minimal, the Board concludes that, under 5 U.S.C. 605, the final rule will not have a significant economic impact on any small employers.

The RFA does not define "significant economic impact." 5 U.S.C. 601. In the absence of specific definitions, "what is `significant' * * * will vary depending on the problem that needs to be addressed, the rule's requirements, and the preliminary assessment of the rule's impact."See A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act, Office of Advocacy, U.S. Small Business Administration at 17 (available at http://www.sba.gov) (SBA Guide). As to economic impact and whether it is significant, one important indicator is the cost of compliance in relation to revenue of the entity or the percentage of profits affected. Id. at 17. More specifically, the criteria to be considered are:

- Whether the rule will lead to long-term insolvency, i.e., regulatory costs that significantly reduce profits;
- Whether the rule will lead to short-term insolvency, i.e., increasing operating expenses or new debt more than cash reserves and cash flow can support, causing nonmarginal firms to close;
- Whether the rule will have disproportionate effects, placing small entities at a significant competitive disadvantage; and
- Whether the rule will result in inefficiency, i.e., in social costs to small entities that outweigh the social benefits resulting from the rule. Id. at 26.

Applying these standards, the Board concludes that the economic impact of its notice-posting rule on small employers is not significant. The Board has determined that the average cost of complying with the rule in the first year for all employers subject to the NLRA will be $64.40. It is unlikely in the extreme that this minimal cost would lead to either the short- or long-term insolvency of any business entity, or place small employers at a competitive disadvantage. Since this rule applies only to organizations within the NLRB's jurisdictional standards, the smallest employer subject to the rule must have an annual inflow or outflow across state lines of at least $50,000. Siemons Mailing Service, 122 NLRB 81 (1959). Given that the Board estimates that this rule will cost, on average, $64.40, the total cost for the smallest affected companies would be an amount equal to less than two-tenths of one percent of that required annual inflow or outflow (.13%). The Board concludes that such a small percentage is highly unlikely to adversely affect a small business.[193] And, in the Board's judgment, the social benefits of employees' (and employers') becoming familiar with employees' NLRA rights far outweigh the minimal costs to employers of posting notices informing employees of those rights.[194]

For all the foregoing reasons, the Board has concluded that the final rule will not have a significant economic impact on a substantial number of small entities. 5 U.S.C. 605.

As discussed in the NPRM, because it assumes that a substantial number of small businesses will be required to comply with the rule, the Board preliminarily considered alternatives that would minimize the impact of the rule, including a tiered approach for small entities with only a few employees. However, as it also explained, the Board rejected those alternatives, concluding that a tiered approach or an exemption for some entities would substantially undermine the purpose

of the rule because so many employers would be exempt under the SBA definitions. Given the very small estimated cost of compliance, it is possible that the burden on a small business of determining whether it fell into a particular tier might exceed the burden of compliance. The Board further pointed out that Congress gave the Board very broad jurisdiction, with no suggestion that it wanted to limit coverage of any part of the NLRA to only larger employers. The Board also believes that employees of small employers have no less need of a Board notice than have employees of larger employers. Finally, the Board's jurisdictional standards mean that very small employers will not be covered by the rule in any case. 75 FR 80416. (A summary of the Board's discretionary jurisdictional standards appears in § 104.204, below.) Thus, although several comments urge that small employers be exempted from the rule, the Board remains persuaded, for the reasons set forth in the NPRM, that such an exemption is unwarranted.[195]

Some comments contend that, in concluding that the proposed rule will not have a significant impact on small employers, the Board understates the rule's actual prospective costs. One comment, from Baker & Daniels LLP, argues that the Board improperly focuses solely on the cost of complying with the rule—i.e., of printing and posting the notice—and ignored the "actual economic impact of the rule's effect and purpose." According to this comment, it is predictable that, as more employees become aware of their NLRA rights, they will file more unfair labor practice charges and elect unions to serve as their collective-bargaining representatives. The comment further asserts that the Board has ignored the "economic realities of unionization," specifically that union wages are inflationary; that unions make business less flexible, less competitive, and less profitable; and that unions cause job loss and stifle economic recovery from recessions. Accordingly, this comment contends that "the Board's RFA certification is invalid, and [that] the Board must prepare an initial regulatory flexibility analysis." Numerous other comments echo similar concerns, but without reference to the RFA.

The Board disagrees with the comment submitted by Baker & Daniels LLP.[196] Section 605(b) of the RFA states that an agency need not prepare an initial regulatory flexibility analysis if the agency head certifies that the rule will not have a significant economic impact on a substantial number of small entities. 5 U.S.C. 605(b) (emphasis added). The Board understands the "economic impact of * * *the rule" to refer to the costs to affected entities of complying with the rule, not to the economic impact of a series of subsequent decisions made by individual actors in the economy that are neither compelled by, nor the inevitable result of, the rule.[197] Even if more employees opt for union representation after learning about their rights, employers can avoid the adverse effects on business costs, flexibility, and profitability predicted by Baker & Daniels LLP and other commenters by not agreeing to unions' demands that might produce those effects.[198]

The Board finds support for this view in the language of Section 603 of the RFA, which lists the items to be included in an initial regulatory flexibility analysis if one is required. 5 U.S.C. 603. Section 603(a) states only that such analysis "shall describe the impact of the proposed rule on small

entities." 5 U.S.C. 603(a). However, Section 603(b) provides, as relevant here, that "[e]ach initial regulatory flexibility analysis * * * shall contain—* * *

"(4) a description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record[.]" 5 U.S.C. 603(b)(4) (emphasis added). The Small Business Administration cites, as examples of "other compliance requirements,"

(a) Capital costs for equipment needed to meet the regulatory requirements; (b) costs of modifying existing processes and procedures to comply with the proposed rule; (c) lost sales and profits resulting from the proposed rule; (d) changes in market competition as a result of the proposed rule and its impact on small entities or specific submarkets of small entities; (e) extra costs associated with the payment of taxes or fees associated with the proposed rule; and (f) hiring employees dedicated to compliance with regulatory requirements.[199]

Thus, the "impact" on small entities referred to in Section 603(a) refers only to the rule's projected compliance costs to small entities (none of which would result from posting a workplace notice), not the kinds of speculative and indirect economic impact that Baker & Daniels LLC invokes.[200]

Associated Builders and Contractors, Inc. (ABC) and Retail Industry Leaders Association (RILA) contend that the Board's RFA analysis fails to account for the costs of electronic notice posting, especially for employers that communicate with employees via multiple electronic means. Both comments deplore what they consider to be the rule's vague requirements in this respect. ABC argues that clear guidance is needed, and that the Board should withdraw the electronic notice posting requirements until more information can be gathered. RILA asserts that "[d]eciphering and complying with the Board's requirements would impose significant legal and administrative costs and inevitably result [in] litigation as parties disagree about when a communication is `customarily used,' and whether and when employees need to be informed through multiple communications."

Numerous comments assert that employers, especially small employers that lack professional human resources staff, will incur significant legal expenses as they attempt to comply with the rule. For example, Fisher and Phillips, a management law firm, urges that the cost of legal fees should be included in assessing the economic impact of the proposed rule: "[I]t might be considered naïve to assume that a significant percentage of small employers would not seek the advice of counsel, and it would be equally naïve to assume that a significant percentage of those newly-engaged lawyers could be retained for as little as $31.02/hour."

Those comments are not persuasive. The choice to retain counsel is not a requirement for complying with the rule. This is not a complicated or nuanced rule. The employer is only required to post a notice provided by the Board in the same manner in which that employer customarily posts notices to its employees. The Board has explained above what the rule's electronic posting

provisions require of employers in general, and it has simplified those provisions by eliminating the requirement that notices be provided by email and many other forms of electronic communication. [201] It should not be necessary for employers, small or large, to add human resources staff, retain counsel, or resort to litigation if they have questions concerning whether the proposed rule applies to them or about the requirements for technical compliance with the rule, including how the electronic posting provisions specifically affect their enterprises. [202] Such questions can be directed to the Board's regional offices, either by telephone, personal visit, email, or regular mail, and will be answered free of charge by representatives of the Board. [203]

Cass County Electric Cooperative argues that the Board failed to take into account legal expenses that employers will incur if they fail to "follow the letter of the proposed rule." The comment urges that the Board should estimate the cost to businesses "should they have to defend themselves against an unfair labor practice for failure to comply with the rule, no matter what the circumstances for that failure might be," presumably including failures to post the notice by employers that are unaware of the rule and inadvertent failures to comply with technical posting requirements. International Foodservice Distributors Association contends that the Board also should have considered the costs of tolling the statute of limitations when employers fail to post the notice. However, the costs referred to in these comments are costs of not complying with the rule, not compliance costs. As stated above, for RFA purposes, the relevant economic analysis focuses on the costs of complying with the rule. [204]

Some comments assert that the content of the notice will prompt employee questions, which managers and supervisors will have to answer, and be trained to answer, and that the Board failed to account for the cost of such training and discussions in terms of lost work time. [205] Other comments contend that employers will incur costs of opposing an increased number of union organizing campaigns. [206] Relatedly, several comments state that employers should be allowed to, and/or will respond to the notice by informing employees of aspects of unionization and collective bargaining that are not covered by the notice; some suggest that employers may post their own notices presenting their point of view. [207] (A few comments, by contrast, protest that employers will be prohibited from presenting their side of the issues raised by the posting of notices.) The Board responds that any costs that employers may incur in responding to employee questions, in setting forth the employers' views on unions and collective bargaining, or in opposing union organizing efforts will be incurred entirely at the employers' own volition; they are not a cost of complying with the rule.

As discussed above, many comments express concerns that union supporters will tear down the notices in order to expose employers to 8(a)(1) liability for failing to post the notices. Some of these comments also contend that, as a result, employers will have to spend considerable time monitoring the notices to make sure that they are not torn down, or incur additional costs of installing tamper-proof bulletin boards. One commenter predicts that his employer will have to spend $20,000 for

such bulletin boards at a single facility, or a total of $100,000 at all of its facilities, and even then will have to spend two hours each month monitoring the postings. For the reasons discussed above, the Board is not convinced at this time that the problem of posters being torn down is anything more than speculative, and accordingly is inclined to discount these predictions substantially. In any event, the rule requires only that employers "take reasonable steps"—not every conceivable step—to ensure that the notice is not defaced or torn down. The rule does not require, or even suggest, that employers must spend thousands of dollars to install tamper-proof bulletin boards or that employers must constantly monitor the notice.[208]

One comment contends that most small employers do not have 11 x 17-inch color printers, and therefore will have to have the posters printed commercially at a cost that, alone, assertedly will exceed the Board's estimate of the cost of the rule. The Board understands the concerns of this small employer. The Board points out that it will furnish a reasonable number of copies of the notice free of charge to any requesting employer. Moreover, as explained above, employers may reproduce the notice in black-and-white and may print the notice on two standard-sized, 8.5 x 11-inch pages and tape or bind them together, rather than having them printed commercially.

A number of comments argue that the rule will lead to workplace conflict. For example, the comment of Wiseda Corporation contains the following:

Unnecessary Confusion and Conflict in the Workplace. The labor law terms and industrial union language of the proposed notice (such as hiring hall and concerted activity) present an unclear and adversarial picture to employees. Most non-union employers like us, who wish to remain non-union, encourage cooperative problem solving. In a modern non-union workplace, to require such a poster encouraging strikes and restroom leaflets is disrespectful of the hard work and good intentions of employers, management, and employees. The proposed poster would exist alongside other company notices on problem-solving, respect for others, resolving harassment issues, etc., and would clearly be out of character and inappropriate. (Emphasis in original.)

Another comment puts it more bluntly: "The notice as proposed is more of an invitation to cause employee/employer disputes rather than an explanation of employee rights." The Board's response is that the ill effects predicted in these comments, like the predicted adverse effects of unionization discussed above, are not costs of compliance with the rule, but of employees' learning about their workplace rights. In addition, Congress, not the Board, created the subject rights and did so after finding that vesting employees with these rights would reduce industrial strife.

## B. Paperwork Reduction Act (PRA) 209

The final rule imposes certain minimal burdens associated with the posting of the employee notice required by § 104.202. As noted in § 104.202(e), the Board will make the notice available, and employers will be permitted to post copies of the notice that are exact duplicates in content, size,

format, and type size and style. Under the regulations implementing the PRA, "[t]he public disclosure of information originally supplied by the Federal government to [a] recipient for the purpose of disclosure to the public" is not considered a "collection of information" under the Act. See 5 CFR 1320.3(c)(2). Therefore, contrary to several comments, the posting requirement is not subject to the PRA.[210]

The Board received no comments suggesting that the PRA covers the costs to the Federal government of administering the regulations established by the proposed rule. Therefore, the NPRM's discussion of this issue stands.

Accordingly, this rule does not contain information collection requirements that require approval by the Office of Management and Budget under the PRA (44 U.S.C. 3507 et seq.).

## C. Congressional Review Act (CRA) 211

This rule is a "major rule" as defined by Section 804(2) of the Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act), because it will have an effect on the economy of more than $100 million, at least during the year it takes effect. 5 U.S.C. 804(2)(A).[212] Accordingly, the effective date of the rule is 75 days after publication in the Federal Register.[213]

# List of Subjects in 29 CFR Part 104

Administrative practice and procedure, Employee rights, Labor unions.

## Text of Final Rule

Accordingly, a new part 104 is added to 29 CFR chapter 1 to read as follows:

# PART 104—NOTIFICATION OF EMPLOYEE RIGHTS; OBLIGATIONS OF EMPLOYERS

# Subpart A—Definitions, Requirements for Employee Notice, and Exceptions and Exemptions

104.201 What definitions apply to this part?

104.202 What employee notice must employers subject to the NLRA post in the workplace?

104.203 Are Federal contractors covered under this part?

104.204 What entities are not subject to this part?

Appendix to Subpart A—Text of Employee Notice

# Subpart B—General Enforcement and Complaint Procedures

104.210 How will the Board determine whether an employer is in compliance with this part?

104.211 What are the procedures for filing a charge?

104.212 What are the procedures to be followed when a charge is filed alleging that an employer has failed to post the required employee notice?

104.213 What remedies are available to cure a failure to post the employee notice?

104.214 How might other Board proceedings be affected by failure to post the employee notice?

# Subpart C—Ancillary Matters

104.220 What other provisions apply to this part?

# Authority:

National Labor Relations Act (NLRA), Section 6, 29 U.S.C. 156; Administrative Procedure Act, 5 U.S.C. 553.

# Subpart A—Definitions, Requirements for Employee Notice, and Exceptions and Exemptions

§ 104.201 What definitions apply to this part?

Employee includes any employee, and is not limited to the employees of a particular employer, unless the NLRA explicitly states otherwise. The term includes anyone whose work has ceased because of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment. However, it does not include agricultural laborers, supervisors, or independent contractors, or anyone employed in the domestic service of any family or person at his home, or by his parent or spouse, or by an employer subject to the Railway Labor Act (45 U.S.C. 151 et seq.), or by any other person who is not an employer as defined in the NLRA. 29 U.S.C. 152(3).

Employee notice means the notice set forth in the Appendix to Subpart A of this part that employers subject to the NLRA must post pursuant to this part.

Employer includes any person acting as an agent of an employer, directly or indirectly. The term does not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization. 29 U.S.C. 152(2). Further, the term "employer" does not include entities over which the Board has been found not to have jurisdiction, or over which the Board has chosen through regulation or adjudication not to assert jurisdiction.

Labor organization means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work. 29 U.S.C. 152(5).

National Labor Relations Board (Board) means the National Labor Relations Board provided for in section 3 of the National Labor Relations Act, 29 U.S.C. 153. 29 U.S.C. 152(10).

Person includes one or more individuals, labor organizations, partnerships, associations, corporations, legal representatives, trustees, trustees in cases under title 11 of the United States Code, or receivers. 29 U.S.C. 152(1).

Rules, regulations, and orders, as used in § 104.202, means rules, regulations, and relevant orders issued by the Board pursuant to this part.

Supervisor means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment. 29 U.S.C. 152(11).

Unfair labor practice means any unfair labor practice listed in section 8 of the National Labor Relations Act, 29 U.S.C. 158. 29 U.S.C. 152(8).

Union means a labor organization as defined above.

§ 104.202 What employee notice must employers subject to the NLRA post in the workplace?

(a) Posting of employee notice. All employers subject to the NLRA must post notices to employees, in conspicuous places, informing them of their NLRA rights, together with Board contact information and information concerning basic enforcement procedures, in the language set forth in the Appendix to Subpart A of this part.

(b) Size and form requirements. The notice to employees shall be at least 11 inches by 17 inches in size, and in such format, type size, and style as the Board shall prescribe. If an employer chooses to print the notice after downloading it from the Board's Web site, the printed notice shall be at least 11 inches by 17 inches in size.

(c) Adaptation of language. The National Labor Relations Board may find that an Act of Congress, clarification of existing law by the courts or the Board, or other circumstances make modification of the employee notice necessary to achieve the purposes of this part. In such circumstances, the Board will promptly issue rules, regulations, or orders as are needed to ensure that all future employee notices contain appropriate language to achieve the purposes of this part.

(d) Physical posting of employee notice. The employee notice must be posted in conspicuous places where they are readily seen by employees, including all places where notices to employees concerning personnel rules or policies are customarily posted. Where 20 percent or more of an employer's workforce is not proficient in English and speaks a language other than English, the employer must post the notice in the language employees speak. If an employer's workforce includes two or more groups constituting at least 20 percent of the workforce who speak different languages, the employer must either physically post the notice in each of those languages or, at the employer's option, post the notice in the language spoken by the largest group of employees and provide each employee in each of the other language groups a copy of the notice in the appropriate language. If an employer requests from the Board a notice in a language in which it is not available, the requesting employer will not be liable for non-compliance with the rule until the notice becomes available in that language. An employer must take reasonable steps to ensure that the notice is not altered, defaced, covered by any other material, or otherwise rendered unreadable.

(e) Obtaining a poster with the employee notice. A poster with the required employee notice, including a poster with the employee notice translated into languages other than English, will be printed by the Board, and may be obtained from the Board's office, 1099 14th Street, NW., Washington, DC 20570, or from any of the Board's regional, subregional, or resident offices. Addresses and telephone numbers of those offices may be found on the Board's Web site at **http://www.nlrb.gov**. A copy of the poster in English and in languages other than English may also be downloaded from the Board's Web site at http://www.nlrb.gov. Employers also may reproduce and use copies of the Board's official poster, provided that the copies duplicate the official poster in size, content, format, and size and style of type. In addition, employers may use commercial services to provide the employee notice poster consolidated onto one poster with other Federally mandated labor and employment notices, so long as the consolidation does not alter the size, content, format, or size and style of type of the poster provided by the Board.

(f) Electronic posting of employee notice. (1) In addition to posting the required notice physically, an employer must also post the required notice on an intranet or internet site if the employer customarily communicates with its employees about personnel rules or policies by such means. An

employer that customarily posts notices to employees about personnel rules or policies on an intranet or internet site will satisfy the electronic posting requirement by displaying prominently—i.e., no less prominently than other notices to employees—on such a site either an exact copy of the poster, downloaded from the Board's Web site, or a link to the Board's Web site that contains the poster. The link to the Board's Web site must read, "Employee Rights under the National Labor Relations Act."

(2) Where 20 percent or more of an employer's workforce is not proficient in English and speaks a language other than English, the employer must provide notice as required in paragraph (f)(1) of this section in the language the employees speak. If an employer's workforce includes two or more groups constituting at least 20 percent of the workforce who speak different languages, the employer must provide the notice in each such language. The Board will provide translations of the link to the Board's Web site for any employer that must or wishes to display the link on its Web site. If an employer requests from the Board a notice in a language in which it is not available, the requesting employer will not be liable for non-compliance with the rule until the notice becomes available in that language.

§ 104.203 Are Federal contractors covered under this part?

Yes, Federal contractors are covered. However, contractors may comply with the provisions of this part by posting the notices to employees required under the Department of Labor's notice-posting rule, **29 CFR part 471**.

§ 104.204 What entities are not subject to this part?

(a) The following entities are excluded from the definition of "employer" under the National Labor Relations Act and are not subject to the requirements of this part:

(1) The United States or any wholly owned Government corporation;

(2) Any Federal Reserve Bank;

(3) Any State or political subdivision thereof;

(4) Any person subject to the Railway Labor Act;

(5) Any labor organization (other than when acting as an employer); or

(6) Anyone acting in the capacity of officer or agent of such labor organization.

(b) In addition, employers employing exclusively workers who are excluded from the definition of "employee" under § 104.201 are not covered by the requirements of this part.

(c) This part does not apply to entities over which the Board has been found not to have jurisdiction, or over which the Board has chosen through regulation or adjudication not to assert jurisdiction.

(d)(1) This part does not apply to entities whose impact on interstate commerce, although more than de minimis, is so slight that they do not meet the Board's discretionary jurisdiction standards. The most commonly applicable standards are:

(i) The retail standard, which applies to employers in retail businesses, including home construction. The Board will take jurisdiction over any such employer that has a gross annual volume of business of $500,000 or more.

(ii) The nonretail standard, which applies to most other employers. It is based either on the amount of goods sold or services provided by the employer out of state (called "outflow") or goods or services purchased by the employer from out of state (called "inflow"). The Board will take jurisdiction over any employer with an annual inflow or outflow of at least $50,000. Outflow can be either direct—to out-of-state purchasers—or indirect—to purchasers that meet other jurisdictional standards. Inflow can also be direct—purchased directly from out of state—or indirect—purchased from sellers within the state that purchased them from out-of-state sellers.

(2) There are other standards for miscellaneous categories of employers. These standards are based on the employer's gross annual volume of business unless stated otherwise. These standards are listed in the Table to this section.

Table to § 104.204 **Back to Top**

| Employer category | Jurisdictional standard |
| --- | --- |
| Amusement industry | $500,000. |
| Apartment houses, condominiums, cooperatives | $500,000. |
| Architects | Nonretail standard. |
| Art museums, cultural centers, libraries | $1 million. |
| Bandleaders | Retail/nonretail (depends on customer). |
| Cemeteries | $500,000. |
| Colleges, universities, other private schools | $1 million. |
| Communications (radio, TV, cable, telephone, telegraph) | $100,000. |

| Employer category | Jurisdictional standard |
| --- | --- |
| Credit unions | Either retail or nonretail standard. |
| Day care centers | $250,000. |
| Gaming industry | $500,000. |
| Health care institutions: | |
| Nursing homes, visiting nurses associations | $100,000. |
| Hospitals, blood banks, other health care facilities (including doctors' and dentists' offices) | $250,000. |
| Hotels and motels | $500,000. |
| Instrumentalities of interstate commerce | $50,000. |
| Labor organizations (as employers) | Nonretail standard. |
| Law firms; legal service organizations | $250,000. |
| Newspapers (with interstate contacts) | $200,000. |
| Nonprofit charitable institutions | Depends on the entity's substantive purpose. |
| Office buildings; shopping centers | $100,000. |
| Private clubs | $500,000. |
| Public utilities | $250,000 or nonretail standard. |
| Restaurants | $500,000. |
| Social services organizations | $250,000. |
| Symphony orchestras | $1 million. |
| Taxicabs | $500,000. |
| Transit systems | $250,000. |

(3) If an employer can be classified under more than one category, the Board will assert jurisdiction if the employer meets the jurisdictional standard of any of those categories.

(4) There are a few employer categories without specific jurisdictional standards:

(i) Enterprises whose operations have a substantial effect on national defense or that receive large amounts of Federal funds

(ii) Enterprises in the District of Columbia

(iii) Financial information organizations and accounting firms

(iv) Professional sports

(v) Stock brokerage firms

(vi) U. S. Postal Service

(5) A more complete discussion of the Board's jurisdictional standards may be found in An Outline of Law and Procedure in Representation Cases, Chapter 1, found on the Board's Web site, http://www.nlrb.gov.

(e) This part does not apply to the United States Postal Service.

## Appendix to Subpart A—Text of Employee Notice

# "EMPLOYEE RIGHTS UNDER THE NATIONAL LABOR RELATIONS ACT

The National Labor Relations Act (NLRA) guarantees the right of employees to organize and bargain collectively with their employers, and to engage in other protected concerted activity or to refrain from engaging in any of the above activity. Employees covered by the NLRA* are protected from certain types of employer and union misconduct. This Notice gives you general information about your rights, and about the obligations of employers and unions under the NLRA. Contact the National Labor Relations Board (NLRB), the Federal agency that investigates and resolves complaints under the NLRA, using the contact information supplied below, if you have any questions about specific rights that may apply in your particular workplace.

"Under the NLRA, you have the right to:

- Organize a union to negotiate with your employer concerning your wages, hours, and other terms and conditions of employment.
- Form, join or assist a union.
- Bargain collectively through representatives of employees' own choosing for a contract with your employer setting your wages, benefits, hours, and other working conditions.
- Discuss your wages and benefits and other terms and conditions of employment or union organizing with your co-workers or a union.

- Take action with one or more co-workers to improve your working conditions by, among other means, raising work-related complaints directly with your employer or with a government agency, and seeking help from a union.
- Strike and picket, depending on the purpose or means of the strike or the picketing.
- Choose not to do any of these activities, including joining or remaining a member of a union.

"Under the NLRA, it is illegal for your employer to:

- Prohibit you from talking about or soliciting for a union during non-work time, such as before or after work or during break times; or from distributing union literature during non-work time, in non-work areas, such as parking lots or break rooms.
- Question you about your union support or activities in a manner that discourages you from engaging in that activity.
- Fire, demote, or transfer you, or reduce your hours or change your shift, or otherwise take adverse action against you, or threaten to take any of these actions, because you join or support a union, or because you engage in concerted activity for mutual aid and protection, or because you choose not to engage in any such activity.
- Threaten to close your workplace if workers choose a union to represent them.
- Promise or grant promotions, pay raises, or other benefits to discourage or encourage union support.
- Prohibit you from wearing union hats, buttons, t-shirts, and pins in the workplace except under special circumstances.
- Spy on or videotape peaceful union activities and gatherings or pretend to do so.

"Under the NLRA, it is illegal for a union or for the union that represents you in bargaining with your employer to:

- Threaten or coerce you in order to gain your support for the union.
- Refuse to process a grievance because you have criticized union officials or because you are not a member of the union.
- Use or maintain discriminatory standards or procedures in making job referrals from a hiring hall.
- Cause or attempt to cause an employer to discriminate against you because of your union-related activity.
- Take adverse action against you because you have not joined or do not support the union.

"If you and your co-workers select a union to act as your collective bargaining representative, your employer and the union are required to bargain in good faith in a genuine effort to reach a written, binding agreement setting your terms and conditions of employment. The union is required to fairly represent you in bargaining and enforcing the agreement.

"Illegal conduct will not be permitted. If you believe your rights or the rights of others have been violated, you should contact the NLRB promptly to protect your rights, generally within six months of the unlawful activity. You may inquire about possible violations without your employer or anyone else being informed of the inquiry. Charges may be filed by any person and need not be filed by the employee directly affected by the violation. The NLRB may order an employer to rehire a worker fired in violation of the law and to pay lost wages and benefits, and may order an employer or union to cease violating the law. Employees should seek assistance from the nearest regional NLRB office, which can be found on the Agency's Web site: <ins>http://www.nlrb.gov</ins>.

You can also contact the NLRB by calling toll-free: 1-866-667-NLRB (6572) or (TTY) 1-866-315-NLRB (1-866-315-6572) for hearing impaired.

If you do not speak or understand English well, you may obtain a translation of this notice from the NLRB's Web site or by calling the toll-free numbers listed above.

"*The National Labor Relations Act covers most private-sector employers. Excluded from coverage under the NLRA are public-sector employees, agricultural and domestic workers, independent contractors, workers employed by a parent or spouse, employees of air and rail carriers covered by the Railway Labor Act, and supervisors (although supervisors that have been discriminated against for refusing to violate the NLRA may be covered).

"This is an official Government Notice and must not be defaced by anyone."

# Subpart B—General Enforcement and Complaint Procedures

§ 104.210 How will the Board determine whether an employer is in compliance with this part?

The Board has determined that employees must be aware of their NLRA rights in order to exercise those rights effectively. Employers subject to this rule are required to post the employee notice to inform employees of their rights. Failure to post the employee notice may be found to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by NLRA Section 7, <ins>29 U.S.C. 157</ins>, in violation of NLRA Section 8(a)(1), <ins>29 U.S.C. 158</ins>(a)(1).

Normally, the Board will determine whether an employer is in compliance when a person files an unfair labor practice charge alleging that the employer has failed to post the employee notice required under this part. Filing a charge sets in motion the Board's procedures for investigating and adjudicating alleged unfair labor practices, and for remedying conduct that the Board finds to be unlawful. See NLRA Sections 10-11, <ins>29 U.S.C. 160</ins>-61, and <ins>29 CFR part 102</ins>, subpart B.

§ 104.211 What are the procedures for filing a charge?

(a) Filing charges. Any person (other than Board personnel) may file a charge with the Board alleging that an employer has failed to post the employee notice as required by this part. A charge should be filed with the Regional Director of the Region in which the alleged failure to post the required notice is occurring.

(b) Contents of charges. The charge must be in writing and signed, and must be sworn to before a Board agent, notary public, or other person authorized to administer oaths or take acknowledgements, or contain a declaration by the person signing it, under penalty of perjury, that its contents are true and correct. The charge must include:

(1) The charging party's full name and address;

(2) If the charge is filed by a union, the full name and address of any national or international union of which it is an affiliate or constituent unit;

(3) The full name and address of the employer alleged to have violated this part; and

(4) A clear and concise statement of the facts constituting the alleged unfair labor practice.

§ 104.212 What are the procedures to be followed when a charge is filed alleging that an employer has failed to post the required employee notice?

(a) When a charge is filed with the Board under this section, the Regional Director will investigate the allegations of the charge. If it appears that the allegations are true, the Regional Director will make reasonable efforts to persuade the respondent employer to post the required employee notice expeditiously. If the employer does so, the Board expects that there will rarely be a need for further administrative proceedings.

(b) If an alleged violation cannot be resolved informally, the Regional Director may issue a formal complaint against the respondent employer, alleging a violation of the notice-posting requirement and scheduling a hearing before an administrative law judge. After a complaint issues, the matter will be adjudicated in keeping with the Board's customary procedures. See NLRA Sections 10 and 11, **29 U.S.C. 160**, 161; **29 CFR part 102**, subpart B.

§ 104.213 What remedies are available to cure a failure to post the employee notice?

(a) If the Board finds that the respondent employer has failed to post the required employee notices as alleged, the respondent will be ordered to cease and desist from the unlawful conduct and post the required employee notice, as well as a remedial notice. In some instances additional remedies may be appropriately invoked in keeping with the Board's remedial authority.

(b) Any employer that threatens or retaliates against an employee for filing charges or testifying at a hearing concerning alleged violations of the notice-posting requirement may be found to have committed an unfair labor practice. See NLRA Section 8(a)(1) and 8(a)(4), **29 U.S.C. 158**(a)(1), (4).

§ 104.214 How might other Board proceedings be affected by failure to post the employee notice?

(a) Tolling of statute of limitations. When an employee files an unfair labor practice charge, the Board may find it appropriate to excuse the employee from the requirement that charges be filed within six months after the occurrence of the allegedly unlawful conduct if the employer has failed to post the required employee notice unless the employee has received actual or constructive notice that the conduct complained of is unlawful. See NLRA Section 10(b), **29 U.S.C. 160**(b).

(b) Noncompliance as evidence of unlawful motive. The Board may consider a knowing and willful refusal to comply with the requirement to post the employee notice as evidence of unlawful motive in a case in which motive is an issue.

# Subpart C—Ancillary Matters

§ 104.220 What other provisions apply to this part?

(a) The regulations in this part do not modify or affect the interpretation of any other NLRB regulations or policy.

(b)(1) This subpart does not impair or otherwise affect:

(i) Authority granted by law to a department, agency, or the head thereof; or

(ii) Functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(2) This subpart must be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This part creates no right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Signed in Washington, DC, August 22, 2011.

Wilma B. Liebman,

Chairman.

[FR Doc. 2011-21724 Filed 8-25-11; 8:45 am]

# Footnotes

1. Labor-management relations in the railroad and airline industries are governed by the Railway Labor Act, 45 U.S.C. 151 et seq.

Back to Context

2. The original NLRA did not include restrictions on the actions of unions; those were added in the Labor-Management Relations (Taft-Hartley) Act of 1947, 29 U.S.C. 141 et seq., Title I.

Back to Context

3. The Board cited three law review articles in which the authors contended that American workers are largely unaware of their NLRA rights, that the Board can take action to vindicate those rights, and that this lack of knowledge stands in the way of employees' effectively exercising their rights. Peter D. DeChiara, "The Right to Know: An Argument for Informing Employees of Their Rights under the National Labor Relations Act," 32 Harv. J. on Legis. 431, 433-434 (1995); Charles J. Morris, "Renaissance at the NLRB—Opportunity and Prospect for Non-Legislative Procedural Reform at the Labor Board," 23 Stetson L. Rev. 101, 107 (1993); Morris, "NLRB Protection in the Nonunion Workplace: A Glimpse at a General Theory of Section 7 Conduct," 137 U. Pa. L. Rev. 1673, 1675-1676 (1989). 75 FR at 80411.

Back to Context

4. Id.

Back to Context

5. The Board requires that employees be notified of their NLRA rights in only the following narrow circumstances: (1) For the three working days before a Board-conducted representation election, the employer is required to post a notice of election including a brief description of employee rights; see 29 CFR 103.20. (2) When an employer or a union has been found to have violated employee rights under the NLRA, it is required to post a notice containing a brief summary of those rights. (3) Before a union may seek to obligate newly hired nonmember employees to pay dues and fees under a union-security clause, it must inform them of their right under NLRB v. General Motors, 373 U.S. 734 (1963), and Communications Workers v. Beck, 487 U.S. 735 (1988), to be or remain nonmembers and that nonmembers have the right to object to paying for union activities unrelated to the union's duties as the bargaining representative and to obtain a reduction in dues and fees of such activities. California Saw & Knife Works, 320 NLRB 224, 233 (1995), enfd. sub nom. Machinists v. NLRB, 133 F.3d 1012 (7th Cir. 1998), cert. denied sub nom. Strang v. NLRB, 525 U.S. 813 (1998). The same notice must also be given to union members if they did not receive it when they entered the bargaining unit. Paperworkers Local 1033 (Weyerhaeuser Paper Co.), 320

NLRB 349, 350 (1995), rev'd. on other grounds sub nom. Buzenius v. NLRB, 124 F.3d 788 (6th Cir. 1997), vacated sub nom. United Paperworkers Intern. Union v. Buzenius, 525 U.S. 979 (1998). (4) When an employer voluntarily recognizes a union, the Board has required that the employer must post a notice informing employees: (i) That the employer recognized the union on the basis of evidence that it was designated by a majority of the unit employees; (ii) the date of recognition; (iii) that all employees, including those who previously signed cards for the recognized union, have the right to be represented by a labor organization of their choice, or no union at all; (iv) that within 45 days of the date of the notice a decertification or rival petition, supported by 30 percent or more of the unit employees, may be filed with the Board and will be processed to an election; and, (v) that if no petition is filed within 45 days, the recognition will not be subject to challenge for a reasonable period to allow the employer and union to negotiate a collective-bargaining agreement. Dana Corp., 351 NLRB 434 (2007).

**Back to Context**

6. See, e.g., Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-10(a); Age Discrimination in Employment Act, 29 U.S.C. 627; Family and Medical Leave Act, 29 U.S.C. 2601, 2619(a); Fair Labor Standards Act, 29 CFR 516.4 (implementing 29 U.S.C. 211). 75 FR 80411.

**Back to Context**

7. As set forth in the NPRM, two petitions were filed to address this anomaly. 75 FR 80411.

**Back to Context**

8. March 23, 2011 was the date that the Board downloaded all of the electronic and (pdf. versions of) hard copy comments it had received from http://www.regulations.gov and subsequently uploaded into a text analytics tool for coding and review.

A few commenters submitted their comments in both electronic and hard copy form. Because all comments received are included in the numbers cited in text above, those numbers overstate somewhat the number of individuals, organizations, etc. that submitted comments.

**Back to Context**

9. Many comments charge that the Board is issuing the rule for political reasons, to encourage and spread unionism, to discourage employers and employees from engaging in direct communication and problem solving, to drive up union membership in order to retain agency staff, and even to "line [its] pockets." The Board responds that its reasons for issuing the rule are set forth in this preamble.

**Back to Context**

10. The Board majority's reasoning stands on its own. By its silence, the majority does not adopt any characterization made by the dissent of the majority's rationale or motives.

**Back to Context**

11. Gen. Eng'g, Inc. v. NLRB, 341 F.2d 367, 374 (1965).

**Back to Context**

12. Citing United States v. O'Hagan, 521 U.S. 642, 673 (1997). However, the Supreme Court actually held there that an agency's interpretation of its enabling statute must be given "controlling weight unless it is arbitrary, capricious, or manifestly contrary to the statute." (quoting Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844 (1984)). There, the Court upheld the rule and found it was not arbitrary, capricious, or manifestly contrary to the statute.

**Back to Context**

13. Quoting Member Hayes' dissent, **75 FR 80415**.

**Back to Context**

14. See **5 USC 553**(b)(2). For this conclusion, the Heritage Foundation cites Global Van Lines, Inc., v. ICC, 714 F.2d 1290, 1297-98 (5th Cir. 1983). But Global Van Lines did not find that a general statement of authority can never meet the APA's requirements to specify the legal authority for the rule. Instead, the Fifth Circuit held that that portion of the APA is violated when an agency chooses to rely on additional statutory provisions in support of its rule for the first time on appeal, and those grounds do not appear elsewhere in the administrative record. See id. at 1298-99. Here, in contrast, the grounds for the Board's rule are clearly laid out in subsection B, Statutory Authority, below.

**Back to Context**

15. 131 S.Ct. 704, 713-14 (2011).

**Back to Context**

16. 393 U.S. 268 (1969).

**Back to Context**

17. Id. at 277 n. 28 (citations omitted). The rulemaking grant there at issue provided that HUD may, "from time to time * * * make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this Act,"id. at 277, quite similar to Section 6 of the NLRA.

**Back to Context**

18. 411 U.S. 356 (1973).

Back to Context

19. Id. at 369 (quoting Thorpe, 393 U.S. at 280-81).

Back to Context

20. Nat'l Ass'n. of Pharm. Mfrs. v. FTC, 637 F.2d 877, 880 (2d Cir. 1981) ("this generous construction of agency rulemaking authority has become firmly entrenched"); Nat'l Petroleum Refiners Ass'n v. FTC, 482 F.2d 672, 686 (D.C. Cir. 1973) ("plain, expansive language" of the rulemaking grant at issue, together with the "broad, undisputed policies" meant to be furthered by Congress's enactment of the Federal Trade Commission Act of 1914, sufficed to grant the FTC substantive rulemaking authority).

Back to Context

21. 394 U.S. 759, 764 (1969) (plurality opinion of Fortas, J., joined by Warren, C.J., Stewart, J., and White, J.), 770 (Black, J., Marshall, J., and Brennan, J), 777, 779 (Douglas, J.), 783 n. 2 (Harlan, J.).

Back to Context

22. 416 U.S. 267, 295 (1974) (majority opinion of Powell, J., and dissenting opinion of White, J. (and three other justices)).

Back to Context

23. 499 U.S. 606 (1991) (AHA).

Back to Context

24. Id. at 609-10 (emphasis added).

Back to Context

25. (Hereafter, Harkin and Miller.) Senator Harkin is the Chairman of the Senate Committee on Health, Education, Labor, and Pensions. Representative Miller is Ranking Member on the House Committee on Education and the Workforce.

Back to Context

26. Id. at 613 (emphasis added).

Back to Context

27. Statement of Donald A. Callahan, U.S. Senate Committee on Education and Labor, March 29, 1935, Legislative History of the National Labor Relations Act, U.S. Government Printing Office, 1949, p. 2002.

**Back to Context**

28. 131 S. Ct. 704, 713-14 (2011).

**Back to Context**

29. Id. at 713.

**Back to Context**

30. Id. (quoting United States v. Mead, 533 U.S. 218, 226-27 (2001)); see also Chevron, 467 U.S. at 842-43 (announcing two-part framework for determining whether courts should grant deference to agency interpretations of enabling statutes).

**Back to Context**

31. Mayo, 131 S. Ct. at 713-14 (emphasis added and citations omitted).

**Back to Context**

32. See Comparison of S. 2926 (73d Congress) and S. 1958 (74th Congress) 24 (Comm. Print 1935), reprinted in 1 Legislative History of the National Labor Relations Act, 1935, (1949) at 1349.

**Back to Context**

33. NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 153-54 (1975) (ordering disclosure of such Agency opinions under the FOIA, and quoting legislative history of the FOIA to that effect, H.R. Rep. No. 1497, p. 7, U.S. Code Cong. & Admin. News, 1966, p. 2424).

**Back to Context**

34. 499 U.S. at 609-10. But even if one were to construe the report in the way advocated by the comment, such reports themselves do not have the force and effect of law, see Lincoln v. Vigil, 508 U.S. 182, 192 (1993); AHA, 499 U.S. at 616, and thus at best are only potential evidence of legislative intent.

**Back to Context**

35. However, it is incorrect that the rule has never been challenged; it has been challenged and upheld. See Pannier Corp. v. NLRB, 120 F.3d 603, 606-07 (6th Cir. 1997) (rejecting an as-applied challenge to Rule 103.20).

Back to Context

36. Comment of Manufacturers' Association of South Central Pennsylvania.

Back to Context

37. In National Petroleum Refiners Ass'n v. FTC, 482 F.2d 672 (D.C. Cir. 1973), the court rejected the argument that the FTC's prosecutorial functions rendered it unsuitable for issuing rules. By way of example, it noted that the NLRB is similar to the FTC in its methods of adjudication and enforcement, but the Supreme Court had repeatedly encouraged the Board to utilize its rulemaking powers. Id. at 684.

Back to Context

38. 380 U.S. 300, 318 (1965).

Back to Context

39. See also comment of Americans for Limited Government, citing to AFL-CIO v. Chao, 409 F.3d 377, 391 (D.C. Cir. 2005) for the same principle.

Back to Context

40. 319 U.S. 624, 639 (1943).

Back to Context

41. 499 U.S. at 614.

Back to Context

42. Mourning, 411 U.S. at 369 (quoting Thorpe, 393 U.S. at 280-81).

Back to Context

43. These regulations are entirely compatible with the national labor policy, as expressed in Section 1, "to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred." 29 U.S.C. 151 (fifth paragraph). As explained below, the Board's ability to "eliminate" the causes of labor strife and depressed wage rates, "which have the intent or necessary effect of burdening or obstructing commerce,"id., depends on workers' knowledge of their rights and the protections provided by the NLRB. The Board therefore rejects the argument of the Manufacturer's Association of South Central Pennsylvania that both the notice-posting rule and the Board's general assertion of rulemaking authority are inconsistent with Section 1.

Back to Context

44. The decision of the intermediate state court in Smith v. Fair Employment & Housing Commission, 30 Cal. Rptr. 2d 395 (Cal. Ct. App. 1994), rev'd on other grounds, 913 P.2d 909 (Cal. 1996), lends no support to arguments challenging these regulations on First Amendment grounds. There, the California Court of Appeal held that a landlord's right to freedom of speech was "implicate[d],"id. at 401-02, by a state fair housing agency's remedial order requiring her to sign, post, and distribute notices "setting out the provisions of [the fair housing statute], the outcome of th[e] case, and the statement that [she] practices equal housing opportunity." 913 P.2d at 914. The Smith case is not persuasive here because the notice at issue in Smith would not merely have set forth the rights of prospective buyers or renters but also would have contained a signed statement from the landlord which would have given the false appearance that she agreed with the state's fair housing "concepts and rules," despite her religious beliefs to the contrary. 30 Cal. Rptr. 2d at 401. That feature of the case has no parallel here. Here, by contrast, employers are not required to sign the informational notice, and as noted, nothing in the poster is attributed to them. The Board further notes that the Smith decision is not authoritative because it was superseded by the California Supreme Court's grant of review in that case. See 913 P.2d at 916 n.*.

Back to Context

45. The Employers Association of New Jersey is therefore off the mark when it argues that the notice-posting requirement is preempted under the principles of Lodge 76, International Ass'n of Machinists & Aerospace Workers v. Wisconsin Employment Relations Commission, 427 U.S. 132 (1976), as an attempt to regulate employer speech "about unionization and collective bargaining." As explained above, the employer's choice whether to express its own views, arguments, or opinions is wholly unaffected by a requirement to post a government-provided notice summarizing what the law requires. Indeed, consistent with both Machinists and the policy of Section 8(c) "`to encourage free debate on issues dividing labor and management,'"Brown, 554 U.S. at 67 (quoting Linn v. United Plant Guard Workers, Local 114, 383 U.S. 53, 62 (1966)), employers remain free under this rule—as they have in the past—to express noncoercive views regarding the exercise of these rights as well as others. See, e.g., United Techs. Corp., 274 N.L.R.B. 609, 609, 618-20, 624-26 (1985), enforced sub nom. NLRB v. Pratt & Whitney Air Craft Div. v., United Techs. Corp., 789 F.2d 121 (2d Cir. 1986); Warrensburg Bd. & Paper Corp., 143 N.L.R.B. 398, 398-99 (1963), enforced, 340 F.2d 920 (2d Cir. 1965). For this reason, the Board finds it unnecessary to adopt the proposal made by thePilchak attorneys to revise the rule to specify that employers "may post a notice of equal dignity which advises employees of * * * additional rights and realities." Alternatively, the Pilchak attorneys propose that the Board amend the rule to permit employers to "alter the Poster and include additional rights." Adopting this suggestion would compromise the integrity of the notice as a communication from the government. It, too, is therefore rejected.

Back to Context

46. To the extent that the Board espoused a contrary view of Teamsters 357 in a prior rulemaking proceeding, that view is abandoned. See Union Dues Regulation, 57 FR 43635, 43637-38 (Sept. 22, 1992), withdrawn, **61 FR 11167** (Mar. 19, 1996).

### Back to Context

47. See NPRM, **75 FR 80411** and fn. 3 above.

### Back to Context

48. The Board has also placed the other non-case materials cited to in this final rule into the hard copy docket.

### Back to Context

49. Comment of the Employers Association.

### Back to Context

50. Comment of Malt-O-Meal Company (Malt-O-Meal).

### Back to Context

51. Comment of Tecton Products.

### Back to Context

52. Comment of Printing and Imaging Association of MidAmerica (Printing and Imaging Ass'n).

### Back to Context

53. See, e.g., comment of the Printing and Imaging Ass'n.

### Back to Context

54. See, e.g., comment of Coalition for a Democratic Workplace.

### Back to Context

55. See, e.g., comments of Printing Industries of America and the Portland Cement Association.

### Back to Context

56. See, e.g., comments of Cass County Electric Cooperative and Pilchak Cohen & Tice, P.C.

### Back to Context

57. As one person states, "The internet has long ago replaced lunch room bulletin board postings as the means by which employees learn of and exercise their rights."

**Back to Context**

58. Such comments appear to misunderstand that by this rule, the Board is indeed seeking to inform employees of the provisions of the NLRA, using the most accessible venues to reach them, their workplaces.

Other comments question why this rule does not mandate notice posting by governmental employers. The NLRA does not cover such employers. See Section 2(2), **29 U.S.C. 152**(2).

**Back to Context**

59. Comment of Fisher & Phillips, LLP.

**Back to Context**

60. Comment of Member, Local 150, Operating Engineers.

**Back to Context**

61. Comment of Organizer, IBEW.

**Back to Context**

62. Comment of International Staff Representative, Steelworkers.

**Back to Context**

63. Comment of Member, Local 150, Operating Engineers.

**Back to Context**

64. Comment of Organizer, Local 150, Operating Engineers.

**Back to Context**

65. Comment of Strokoff and Cowden.

**Back to Context**

66. Comment of Organizer, Teamsters, Local 117.

**Back to Context**

67. Comment of SEIU Local 615.

**Back to Context**

68. Comment of Financial Secretary, Local 150, Operating Engineers.

**Back to Context**

69. Comment of Staff Representative, Steelworkers.

**Back to Context**

70. See e.g., comments of National Immigration Law Center and Latino Justice.

**Back to Context**

71. See, e.g., comment of Friends of Farmworkers, Inc.

**Back to Context**

72. Comment of Alliance of Guestworkers for Dignity.

**Back to Context**

73. Comment of Instructor, Apprenticeship and Skill Improvement Program, Local 150, Operating Engineers.

**Back to Context**

74. North Carolina License Plate Agency #18, 346 NLRB 293 (2006), enf'd. 243 F. Appx. 771 (4th Cir. 2007) (unpublished).

**Back to Context**

75. Eastex, Inc. v. NLRB, above, 437 U.S. at 565-567.

**Back to Context**

76. NLRB v. Washington Aluminum Co., 370 U.S. 9, 14 (1962).

**Back to Context**

77. See comment of Cass County Electric Cooperative. For example, Professor Morris, author of two of the articles cited by the Board (as "see also") listed no authority to support his assertion that employees lack knowledge about the NLRA. See Charles J. Morris, "Renaissance at the NLRB," above at fn. 3; Morris, "NLRB Protection in the Nonunion Workplace," above at fn. 3.

Back to Context

78. See DeChiara, "The Right to Know," above at fn. 1; 75 FR 80411 fn. 4.

Back to Context

79. The Printing and Imaging Association discussed these declining rates of unionization, andcited Professor Kate Bronfenbrenner's doctoral dissertation, "Seeds of Resurgence: Successful Union Strategies for Winning Certification Elections and First Contracts in the 1980s and Beyond," (available at http://digitalcommons.ilr.cornell.edu/cgi/viewcontent.cgi?article=1002&amp;context=reports&amp;sei-redir=1#search=&ldquo;Kate+Bronfenbrenner,+Uneasy+terrain:+The+impact+of+capital+mo to argue that the higher win rates for unions in elections involving both immigrant and older workers argued against the need for the proposed rule.

The Board is not addressing the many debated causes of the declining rates of private sector unionization in the United States. This rule simply accepts those rates as given, and seeks to increase the knowledge of NLRA provisions among those without readily available sources of reliable information on these provisions.

Back to Context

80. See, e.g., comment of Desert Terrace Healthcare Center.

Back to Context

81. See Bureau of Labor Statistics, Economic News Release, Table B-1, "Employees on nonfarm payrolls by industry sector and selected industry detail," May 3, 2011 (seasonally adjusted data for March 2011) http://data.bls.gov/timeseriesLNS11300000?years_option=specific_years&amp;include_graphs=true&amp;to_year=2010&amp;from_year=1 (last visited June 6, 2011).

Back to Context

82. Comment of P & L Fire Protection, Inc.

Back to Context

83. Comment of OKC Tea Party.

Back to Context

84. Comment of Montana Records Management, LLP.

Back to Context

85. Comment of Humphrey & Associates, Inc.

**Back to Context**

86. Comment of Medina Excavating, Inc.

**Back to Context**

87. Comment of Olsen Tool & Plastics, Co.

**Back to Context**

88. And as one union official writes:

Having been active in labor relations for 30 years I can assure you that both employees and employers are confused about their respective rights under the NLRA. Even union officers often do not understand their rights. Members and non-members rarely understand their rights. Often labor management disputes arise because one or both sides are mis-informed about their rights. Often the employer takes an action it truly believes is within its rights when it is not.

Comment of Civil Service Employees Association.

**Back to Context**

89. Thus, the many comments that assert that employees can just use Internet search engines to find out about unions (see, e.g., comments of Winseda Corp. Homestead Village, Inc.), misapprehend the breadth of the rights of which the Board seeks to apprise all employees. As stated above, Section 7 is not merely about the right to join or refrain from joining a labor organization, but more broadly protects the right of employees to engage in "concerted activities" for the purpose of "mutual aid or protection." It is this right that is the most misunderstood and simply not subject to an easy Internet search by employees who may have no idea of what terms to use, or even that such a right might be protected at all.

**Back to Context**

90. Comment of Riverbend Community Mental Health.

**Back to Context**

91. Comment of Farmers Cooperative Compress.

**Back to Context**

92. Printing Industries of America uses election data to argue that the Labor Department's notice posting rule for Federal contractors has not been effective because the rate of elections has not

increased. It is unclear whether any meaningful conclusion can be drawn from election data for only a few months, especially since the number of contractors covered by the Labor Department's rule is only a small fraction of the number of employers subject to the NLRA. In any event, the Board does not believe that that is the proper criterion by which to measure the rule's effectiveness. The purpose of requiring the posting of such notices is to inform employees of their rights so that they may exercise them more effectively, not to obtain any particular result such as the filing of more election petitions.

The same comment also cites a couple of textbooks which it asserts are popularly used in high schools today to argue that labor history is being taught to today's students. The Board is unable to assess the truth of that assertion, but regardless, it is unclear whether students necessarily connect this history to their future rights as employees.

**Back to Context**

93. Comment of Weinberg, Roger & Rosenfeld.

**Back to Context**

94. Id.

**Back to Context**

95. Comment of Staff Representative, Steelworkers.

**Back to Context**

96. Accordingly, the Board finds it unnecessary to conduct a study to determine the extent of employees' knowledge of NLRA rights. The Board further observes that even if only 10 percent of workers were unaware of those rights, that would still mean that more than 10 million workers lacked knowledge of one of their most basic workplace rights. The Board believes that there is no question that at least a similar percentage of employees are unaware of the rights explained in the notice. In the Board's view, that justifies issuing the rule.

**Back to Context**

97. See comments of the National Immigration Law Center, Service Employees International Union, and Weinberg, Roger & Rosenfeld.

**Back to Context**

98. Comment of David Fusco, a labor and employment attorney.

**Back to Context**

99. See comments of Pilchak, Cohen & Tice, American Trucking Association, and Electrical and Mechanical Systems Inc.

**Back to Context**

100. See, e.g. comment of the Heritage Foundation.

**Back to Context**

101. See, e.g., comment of the National Right to Work Committee.

**Back to Context**

102. See, e.g., comment of COLLE, Retail Industry Leaders Association.

**Back to Context**

103. See comment of Capital Associated Industries, Inc. and National Association of Manufacturers.

**Back to Context**

104. See e.g. comments of COLLE and Coalition for a Democratic Workplace.

**Back to Context**

105. See, e.g., comment of Pilchak Cohen & Tice.

**Back to Context**

106. See comments of ALFA, Carrollton Health and Rehabilitation Center, and COLLE.

**Back to Context**

107. NLRA Section 19 provides that "Any employee who is a member of and adheres to established and traditional tenets or teachings of a bona fide religion, body, or sect which has historically held conscientious objections to joining or financially supporting labor organizations shall not be required to join or financially support any labor organization as a condition of employment; except that such employee may be required in a contract between such employee's employer and a labor organization in lieu of periodic dues and initiation fees, to pay sums equal to such dues and initiation fees to a nonreligious, nonlabor organization charitable fund exempt from taxation[.]" 29 U.S.C. 169.

**Back to Context**

108. See, e.g., comments of COLLE, Baker & McKenzie, National Association of Manufacturers, and American Trucking Association.

Back to Context

109. See comment of National Association of Manufacturers.

Back to Context

110. See comment of ALFA.

Back to Context

111. See J. Picini Flooring, 356 NLRB No. 9, slip op. at 6 (2010).

Back to Context

112. See, e.g., The Golub Corporation, 159 NLRB 355, 369 (1966).

Back to Context

113. See, e.g., **29 CFR 1903.2** (Occupational Safety and Health Act); **29 CFR 1601.30** (Title VII of the Civil Rights Act of 1964); **42 U.S.C. 2000**e-10(a) (Americans with Disabilities Act); **29 U.S.C. 2619**(a) (Family and Medical Leave Act).

Back to Context

114. **75 FR 28386**.

Back to Context

115. See, e.g., comments of Buffalo Wild Wings; Associated Milk Producers, Inc.; Smitty's, Inc.; National Grocers Association; and Sorensen/Wille, Inc.

Back to Context

116. See, e.g., comments of Dr. Pepper Snapple Group; Georgia Caremaster Medical Services; Homestead Village, Inc.; Exodus Designs & Surfaces; Bonnie Dedmore State Farm.

Back to Context

117. Comment of TLC Companies.

Back to Context

118. Comment of NAI Electrical Contractors.

Back to Context

119. See, e.g., comment of Associated General Contractors (AGC) of Iowa.

**Back to Context**

120. See, e.g., comments of AFL-CIO and three Georgetown University Law Center students.

**Back to Context**

121. See, e.g., comment of Sinnissippi Centers.

**Back to Context**

122. AGC of Iowa.

**Back to Context**

123. Sinnissippi Centers.

**Back to Context**

124. National Council of Agricultural Employers.

**Back to Context**

125. Mercy Center Nursing Unit Inc.

**Back to Context**

126. See, e.g., comments of National Immigration Law Center, Legal Aid Society—Employment Law Center, and La Raza Centro Legal; Filipino Advocates for Justice.

**Back to Context**

127. See, e.g., comments of COLLE; Food Marketing Institute (FMI).

**Back to Context**

128. Georgetown law students.

**Back to Context**

129. See, e.g., Baker & McKenzie; Heritage Foundation; Georgetown law students.

**Back to Context**

130. See, e.g., comments of Gibson, Dunn, Cohen, Leifer & Yellig, P.C.; Beeson, Tayer & Bodine.

Back to Context

131. J. Picini Flooring, 356 NLRB No. 9 (2010).

Back to Context

132. See, e.g., comments of International Foodservice Distributors Association (IFDA); Associated Builders and Contractors; Los Angeles County Business Federation; National Roofing Contractors Association.

Back to Context

133. See, e.g., comments of American Home Furnishings Alliance; Seawright Custom Precast;Mount Sterling, Kentucky Chamber of Commerce; U.S. Xpress, Inc.

Back to Context

134. See, e.g., comments of IFDA; Estes; The Sack Company; National Roofing Contractors Association.

Back to Context

135. A few comments ask whether the Board's rule would preempt the Department of Labor's rule. Because the answer to that question would not affect the validity of the Board's rule, the Board finds it unnecessary to take a position on that issue in this proceeding.

Back to Context

136. The proposed rule excludes small businesses whose impact on interstate commerce is de minimis or so slight that they do not meet the Board's discretionary jurisdiction requirements. See generally An Outline of Law and Procedure in Representation Cases, Chapter 1, found on the Board's Web site, http://www.nlrb.gov, and cases cited therein.

Back to Context

137. The tolling and animus provisions are not remedies in the usual sense of the term; however, these provisions inform the public of the impact that violations of the notice posting obligation may have in other NLRB proceedings. As described below, these impacts are not a "punishment" for noncompliance. To the contrary, the tolling provision is intended to ensure that noncompliance with the notice posting requirement does not prejudice innocent employees. And the animus provision is intended to inform the public that knowing and willful violations of the rule may support an inference of animus toward NLRA rights.

Back to Context

138. See, e.g., Harkin and Miller, National Employment Law Project, Public Justice Center, Inc.

**Back to Context**

139. The Board's General Counsel has unreviewable discretion as to whether to issue a complaint in an unfair labor practice proceeding. See, e.g., Vaca v. Sipes, 386 U.S. 171, 182 (1967). The General Counsel has exercised that discretion to refuse to proceed with meritorious charges when it would not serve the purposes of the Act. See General Counsel memoranda 02-08 and 95-15. This discretion includes dismissing any charge filed against an employer that is not covered by the Board's jurisdictional requirements.

**Back to Context**

140. Consistent with precedent, it will be unlawful for an employer to threaten or retaliate against an employee for filing charges or testifying in a Board proceeding involving an alleged violation of the notice-posting requirement. NLRA Sections 8(a)(1), 8(a)(4), 29 U.S.C. 158(a)(1), (4); Romar Refuse Removal, 314 NLRB 658 (1994).

**Back to Context**

141. See, e.g., comments of FMI, Assisted Living Federation of America (ALFA).

**Back to Context**

142. See, e.g., comment of U. S. Chamber of Commerce.

**Back to Context**

143. See, e.g., comments of Employment and Labor Law Committee, Association of Corporate Counsel ("ACC"); California Chamber of Commerce (California Chamber); and National Council of Agricultural Employers (NCAE).

**Back to Context**

144. See Harkin and Miller. Although the Board suggested in a footnote in California Saw that there was no obligation to inform employees of their Section 7 rights, 320 NLRB at 232 n. 42, this dicta merely indicated that no such obligation had yet been recognized in that particular context. To the extent it could be read as denying that such an obligation may exist, it is the considered view of the Board that this reading must be rejected. Similarly, the statement in U.S. Postal Service, 241 N.L.R.B. 141, 152 (1979), regarding affirmative notice obligations is limited to Weingarten rights, and, in any event, does not suggest that notice of NLRA rights may never be required.

**Back to Context**

145. ALFA contends that failure to post a Board-required notice is not an unfair labor practice, but the authorities cited do not support that proposition.

## Back to Context

146. See, e.g., comments of St Mar Enterprises, Inc. and National Federation of Independent Business.

## Back to Context

147. See comments of Harkin and Miller, AFL-CIO, and Service Employees International Union (SEIU).

## Back to Context

148. The Board has broad discretion to interpret 10(b), including equitable tolling, in accordance with its experience administering the Act. Lodge 64, IAM v. NLRB, 949 F.2d 441, 444 (D.C. Cir. 1991) (deferring to the Board's interpretation of 10(b) equitable exceptions).

## Back to Context

149. Under the final rule, the Board could also find the failure to post the notice to be an unfair labor practice, and could, if appropriate, consider a willful failure to post to be evidence of unlawful motive in an unfair labor practice case. However, in the absence of equitable tolling of the 10(b) period, such "redress" would not aid an employee who was excusably unaware of his or her NLRA rights, failed to file a timely charge, and thus was denied any remedy for violation of those rights. Cf. Kanakis Co., 293 NLRB 435, 436 fn. 10 (1989) (possibility of criminal sanctions against employer would be little comfort to charging party if deprived of recourse to Board's remedial processes).

## Back to Context

150. See, e.g., comments of FMI, COLLE.

## Back to Context

151. See, e.g., comments of FMI, COLLE.

## Back to Context

152. See, e.g., comments of California Chamber and NCAE.

## Back to Context

153. American Bus Association v. Slater, 231 F. 3d 1 (D.C. Cir. 2000), cited by California Chamber and NCAE, did not concern equitable tolling and is therefore inapposite. The court there also found that Congress had expressly limited the sanctions available under the Americans with Disabilities Act to those enumerated in that statute; such is not the case under the NLRA.

**Back to Context**

154. See, e.g., comments of FMI, COLLE, and U.S. Chamber of Commerce.

**Back to Context**

155. See comments of Fisher & Phillips LLC and National Grocers Association.

**Back to Context**

156. As to ACC's concern that the rule could potentially subject employers to unfair labor practice charges based on conduct as far back as 1935, the Board stresses that tolling will be available only in the case of unlawful conduct that occurs after the rule takes effect.

**Back to Context**

157. See, e.g., comments of Coalition for a Democratic Workplace and COLLE.

**Back to Context**

158. Moreover, even in criminal law, the principle is not absolute. See, e.g., Lambert v. California, 355 U.S. 225 (1957).

**Back to Context**

159. See, e.g., comments of U.S. Chamber of Commerce, American Trucking Associations, Taft Stettinius & Hollister LLP.

**Back to Context**

160. See, e.g., comments of COLLE and California Chamber.

**Back to Context**

161. See comment of AFL-CIO.

**Back to Context**

162. One example could be an employer that believes that it is subject to the Railway Labor Act and not to the NLRA.

**Back to Context**

163. This is so in other areas of NLRA law. For example, an employer who coercively interrogates or disciplines an individual concerning his or her union activities violates the NLRA if the individual is a statutory employee, even though the employer may have honestly believed that the individual was a statutory supervisor and not protected by the NLRA. Also, absent compelling economic circumstances, an employer that is testing the Board's certification of a newly-selected union in the court of appeals makes unilateral changes in unit employees' terms and conditions of employment at its peril; if the court affirms the certification, the unilateral changes violate NLRA Section 8(a)(5) even if the employer believed in good faith that the certification was inappropriate. Mike O'Connor Chevrolet, 209 NLRB 701, 703 (1974), enf. denied on other grounds 512 F.2d 684 (8th Cir. 1975).

**Back to Context**

164. See also comment of American Health Care Association (AHCA).

**Back to Context**

165. See, e.g., comments of FMI and COLLE.

**Back to Context**

166. The Georgetown law students ask whether, if failure to post the notice may be found to be an unfair labor practice and also may be considered evidence of antiunion animus, such a failure could "satisfy an element of its own violation." The answer is no, because the failure to post, whether knowing or inadvertent, would be an unfair labor practice regardless of motive; knowing and willful failure to post would be relevant only in cases such as those alleging unlawful discipline, discharge, or refusal to hire, in which motive is an element of the violation.

**Back to Context**

167. See, e.g., comments of Lemon Grove Care & Rehabilitation, numerous "postcard" comments.

**Back to Context**

168. One comment asserts that because of the potential for tolling the 10(b) period, "businesses * * * will have to keep records forever[.]" The Board finds no merit in this contention. Employers that are aware of the rule can avoid keeping records "forever" simply by posting the notice. Employers that are not aware of the requirement to post the notice would also be unaware of the possibility of tolling the 10(b) period in the event of a failure to post, and thus would discern no reason to—and probably would not—keep records "forever." Prejudice to the employer because of long-lost records would be considered by the Board in determining whether tolling is appropriate in the particular case.

Another comment complains that "the requirement of proof on the employer to `certify' that this posting is up each day is burdensome[.]" There is no such requirement.

**Back to Context**

169. See, e.g., comments of FMI, ALFA, AHCA.

**Back to Context**

170. For example, "This seems to be yet another trap for the employers. Another avenue to subject them to law suits and interrogations, and uneconomic activities and ungodly expenditures."

**Back to Context**

171. See Section 103.20 of the Board's Rules and Regulations.

**Back to Context**

172. Alexander v. Sandoval, 532 U.S. 275, 291 (2001).

**Back to Context**

173. Throughout this dissent, I will refer generally to the statute we administer as the NLRA, unless the discussion focuses on a specific historical version, such as the Wagner Act.

**Back to Context**

174. Of course, this reasoning would seem to dictate that the failure of the Board to inform its own employees of their general rights under the Federal Labor Relations Act is an unfair labor practice, even though that statute imposes no such express requirement. To date, I am not aware that this agency, or any other, views itself as subject to such an enforceable obligation.

**Back to Context**

175. The majority contends that the fact that the rule comes 76 years after the NLRA was enacted is not a "condition of validity."Mayo Foundation for Medical Education and Research v. United States, 131 S.Ct. 704, 713-14 (2011) (quoting Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 740 (1996) ("neither antiquity nor contemporaneity with the statute is a condition of validity."). I have no problem with that proposition, but if the Board lacks statutory authority to promulgate a rule, it is of no matter that it attempts to do so in year 1 or year 76 of its existence.

**Back to Context**

176. See, e.g., Mourning v. Family Publications Service, Inc., 411 U.S. 356, (1973) Unlike here, the Federal Reserve Board easily met this standard in Mourning when issuing a disclosure regulation

under the Truth in Lending Act, even though that Act did not explicitly require lenders to make such disclosures. In sustaining the regulation, the Court found the regulation to be within the Federal Reserve's rulemaking authority and, in light of the legislative history, the disclosure requirement was not contrary to the statute. "The crucial distinction, * * * [was that] the disclosure requirement was in fact enforced through the statute's pre-existing remedial scheme and in a manner consistent with it."Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 94 (2002).

### Back to Context

177. The Senate report on the Wagner bill stressed that unfair labor practices were "strictly limited to those enumerated in section 8. This is made clear by paragraph 8 of section 2, which provides that `The term `unfair labor practice' means unfair labor practice listed in Section 8," and by Section 10(a) empowering the Board to prevent any unfair labor practice "listed in Section 8." Thus, "[n] either the National Labor Relations Board nor the courts are given any blanket authority to prohibit whatever labor practices that in their judgment are deemed to be unfair." S. Rep. No. 573, 74th Cong., 1st Sess. 17 (1935) at 8-9 reprinted in Legislative History of the National Labor Relations Act of 1935, Vol. II at 2307-2308 (1985).

### Back to Context

178. Communications Workers v. Beck, 487 U.S. 735 (1988).

### Back to Context

179. NLRB v. General Motors, 373 U.S. 734 (1963).

### Back to Context

180. California Saw & Knife Works, 320 NLRB 224, 233 (1995).

### Back to Context

181. None of the FMLA cases cited by the majority support finding that a failure to post a general notice of employee rights under the NLRA is unlawful. In Bachelder, the Ninth Circuit actually found "unavailing" the employer's argument that it had satisfied all its specific FMLA notice obligations because it had complied with the FMLA's general posting rule. Id. at 1127, fn. 5. Rather, the court found that because the employer failed to "notify" an employee which of the four FMLA's "leave year" calculation methods it had chosen, the employer "interfered" with that employee's rights and, therefore, improperly used the employee's FMLA covered absences as a "negative factor" when taking the affirmative adverse action of discharging her.

Similarly, in neither Greenwell v. Charles Machine Works, Inc., 2011 WL 1458565 (W.D.Okla., 2011); Smith v. Westchester County, 769 F. Supp 2d 448 (S.D.N.Y. 2011), was the FMLA general

posting requirement at issue. Smith did not involve a notice issue and Greenwell involved the employer's failure to comply with a different notification obligation under the FMLA.

In any event, as previously stated, FMLA expressly provides that employers give notice to employees of rights thereunder and expressly provides for sanctions if notice is not given. The NLRA does neither.

## Back to Context

182. 365 U.S. at 676.

## Back to Context

183. My colleagues attempt to distinguish Local 357 as limited to an interpretation of Sec. 8(a)(3) and 8(b)(2)'s prohibition of discriminatory practices. That may have been the issue before the Court, but I do not view the quoted rationale as so limited.

## Back to Context

184. Peter D. DeChiara, "The Right to Know: An Argument for Informing Employees of Their Rights under the National Labor Relations Act," 32 Harv. J. on Legis. 431, at 436 and fn. 28 (1995).

In the Notice of Proposed Rulemaking, the majority also relied on two articles by Professor Charles J. Morris, a co-petitioner for notice-posting rulemaking: "Renaissance at the NLRB—Opportunity and Prospect for Non-Legislative Procedural Reform at the Labor Board," 23 Stetson L. Rev. 101, 107 (1993); and "NLRB Protection in the Nonunion Workplace: A Glimpse at a General Theory of Section 7 Conduct," 137 U. Pa. L. Rev. 1673, 1675-1676 (1989). Professor Morris did not refer to any specific evidence supporting a belief that employees lack knowledge of their rights.

## Back to Context

185. Mayer, Gerald, "Union Membership Trends in the United States" (2004). Federal Publications. Paper 174, Appendix A. http://digitalcommons.ilr.cornell.edu/key_workplace/.

## Back to Context

186. 74 FR 6107 (Feb. 4, 2009).

## Back to Context

187. 75 FR 28368 (May 20, 2011).

## Back to Context

188. San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 244 (1959)

**Back to Context**

189. Because I find the rule is invalid, I find it unnecessary to comment on the content of the notice or the consequences, other than finding an unfair labor practice, if an employer fails to post the required notice. For the reasons stated in my dissenting opinion in J. Picini Flooring, 356 NLRB No. 9 (2010), I also disagree with the rule's requirement that certain employers must also electronically distribute the notice.

**Back to Context**

190. Source: U.S. Department of Labor, Bureau of Labor Statistics, "Economic News Release," Table B-8, June 3, 2011 (available at http://www.bls.gov). (The Board is administratively informed that BLS estimates that fringe benefits are approximately equal to 40 percent of hourly wages. Thus, to calculate total average hourly earnings, BLS multiplies average hourly wages by 1.4. In March, 2011, average hourly wages for professional and business workers were $23.00. Table B-8. Accordingly, the Board multiplied that number by 1.4 to arrive at its estimate of $32.20 average hourly earnings, including fringe benefits.) In the NPRM, the Board estimated hourly earnings of $31.02, based on BLS data from January 2009. 75 FR 80415. The estimate has been updated to reflect increases in hourly earnings since that time. Those increases have been relatively minor, and do not affect the Board's conclusion that the economic impact of the rule will not be significant; see discussion below.

**Back to Context**

191. The National Roofing Contractors Association asserts (without support) that "federal agencies have a notoriously poor track record in estimating the costs of new regulations on businesses"; it therefore predicts that "the actual cost for many employers could be considerably higher." The Board recognizes that some employers, generally firms with extensive and/or multiple facilities, may incur initial compliance costs in excess of the Board's estimate. For example, a company with multiple locations may require more than 30 minutes to physically post the notices on all of its various bulletin boards. The Board's estimate, however, is an average for all employers; many small employers, especially those with only one facility and/or limited electronic communication with employees, may incur lower compliance costs.

In this regard, however, contrary to numerous comments, such as that of St Mar Enterprises, Inc., the Board does not expect that the rule will be "very burdensome" for businesses with more than one facility. Normally, such firms should have to learn about the rule's requirements and acquire the notices only once, no matter how many facilities are involved. The same should be true for electronic posting: downloading the notice and posting it on an employer's Web site normally should have to be done once for all facilities. Thus, the only additional costs involved for multi-facility firms should be those of physically posting the notices at each facility.

**Back to Context**

192. Source: SBA Office of Advocacy estimates based on data from the U.S. Department of Commerce, Bureau of the Census, and trends from the U.S. Department of Labor, Bureau of Labor Statistics, Business Employment Dynamics.

**Back to Context**

193. In reaching this conclusion, the Board believes it is likely that employers that might otherwise be significantly affected even by the low cost of compliance under this rule will not meet the Board's jurisdictional requirements, and consequently those employers will not be subject to this rule.

**Back to Context**

194. See further discussion in section II, subsection C, Factual Support for the Rule, above.

**Back to Context**

195. Cass County Electric Cooperative says that, after estimating the average cost of compliance, "the NLRB quickly digresses into an attempt to estimate the cost of the proposed rule on only small businesses." The Board responds that in estimating the cost of the rule on small businesses, it was doing what the RFA explicitly requires (and that focusing on small businesses, which comprise more than 99 percent of potentially affected firms, is hardly a "digression"). The comment also asserts that the Board concluded "that the cost of estimating the implementation cost will likely exceed the cost of implementation, and thus is not warranted. At best, this is a poor excuse to justify the rule." This misstates the Board's observation that "Given the very small estimated cost of compliance, it is possible that the burden on a small business of determining whether it fell into a particular tier might exceed the burden of compliance." This observation was one of the reasons why the Board rejected a tiered approach to coverage for small entities, not an "excuse to justify the rule." 75 FR 80416.

**Back to Context**

196. In any event, the comment from Baker & Daniels LLP and related comments are difficult to square with the assertions made in numerous other comments that the notice posting is unnecessary because employees are already well aware of their NLRA rights and have made informed decisions not to join unions or seek union representation.

**Back to Context**

197. For RFA purposes, the relevant economic impact on small entities is the impact of compliance with the rule. Mid-Tex Electric Cooperative, Inc. v. FERC, 773 F.2d 327, 342 (D.C. Cir. 1985), cited in SBA Guide, above, at 77.

Back to Context

198. NLRA Section 8(d) expressly states that the obligation to bargain in good faith "does not compel either party to agree to a proposal or require the making of a concession[.]" 29 U.S.C. 158 (d).

Back to Context

199. SBA Guide, above, at 34.

Back to Context

200. Baker & Daniels LLP cites no authority to support its contention that the RFA is concerned with costs other than the costs of compliance with the rule, and the Board is aware of none.

Back to Context

201. Contrary to ABC's and RILA's assertions, the Board did estimate the cost of complying with the rule's electronic notice posting requirements; its estimated average cost of $62.04 specifically included such costs. 75 FR 80415. Although ABC faults the Board for failing to issue a preliminary request for information (RFI) concerning the ways employers communicate with employees electronically, the Board did ask for comments concerning its RFA certification in the NPRM, id. at 80416. In this regard, ABC states only that "many ABC member companies communicate with employees through email or other electronic means," which the Board expressly contemplated in the NPRM, id. at 80413, and which is also the Board's practice with respect to communicating with its own employees. If ABC has more specific information it has failed to provide it. In any event, the final rule will not require email or many other types of electronic notice.

Back to Context

202. Association of Corporate Counsel contends that employers will have to modify their policies and procedures manuals as a result of the rule. The Board questions that contention, but even if some employers do take those steps, they would not be a cost of complying with the rule.

Back to Context

203. Fisher and Phillips also suggest that the Board failed to take into account the effect that the proposed rule would have on the Board's own case intake and budget. The RFA, however, does not require an estimate of the economic effects of proposed rules on Federal agencies.

**Back to Context**

204. See fn. 197, above.

**Back to Context**

205. See, e.g., comments of Cass County Electric Cooperative and Baker & McKenzie. The latter estimates that each private sector employee will spend at least an hour attending meetings concerning the content of the notice, and that the cost to the economy in terms of lost employee work time will be \$3.5 billion.

**Back to Context**

206. See, e.g., comment of Dr. Pepper Snapple Group.

**Back to Context**

207. See, e.g., comments of Metro Toyota and Capital Associated Industries, Inc.

**Back to Context**

208. Contrary to one comment's suggestion, no employer will be "bankrupted" by fines imposed if the notice is torn down. As explained above, the Board does not have the authority to impose fines.

**Back to Context**

209. 44 U.S.C. 3501 et seq.

**Back to Context**

210. The California Chamber of Commerce and the National Council of Agricultural Employers dispute this conclusion. They assert that the PRA distinguishes between the "agencies" to which it applies and the "Federal government," and therefore that the exemption provided in 5 CFR 1320.3 (c)(2) applies only to information supplied by "the actual Federal government," not to information supplied by a Federal agency such as the Board. The flaw in this argument is that there is no such legal entity as "the [actual] Federal government." What is commonly referred to as "the Federal government" is a collection of the three branches of the United States government, including the departments of the executive branch, and the various independent agencies, including the Board. If "the Federal government" can be said to act at all, it can do so only through one or more of those entities—in this instance, the Board—and that is undoubtedly the meaning that the drafters of 5 CFR 1320(c)(2) meant to convey.

**Back to Context**

211. 5 U.S.C. 801 et seq.

**Back to Context**

212. A rule is a "major rule" for CRA purposes if it will (A) Have an annual effect on the economy of \$100 million or more; (B) cause a major increase in costs or prices for consumers, individual industries, government agencies, or geographic regions; or (C) result in significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets. 5 U.S.C. 804. The notice-posting rule is a "majorrule" because, as explained in the discussion of the Regulatory Flexibility Act above, the Board has estimated that the average cost of compliance with the rule will be approximately \$64.40 per affected employer; thus, because there are some 6 million employers that could potentially be affected by the rule, the total cost to the economy of compliance with the rule will be approximately \$386.4 million. As further explained, nearly all of that cost will be incurred during the year in which the rule takes effect; in subsequent years, the only costs of compliance will be those incurred by employers that either open new facilities or expand existing ones, and those that for one reason or another fail to comply with the rule during the first year. The Board therefore expects that the costs of compliance will be far less than \$100 million in the second and subsequent years. The Board is confident that the rule will have none of the effects enumerated in 5 U.S.C. 804(2)(B) and (C) above.

**Back to Context**

213. The Board finds unpersuasive the suggestions in several comments that the effective date of the rule be postponed to as late as April 15, 2012. The Board finds nothing in the requirements of the rule or in the comments received that would warrant postponing the effective date.

**Back to Context**
**Site Feedback**