UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

NATIONAL ASSOCIATION OF          )
MANUFACTURERS, et al.,            )
                                 )
          Plaintiffs,            )
                                 )
v.                               )          Case No. 1:11-cv-01629
                                 )          Judge Amy Berman Jackson
NATIONAL LABOR RELATIONS         )
BOARD, et al.,                   )
                                 )
          Defendants             )
_____)

MOTION OF CHARLES J. MORRIS, AMICUS CURIAE,
FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY/SOURCES

Having been advised that on December 19, 2011, the Court  during oral

argument expressed an interest in receiving further authority and/or sources relating to

certain allegations contained in the Amicus Brief of Charles J. Morris, said Amicus

hereby moves this Honorable Court to grant him leave  to file such authority and/or

sources, which are **attached hereto as an Appendix**.

Said Amicus contacted counsel for Plaintiffs and Defendants by sending each of

them electronically a copy of this motion and appendix with a request to be notified

within 24 hours if there was any objection to such filing.  Their responses were:

Defendants:  "Defendants consent to the granting of the motion."

Plaintiffs (from Maurice Baskin):

"I am responding to your email on behalf of all of the co-plaintiffs in the
above referenced action.  The co-plaintiffs object to your motion on
grounds of untimeliness and lack of relevance of the current challenge to

1

the NLRB's Final Rule.  In particular, the co-plaintiffs object to your non-party submission of incomplete authorities/sources relating solely to a decades-old and subsequently withdrawn rulemaking proceeding, which presented substantially different circumstances and issues from the presently challenged Rule.  We request that you advise the Court of the nature of our objections."

The Court is hereby so advised.

WHEREFORE, Amicus Charles J. Morris respectfully requests that the Court grant this Motion.

Respectfully submitted,

CHARLES  J. MORRIS, Esq.
Professor Emeritus
Dedman School of Law
Southern Methodist University
5085 Caminito Exquisito
San Diego, CA 92130
Phone: (858) 525-5004
Fax: (858) 793-1095
E-mail: cjmmorris@aol.com
Appearing *pro se*

# APPENDIX

Source:  Office of the Executive Secretary, National Labor Relations Board, through Freedom of Information Act. ==Highlights== have been added to call attention to specific text and statements.

**Table of Contents:**

Appendix page:

Part 1. Text of proposed union-notice rule........................................  7

    NLRB "Notice of Proposed Rulemaking," 29 CFR Part 103, Sept. 22, 1992; 57 Fed. Reg. 43,635 (Sept. 22, 1992)  ..........  7

        Background......................................................................  8

        I. Validity and Desirability of Rulemaking......................  8

            Comments favorable to rulemaking concept..... ..  9

        VI. Notice Requirements: §§ 103.40(e) and (f) imposing notice and disclosure obligations upon labor organizations; purpose of notice; alternatives of mailing and posting notices..........  9

        XII. Regulatory Flexibility Act: Containing statement that it will not have significant impact and that it is consistent with "Congressional aim".................  10

      XIII. Regulatory Text.............................. .............................  10

        Purpose........................................................................  10

        Failure of unions to abide by notification rules constitutes violations of unfair labor practices.... 11

Coverage and obligation of labor organizations........ .. 11


Part 2. National Association of Manufacturers  (NAM)................  12

Cover letter of Randolph M. Hale.........................................  12

Comments of NAM in response to NLRB rulemaking
          proposal (original page numbers are indicated
          in upper-right bold-faced brackets **[ ]** )...............  13

     I. Comments on the Proposed Rule—Introduction
          and General Observations (commends Board
          for initiating this rulemaking)...............................  14

     II. Validity and Desirability of Rulemaking.................. . 15

          NAM endorses this use of informal rulemaking
          under Administrative Procedure Act; Section 6
          of NLRA grants Board authority........................  15

     III. Purpose [Sec. 103.40 (a)] (sample comments)....  15

          NAM specifically endorses Board's statement
          of how best to effectuate policies of the Act.....  16

          NAM agrees that a union's failure to notify
          employees in accordance with  proposed rules
          should result in unfair labor practice violation... 17

     IV. NAM proposes more simplified version of some
          statements in notice.  Also proposes earlier
          notification requirements..................................  17

          NAM also proposes to broaden coverage by
          extending notification requirement to all

employees immediately upon Board certification or voluntary recognition, which would occur before any negotiation of union-security agreement and thus apply to all newly covered collective bargaining employees regardless of union-security coverage........... 18

Part 3. Board Member John N. Raudabaugh's Endorsement of a General Notice of all Rights and Privileges.......... ...  19

Excerpts from transcript of March 16, 1993, NLRB hearing (original page numbers are indicated in upper-right bold-faced brackets **[ ]** )........................ 19

Background discussion with Laurence Gold, AFL-CIO general counsel.................................  20-24

Raudabaugh's statements favoring employee notice "declaring somewhere all the rights and privileges: the right to get in, the right to get out, the right to pay, this, that, the other thing—all of the rights and privileges...it can be combined with the others down the road, great."....(original page 33, lines 10-17) ...........................................................  24

Gold's reaction, with reference to Charles J. Morris' pending petition......................................................  25

Part 4. Participatory comments from National Right to Work Legal Defense Foundation (NRTW) (original page numbers are indicated in upper-left bold-faced brackets **[ ]** )....................................................................  26

Cover letter from Rex H. Reed.......................................  26

December 1992 comments supportive of proposed rule including samples of proposed additions ..............  27

April 1992 excerpt from comments supportive of
proposed rule........................................................ 29

NRTW endorsement of proposed rule by
comparison with President Bush's
Executive Order 12800.......................................... 30

Part 5. Supportive participation of United States Chamber
of Commerce ( Chamber) in proposed rulemaking......... 31

Excerpt from transcript of March 39, 1993, NLRB
hearing showing identification of Vincent J.
Appruzzese as attorney and spokesperson
for the Chamber..................................................... 32

Letter of Appruzzese discussing one of Chamber's
proposed changes to the rule............................ 33-36

57 Fed. Reg. 43, 635-01

PROPOSED RULES

NATIONAL LABOR RELATIONS BOARD

29 CFR Part 103

Union Dues Regulations

Tuesday, September 22, 1992

**\*43635** AGENCY: National Labor Relations Board.

ACTION: Notice of proposed rulemaking and notice of oral argument.

SUMMARY: this first Notice of Proposed Rulemaking provides rules and procedures for the implementation of the United States Supreme Court decision in Communications Workers v. Beck, 487 U.S. 735 (1988). The supreme Court there held that Section 8(a)(3), like its statutory equivalent, Section 2, Eleventh of the Railway Labor Act (45 U.S.C. 152, Eleventh), does not authorize a union, over the objection of dues-paying nonmember employees, to expend funds collected under a union-security agreement on activities unrelated to collective bargaining, contract administration, or grievance adjustment. The Board has determined that the articulation of certain of labor organizations' statutory duties under the Beck decision may best be achieved through the use of Section 553 ("informal") rulemaking under the Administrative Procedure Act (APA).

We emphasize, however, that in our effort to address by rule what is legally required of a union to fulfill its duty of fair representation, the rules proposed are offered to invite debate and generate discussion of the practical impact of the rules on the workplace. indeed, we are not ourselves unanimous on several issues. The Board hopes to have a full range of opinion on all aspects of the proposed rules before we make a determination on what provisions to include in the final rules.

DATES: Comments must be received on or before (October 22, 1992.) The Board plans to hold oral argument on November 5, 1992, to consider certain legal issues that are likely to be addressed in the public comments. Further details will be announced at a later date.

ADDRESSES: Comments should be submitted in eight copies to: Office of the Executive Secretary, 1717 Pennsylvania Avenue, NW., room 701, Washington, DC 20570, Telephone: (202) 254-9430.

Persons wishing to be heard at the oral argument should notify the Office of the Executive Secretary, 1717 Pennsylvania Avenue, NW., Washington, DC 20570, Telephone: (202) 254-9430.

FOR FURTHER INFORMATION CONTACT: John C. Truesdale, Executive Secretary, Telephone: (202) 254-9430.

SUPPLEMENTARY INFORMATION: The following is an outline of the contents of this Notice:

I. Background

II. Validity and Desirability of Rulemaking; Impact Upon Pending Cases

III. Purpose

IV. Definitions

V. Coverage

VI. Notice, Information, and Challenge Requirements

VII. Challenge Procedures, including Board and Arbitral Procedures

VIII. Chargeable and Nonchargeable Expenses

IX. Union-Security Clauses and Beck

X. Effective Date

XI. Docket

XII. Regulatory Flexibility Act

XIII. Regulatory Text

XIV. Appendix to § 103.42

## I. Background

In its Advance Notice of Proposed Rulemaking at 57 FR 7897 dated February 27, 1992, the Board announced a desire to receive public comment on questions involving rulemaking to articulate certain of labor organizations' duties under the Beck decision. The comment period ended on April 30, 1992, and the Board received twelve comments representing a diversity of viewpoints.

On May 4, 1992, the Board held a public meeting at which it was briefed on and considered these comments. Following the briefing, the Board elected to pursue the rulemaking initiative and directed its staff to produce a preliminary draft of a set of rules and associated comment. The Board decided that during the rulemaking process the Agency should continue adjudicating Beck-related cases. The Board additionally determined that it would, at a future time, hold oral argument on the proposed rules.

In crafting the proposed rule, the Board took note of the recommendations in several of the comments. Comment No. 3 (Management Association of Illinois), Comment No. 9 (Citizens for a Sound Economy Foundation) and Comment No. 10 (National Right to Work Foundation) suggested that a good beginning point would be the General Counsel's Guideline Memorandum 88-14, which was issued approximately five months after the Supreme Court's decision in Beck. That Memorandum was designed as a guide for the NLRB's Regional, sub-Regional and Resident Offices in the handling of Beck-related issues. Since its issuance, many cases have been investigated and complaints issued in some cases pursuant to its directives.

The Board recognizes that this Memorandum has, over the last three and one-half years, been an important element in this Agency's handling of Beck-type cases. Accordingly, while the proposed rules are not to be understood as adopting the provisions of the Memorandum in any legal sense, it has provided an initial frame of reference for identifying the relevant issues and the pertinent legal interests.

## II. Validity and Desirability of Rulemaking; Impact upon Pending Cases

Section 6 of the National Labor Relations Act expressly grants the Board authority to engage in rulemaking:

The Board shall have authority from time to time, to make, amend, and rescind, in the manner prescribed by the Administrative Procedure Act, such rules and regulations as may be necessary to carry out the provisions of this Act.

In American Hospital Association v. NLRB, ___, U.S. ___ 111 S. Ct. 1239 (1991), the Supreme Court upheld the Board's authority to make and promulgate substantive rules. Further, in its comments approving the Board's first use of substantive rulemaking in the area of health care bargaining units and *43636 encouraging the Board to remain open to rulemaking in other appropriate areas, the Administrative Conference of the United States (ACUS) stated that rulemaking offers "broader opportunity for public participation and more meaningful notice to affected parties of potential changes in regulatory standards."The Board finds that ACUS's characterization of the advantages of rulemaking is especially apt in the circumstances here. The Supreme Court's decision in Beck affects thousands of bargaining units and collective-bargaining agreements, and labor organizations already have begun to set up procedures to deal with the Court's new interpretation of the duty of fair representation articulated in Beck. Because of the variety of issues and questions that arise under the application of Beck, the Board finds that engaging in rulemaking and continuing to decide the cases coming before it at the same time serves the dual purposes of increasing access to the process of changing regulatory

standards while preventing unnecessary delay in processing cases.

Further, the Board has examined the changes in the law brought about by the Beck decision in light of ACUS's suggested factors for identifying appropriate areas for future rulemaking and finds that each of those factors is present here. Thus, the Board finds that its efforts to arrive at rules of law that best embody Congressional intent in section 8(a)(3) and 8(b)(1)(A), as interpreted by the Supreme Court in Beck, would be aided by: (i) submissions and information, including empirical data, beyond that normally available through adjudication; (ii) participation by affected persons beyond the parties; (iii) the desirability of establishing new policies promptly in this area; (iv) the desirability of stabilizing the law quickly; (v) the possibility of lessening the cost in all future litigation and enforcement actions through readily applicable rules; and (vi) the achievement of control over policy review and development. See ACUS, 305.91-5, "Facilitating the Use of Rulemaking by the National Labor Relations Board" (Recommendation No. 91-5), I CFR Ch. 3 (1/1/92 edition).

Comments received by the Board in answer to its February 27, 1992, Advance Notice of Proposed Rulemaking was generally favorable to the rulemaking concept with certain exceptions and caveats. Ken Harrison and Peter C. McConarty, Sr., writing as individuals, (Comments 1 and 2) pronounced themselves pleased at the prospect of rulemaking. Mr. Harrison (Comment 1) recommended that the procedure be kept "simple." The Management Association of Illinois (Comment 3) and Associated General Contractors of America (Comment 5) favored rulemaking and presented numerous suggestions for the specific content of the rules. The ranking minority members of the Senate Committee on Labor and Human Resources and the House Committee on Education and Labor—Senator Orrin G. Hatch (R-Utah) and Congressman William F. Goodling (R-Pennsylvania)—both favored rulemaking (Comment 6) as did the Labor Policy Association (Comment 7). The AFL-CIO, through its counsel Lawrence Gold (Comment 8), stated that "there is no clearly right choice between proceeding through rulemaking or proceeding through litigation."The National Right to Work Foundation (Comment 10) and Associated Builders and Contractors, Inc. (Comment 12) opposed rulemaking. Nothing that several Beck cases were pending before the Board, the Right to Work Foundation concluded that "(I)t seems to us that employees' Beck rights can be more promptly and completely protected through the Board's expeditious decisions in these cases, and that rulemaking is, at best, unnecessary."The Right to Work Foundation also noted that cases soon to come before the Board would "present the full range of Beck issues."Associated Builders and Contractors, Inc. stated that it was "most concerned that the present rulemaking proposal not delay resolution of numerous Beck-related issues which are already in the process of adjudication. If not abandoned altogether, this rulemaking proceeding must be expedited so as to avoid the appearance of unwarranted delay."

At the May 4 public meeting, the Board took note of the concern expressed by the foregoing public comments that a rulemaking proceeding would unduly delay the disposition of the cases proceeding through the adjudicatory pipeline. The Board thus concluded that, to the extent feasible, case processing should continue despite the pendency of rulemaking. Ten cases now have been brought before the Board on exceptions from decisions of the Agency's administrative law judges, and deliberations on those cases are presently underway. In the event that the Board does promulgate final administrative rules and applies them to pending cases (an issue on which the Board has proposed alternatives), it is obvious that the administrative rules will probably have a bearing on the outcome of some of those cases. Accordingly, the Board is weighing whether to give notice to the parties in those cases pending before the Board, suggesting that they consider submitting comments for the rulemaking record.

\*\*\*

VI. Notice Requirements

Sections 103.40 (e) and (f) of the proposed rule impose notice and disclosure obligations upon labor organizations.

The purpose of these notice and disclosure requirements is to ensure that all unit employees are advised of their options with respect to the financial obligations arising out of applicable union-security agreements. The legal justification for these requirements is spelled out in part III, supra. In addition, it is noted that some comments received following publication of the Advance Notice of Proposed Rulemaking favored notice requirements of the type set forth in our proposed rule. Comment No. 9, filed by Citizens for a Sound Economy Foundation, at p. 3, followed General Counsel Memorandum 88-14 in calling for a notice requirement. Comment No. 10 from the National Right to Work Foundation also called for a notice requirement.

In particular, the rule requires that the labor organization inform all employees of their Beck rights, the right to join or refrain from joining a union, and the financial obligations incident to each status. In addition, consistent with the guidelines set forth in GC Memorandum 88-14, the rule requires that a labor organization notify all financial core employees of their right to object to expenditures for activities unrelated to representational activities, and the procedure to register such objections.

As provided under subsection (e), the notice of legal rights must be given annually to all employees. New employees, however, must be provided the notice within 30 days of notice to the labor organization of hire or transfer into the unit.

The proposed rule provides alternatives with respect to the method of providing the required notice to employees.

10

Alternative A of **43639** § 103.40(e)(2) and Alternative A of § 103.40(f)(2) provide that notice to all unit employees and to financial core employees shall be given by mail. Alternative B of § 103.40(e)(2) and Alternative B of § 103.40(f)(2) provide for posting of the requisite notices to all unit members and to all financial core employees in an accessible place customarily used for such purposes or for publication in a union publication received by all bargaining unit employees. With respect to the information that labor organizations are required to provide only to objecting financial core employees, the Rules require that notice shall be by mail to the last known address.

***

## XII. Regulatory Flexibility Act

As required by the Regulatory Flexibility Act, 5 U.S.C. 601 et seq., the Board certifies that the proposed rule will not have significant economic impact on small entities. Prior to this rule, parties were compelled to litigate before the Board questions of fair representation and a union's fiduciary responsibilities in the collection of initiation fees and dues under union-security contract clauses. The proposed rule resolves many of these questions and thus the necessity for litigation will be correspondingly reduced. Although the rule requires labor organizations to send notices to employees concerning their rights under General Motors and Beck, this requirement is consistent with the fundamental Congressional aim of insuring employees a free and informed choice in the exercise of their statutory rights.

## XIII. Regulatory Text

List of Subjects in 29 CFR Part 103

Administrative practice and procedure, Labor-management relations.

For the reasons set forth in the prior pages, it is proposed to amend 29 CFR part 103 as follows:

PART 103—OTHER RULES29 CFR § 103.40

29 CFR § 103.41

29 CFR § 103.42

29 CFR § 103.43

Subpart D, consisting of §§ 103.40, 103.41, 103.42, and 103.43 is added to read as follows:

Subpart D—Union Dues RegulationsSec.
103.40 Labor organization dues and fees regulations.
103.41 Categorization of representational and nonrepresentational activities
103.42 Model union security clause
103.43 Effective Date

Subpart D—Union Dues Regulations 29 CFR § 103.40

§ 103.40 Labor organization dues and fees regulations.

(a) Purpose. (1) The purpose of this regulation is to articulate certain obligations that a labor organization must fulfill in connection with the negotiation and administration of union-security agreements authorized under section 8(a)(3) and 8(f) of the National Labor Relations Act (the Act). Those obligations are grounded in the duty of fair representation, which a labor organization owes to employees as their exclusive bargaining representative. The duty of fair representation imposes an obligation on a labor organization to represent each employee fairly and in good faith, without arbitrary or discriminatory treatment. Vaca v. Sipes, 375 U.S. 335 (1964); Miranda Fuels, 140 NLRB 181 (1962), enf. denied 326 F.2d 172 (2d Cir. 1963). Further, the Supreme Court, in Chicago Teachers Union Local No. 1 v. Hudson, 475 U.S. 292 (1986), found that "(b)asic considerations of fairness * * * dictate that the potential objectors be given sufficient information to gauge the propriety of the Union's fee." 475 U.S. 292, 306 (emphasis added). The Board finds that the "basic considerations of fairness" the Court found operative in the context of public sector employment also underlie a union's duty of fair representation. Further, it believes that it best effectuates the policies of the National Labor Relations Act if all employees covered by contractual union-security clauses, whether union members or nonmembers, are informed of their

rights under NLRB v. General Motors Corp., 373 U.S. 734 (1963), CWA v. Beck, 487 U.S. 735 (1988), and related cases. Thus, the Board will find that a labor organization seeking the discharge of an employee for failure to tender dues and fees has violated section 8(b)(1)(A) and 8(b)(2) if the labor organization has failed to notify employees of their rights, as described herein, or to reduce the dues and fees charged if such is warranted under these rules. The Board also will find that a labor organization has failed to notify employees of their rights, as described herein, or to reduce the dues and fees charged if such is warranted under these rules. The Board also will find that a labor organization has violated section 8(b)(1)(A) of the Act if it fails to abide by any of the provisions of these rules.

***

(c) Coverage. The rules set forth in this Section and §§ 103.41 and 103.42 apply in circumstances where a labor organization is party to a union-security agreement entered into pursuant to the proviso of section 8(a)(3) of the National Labor Relations Act (the Act) or section 8(f) of the Act.

(d) Obligations of a labor organization regarding membership and dues and initiation fees. (1) A labor organization may not require, as a condition of employment, that an employee become or remain a full member. A labor organization may require, as a condition of employment, that an employee become a financial core employee or, upon appropriate employee objection, a proportionate share payment.

(e) Obligations of a labor organization to provide certain information to all employees. (1) Each year, a labor organization must inform all bargaining unit employees, both members and nonmembers, of the following rights:

(i) All employees have a right to become or remain full members of the Union;

(ii) All employees have a right to refuse to become or remain full members of the union. All employees have a right to become or remain financial core employees (thereby obligated to pay the equivalent of fees and dues to retain their employment under a contractual union security provision);

(iii) All financial core employees, upon appropriate objection, have a right to become or remain proportionate share payers (thereby obligated to pay only that part of the union fees and dues charged for activities germane to the Union's performance of the duties of an exclusive bargaining representative of employees in dealing with labor-management issues).

(Alternative A

(2) A labor organization shall give the employee the notification specified above by mailing it to each employee at his/her last known address.)

(Alternative B

(2) A labor organization will be deemed to have fulfilled its obligation to notify employees who are full members of these rights by posting a notice containing the above information in an accessible place where such notices are customarily posted or by publishing it in a union publication received by all members. A labor organization will be deemed to have fulfilled its obligation to notify employees who are financial core employees and proportionate share payers if it posts a notice on a bulletin board or other agreed-upon place in the workplace where such notices are customarily posted or if it publishes the information in a newsletter or other publication that it mailed to all uniemployees, full members, financial core employees, and propor tionate share payers alike.)

***

RECEIVED
w,,,:'-ILGTv'l., D.C



National Association
of Manufacturers

Randolph M. Hale
Vice Preaiclont & Manager,
Industrial Relations

Honorable John C. Truesdale
Executive Secretary
National Labor Relations Board
1717 Pennsylvania Avenue, N.W.
Room 701
Washington, DC 20570

Re:   Notice of Proposed Rulemaking for the Implementation of the U.S. Supreme Court's
Decision in <u>Comm,mications Workers of America v. Beck.</u>

Dear Mr. Truesdale:

Enclosed are the original and eight (8) copies of the comments of the National Association
of Manufacturers submitted in response to the Board's Notice of Proposed Rulemaking, 57 Fed.
Reg. 43645 (Sept. 22, 1992), in the above-captioned matter.

Very truly yours,



National Association of Manufacturers

/aa
enclosures

1331 Peaosylvlllia Aveaue, NW, Suite 1500
Washington, DC 20004-1703
(lOl) 637-3127; fax:(lOl) 637-3182

[1]
COMMENTS OF THE NATIONAL ASSOCIATION OF MANUFACTURERS ON THE
[NLRB'S    NOTICE    OF    PROPOSED    RULEMAKING    FOR
THE IMPLEMENTATION OF THE U.S. SUPREME COURT'S DECISION IN
COMMONICATIONS WORKERS V. BECK

The National Association of Manufacturers (NAM) is pleased to
submit the following comments on behalf of its membership in
response to the National Labor Relations Board's ("NLRB" or
"Board") notice of proposed rulemaking concerning the regulation of union
dues payments under a union security clause.  57 Fed. Reg.
43635 (Sept. 22, 1992).

INTEREST O1 THE NATIONAL ASSOCIATION OF MANOFACTURER@

The NAM is a voluntary business association of more than
12,000 member companies and subsidiaries, large and small, located in
every state.  Members range in size from the very large to the more
than 8,000 smaller manufacturing firms, each with fewer than
500 employees.  The NAM member companies employ 85 percent of all
workers in manufacturing and produce more than 80 percent of the
nation's manufactured goods.  The NAM is affiliated with an
additional 158,000 businesses through its Associations Council and the
National Industrial Council.

NAM members have a longstanding, vital interest in all
legislative and regulatory proposals related to the relationships of
employers with their employees, whether or not covered by
collective bargaining agreements, and in the practical impact of such
proposals on the workplace.  It is in this context that the
association submits its views in response to the NLRB's notice of
proposed rulemaking concerning the regulation of union dues
payments under a union-security clause.

O

[2]

<u>COMMENTS ON THE PROPOSED RULE</u>

I.   INTRODUCTION AND GENERAL OBSERVATIONS

The NAM commends the National Labor Relations Board for initiating this rulemaking proceeding to articulate the statutory duties of labor organizations under the U.S. Supreme Court's landmark decision in <u>Communications Workers v. Beck,</u> 487 U.S. 735 (1988) ("Beck"). The Supreme Court held in <u>Beck</u> that a union may not, over the objection of dues-paying nonmember employees, expend funds collected under a union-security agreement on activities unrelated to collective bargaining, contract administration or grievance adjustment.  The expenditure of dues and fees on activities outside the union's role as a collective-bargaining representative, the Court held, violated the union's duty of fair representation to employees who objected to such expenditures.

We stress that the importance of the Board's timely promulgation of its so-called "Beck rule" is not merely to clarify what is legally required of a union to fulfill its duty of fair representation as applied under the Beck decision.  More importantly, the Board's rule is urgently needed to eliminate the apparent confusion and, in some cases, deliberate obfuscation in the workplace concerning these fundamental Section 7 rights of bargaining unit employees subject to union-security clauses in collective bargaining agreements. <u>See</u> testimony of Messrs. Serio, Thomas, Cecil, Misze and Vieira at Board's oral argument on the <u>Beck</u> rule, November 5, 1992.

*  *  *

15

## II.  VALIDITY AND DESIRABILITY OF RULEMAKING                           [4]

The NAM endorses, in this limited instance, the Board's use of Section 553 ("informal") rulemaking under the Administrative Procedure Act as an adjunct to its customary case-by-case adjudication in administering national labor policies. Section 6 of the National Labor Relations Act ("Act") grants the Board authority to engage in rulemaking. 29 u.s.c. § 156. We note, however, that since the Board was established in 1935 it rarely has undertaken substantive rulemaking in an area outside the establishment of jurisdictional standards.[1]  In general, the NAM does not support Board rulemaking in lieu of the traditional, more flexible case-by-case adjudication process. Yet, in the four years since Beck was decided, there have been only a handful of cases that have made their way far enough through the adjudicatory process to reach the Board level. According to the Board, only "[t]en cases now have been brought before the Board on exceptions from decisions of the Agency's administrative law judges, and deliberations on those cases are presently underway." 57 Fed. Reg. 43636 (Sept. 22, 1992).

In view of the reported confusion among employees and obfuscation in the workplace, as well as the seemingly "deliberate speed" of the Board's adjudicatory process in these cases, the NAM supports this rulemaking as a necessary supplement to the Board's on-going adjudication of −related cases. The NAM urges the Board to promulgate a final rule expeditiously so as to provide needed guidance to the parties and to avoid the appearance of unwarranted delay.

[1] See 29 CFR § 103.30 (1991) (health care bargaining units). Other rulemaking proceedings involved jurisdictional standards, such industries as those promulgated between 1970 and 1973, for private colleges and universities, symphony orchestras and the horse-racing and dog-racing.

[5]

III.   PURPOSE [Sec. 103.40(a)]

In submitting these comments the NAM is guided by the bedrock principle of **u**.s. labor law and labor policy that, unlike the laws of other countries which subordinate employee rights to those of labor organizations, under the National Labor Relations Act the privileges   and       concomitant obligations accorded to unions by employees are derivative     of   the   individual     rights of those employees, under Section 7, to engage in or refrain from concerted activities.     With this concept of employee rights in mind, the Supreme Court has ruled that a union's duty of fair representationincludes the obligation "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." Vaca v. Sipes, 386 **u**.s. 171, 177 (1967). Thus, the NAM fully concurs with the Board's position that under the prescriptions of Section 8(b)(l)(A), the breach of a union's duty of disclosure - which must be explicit, full and candid - constitutes a restraint on the employees' Section 7 rights and a violation of the union's duty of fair representation.

The NAM supports the purposes of this rulemaking, as stated at § 103.40(a), which are to articulate obligations that a labor organization must fulfill in connection with the negotiation and administration of union-security agreements authorized under the proviso to Section S(a)(3) and section S(f) of the Act.     The NAM specifically endorses the Board's statement that "it [the Board] believes that it best effectuates the policies of the National Labor Relations Act if all employees covered by contractual union- security clauses, whether union members or nonmembers, are informed of their rights under NLRB **y**. General Motors Cor.p.

17

[citation omitted], CWA v. Beck [citation omitted], cases and related."

Fed.Reg. 43641 (Sept. 22, 1992). Finally, the NAM agrees that a union's failure to notify employees of their rights as set forth in the proposed rules, and any attempt to affect employee rights in violation of the proposed rules, should result in a finding of a violation of Section S(b)(1)(A) and/or Section B(b)(2) of the Act.

IV.   OBLIGATIONS OF A LABOR ORGANIZATION TO PROVIDE CERTAIN
      INFORMATION TO ALL EMPLOYEES [Sec. 103.40(e)]

* * *

[6]

The NAM also submits that the text of the notice to all bargaining unit employees set forth at §§ 103.40(e)(1)(i), (ii) and (iii) should be revised to incorporate a simplified version of the statements set forth at § 103.40(d) and §§ 103.40(f)(i) and (ii). That is, in addition to all bargaining unit employees being informed that they have the right to become or remain "full members" of the union, or to refuse to become or remain "full members" of the union, such employees also should be informed that "a labor organization may not require, as a condition of employment, that an employee become or remain a full member" as set forth in § 103.40(d).

* * *

[9]

The NAM suggests modifications to the obligation set forth at § 103.40(e)(3) that all employees hired or transferred into the bargaining unit should be notified of their Beck rights within thirty days after notice of their entry into the unit. The newly hired or transferred employee in an existing bargaining unit should be informed of his/her Beck rights immediately or as soon as practicable upon notice of entry into the unit, but, in any event, simultaneously with the union's

andjor employer's first meeting with the employee following hisjher hire
or transfer into the unit.

In the same vein, the NAM also suggests the addition of a new
subsection 103.40(e)(4) to provide that all bargaining unit
employees should be apprised of their rights, as set forth in the
proposed rule, immediately upon the Board's certification or
voluntary employer recognition of a union as the bargaining
representative for that unit.  While such notification pre-dates the
negotiation of a union-security clause, it is at this time that

bargaining unit employees first may be solicited to become [11]full[11] union
members, perhaps without being adequately informed that such status is not
required (i.e., that bargaining unit employees may legally choose to
become "financial core members" and, if they
object to the union's expenditures for certain activities unrelated
to collective bargaining, contract administration or grievance
adjustment, to be charged only that percentage of dues and fees spent
for such representational activities).  Such notices could be provided to
all bargaining unit employees in newly certified or recognized units by
the NLRB itself, using the Excelsior list for names and addresses of unit
employees, or by some other method of notifying unit employees in the
Board's official capacity.

* * *

BEFORE THE
NATIONAL LABOR RELATIONS BOARD

In the Matter of:                                    )
                                                     )
UNION DUES REGULATIONS                               )
(Proposed Implementation of                          )
Communications Workers v. Beck,                      )
487 U.S. 735 (1988)                                  )


        The above-entitled matter came on for
hearing, pursuant to notice, at 10:00 a.m. [March 16, 1993]


     BEFORE:     JOHN N. RAUDABAUGH
                 DENNIS M. DEVANEY
                 JAMES M. STEPHENS
                 CLIFFORD R. OVIATT, JR.


OFFICIAL REPORTERS

BURKE COURT REPORTING CO.
58 WOODHURST DRIVE
VOORHEES, NEW JERSEY 08043
(609) 627-7733

[Laurence Gold continued:]                                                    [10]

1    provide for a wide range of notice by regulated parties.  I

2    would not be here saying such requirements are beyond

3    Congress' authority or beyond constitutional limits. But the

4    norms run quite the other way.

5         And I think the norms run quite the other way for two

6    reasons. First of all, there is a basic sense in this

7    society that parties who do not violate the law, do not have

8    to act in ways which they would find contrary to their

9    interests. Requiring notice of an obligation is certainly

10   against the interests of the person who has to give the

11   notice. This is a society in which people are presumed to

12   have to make their own way.

13        Secondly --and I want to emphasize this particularly

14   against the background of the kinds of notice that are

15   required in the proposal, particularly the requirement that

16   the notice go to every member of the bargaining unit yearly,

17   even though objection is perpetual.

18        There is a plain sense in these proposals that unions

19   are being asked to undertake tasks which convey to the

20   bargaining unit members that union status is questionable;

21   that society is --in at least subtle, and perhaps not very

22   subtle ways --against being a full union member, and that it

23   is the role of the Board and the court to make certain that

24   only such individuals as are willing to stand up to this

25   message, continue to be full union members.

1          I do want to conclude --

2          MR. RAUDABAUGH: Excuse me.

3          MR. GOLD: Yes?

4          MR. RAUDABAUGH: I think I've followed this, and I

5     understand what you're saying. What troubles me, of course,

6     is something that permeates this Act and many others as

7     well, and that is, it seems to me we see head-on the conflict

8     between institutional interests and institutional

9      protections, and individual interests and individual

10    protections.

11          And I can certainly understand that --I believe you

12    would find it to be a different case, as you said, if we were

13    at sort of the back door issue. which is those who have

14    objected, and we would provide that information.

15          The question here is, for the individual person, how

12    does the individual even know they have a right to exercise?

17           Now, before we get to whose obligation it is to provide

18    a notice --put that aside --the question is, how does

19    someone even know? And another example would be your own,

20     which is, how does someone even know that they're entitled to

21    a representative at a grievance hearing? I mean, it's a

22     perfectly legitimate example. In either case, how do they

23    know? And who should help inform them? We're talking about

24    fellow citizens here.

25          MR. GOLD: Okay. Mr. Chairman, can I respond?  I

BURKE COURT REPORTING COMPANY
(609) 627-7733

22

1      apologize.

2               MR. STEPHENS: When you finish, I have two questions I

3      want to ask.

4               MR. GOLD: I'm afraid that that's a question that can't

5      get a yes or no answer. How does somebody who goes to work

6      for an open shop contractor know that he has a right to form

7      and join a union?

8               One aspect of all of this is that, as the

9      counterexamples that I've given you indicate, this proceeding

10     is starting from what we regard as a premise contrary to

11     fact. And that premise is that it is the norm where a right

12     is created for those against whom the right runs, to inform

13     individuals of their rights. That just is not the norm in

14      this society.

15              And I want to emphasize in this regard that this

16     proceeding would have a different focus and a different tone

17     if you were talking about notice of NLRA rights across the

18     Board. I'm sure that our brothers and sisters at the

19     employer bar would not be sitting and regarding the matter as

20     an amusement. So that is point number one.

21              Point number two is that while unions, for good reason,

22      bad reason and indifferent reason, may resist wishing to give

23     notices of this kind, we do not have a monopoly on the

24     informative devices in this society. The Beck case brought.

25     You've got charges which indicate that there is a great deal

***

1          MR. GOLD: If you reduce it to that, are we going to

2     have a general law that if you go in to negotiate a purchase,

3     that the person you're dealing with has an affirmative

4     obligation to tell you somebody else has the same goods on

5     sale, you ought to go down the street or -6

6          MR. RAUDABAUGH: Then it would be Miracle on 34th

7      Street, wouldn't it?

8          MR. GOLD: What I find is that a lot of miracles are

9     created by individuals pretending to be good-hearted, who are

10    settling a different score. It's just the way life is.

11    There is an extraordinarily interesting and worthwhile

12    opinion by Justice Jackson on equal protection. He makes the

13     point that the narrower the class covered by a regulation,

14     and the less in favor the class is with the people who are

15    making the regulation, the more the regulation is apt to be

16    stringent.

17          I want to emphasize that if there had been once, in the

18    55-plus year history of this statute, where it had ever been

19    interpreted on these views of good faith and fair dealing, we

20     would be operating in a very different melior. And the fact

21    of the matter is that there hasn't been.

22          And as this president said, on another notice issue

23    akin to the one that you're grappling with here, the effect

24    of Executive Order 12,800 was distinctly anti-union, as it

25    did not require contractors to notify workers of any of their

[33]

1    other rights protected by the National Labor Relations Act,

2    such as the right to organize and bargain collectively.

3          By revoking this order today would end the government's

4    role in promoting this one-sided version of work place

5    rights.

6          So there are not only individuals. There are systems,

7    there are groups, there are tests of regulatory good faith as

8    well as of union good faith.

9          MR. RAUDABAUGH: I don't doubt that at all. I said

10   earlier, if you heard me, the issue of declaring somewhere

11   all the rights and privileges: the right to get in, the right

12   to get out, the right to pay, this, that, the other thing --

13   all of the rights and privileges, there's not a thing wrong

14   in spelling all that out. Every last detail.

15          I'm only talking about the fact that, on this

16   particular issue, if it can be combined with the others down

17   the road, great. But the question still remains: Is it fair

18   to the individual?

19          I don't see anything funny about it at all. We're here

20   to talk about this issue, and the question is --the legal

21   question that you brought up is the foundation, the basic

22   thesis for the duty of fair representation.

23          There's law out there. One of the tenets that the

24   chair has brought up is the question of bad faith and you

25   know, the question is, does this fit within that?

1          MR. STEPHENS: I think we need to move on.

2          MR. GOLD: I agree. Let me just say in conclusion that

3     I think you ought to carefully study Charlie Morris'

4     submission, and certainly we would be interested in

5     participating on a new proposed rule along the broader lines

6     you say. But I think the chuckle in the back was from some

7     fellow reader of Alice in Wonderland who remembers, from our

8     perspective, "Jam tomorrow, jam tomorrow, never jam today."

9          MR. STEPHENS: Thank you, Mr. Gold.

                                        ***



**NATIONAL RIGHT TO WORK LEGAL DEFENSE FOUNDATION, INC.**

8001 BRADDOCK ROAD • SPRINGFIELD, VIRGINIA 22160 • (703) 321-8510

December 3, 1992

John C. Truesdale,
Executive Secretary
National Labor Relations Board
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20570

                              Re: <u>Beck</u> Comments

Dear Mr. Truesdale:

     As you know, the Board published an Advance Notice of Proposed Rulemaking "relating to its implementation of the Supreme Court's decision in <u>Communications Workers of America v. Beck,</u> 487 U.S. 735 (1988)" at 57 Federal Register 7897 (March 5, 1992) ("ANPR").  It also published a Notice of Proposed Rulemaking on Beck implementation, 57 <u>Federal Register</u> 43635 (September 22, 1992) ("NPR"), which was later amended to extend the comment period to the close of business on December 4, 1992.

     The National Right To Work Legal Defense Foundation, Inc. submitted extensive substantive comments on the ANPR.  Those comments, as well as additional comments directed to the NPR, itself, are attached hereto.  We submit that both sets of comments should be part of the rulemaking record, and also should be considered by the Board in its preparation of final rules on Beck implementation.

                              Sincerely,

                              *t&e*

                              Rex H. Reed,
                              Executive Vice President and
                                 Legal Director

RHR/hr

Defending America's working men and women against injustices of forced unionism since 1968

COMMENTS OF THE NATIONAL RIGHT TO WORK
FOUNDATION ON THE NATIONAL LABOR RELATIONS
BOARD'S NOTICE OF PROPOSED RULEMAKING ON
COMMUNICATIONS WORKERS v. BECK, 487 U.S. 735
(1988).

The National Right to Work Legal Defense Foundation, Inc. (Foundation) submits these comments in response to the National Labor Relations Board's notice of proposed rulernaking ("NPR"), 57 Federal Register 43635 (September 22, 1992). The NPR solicits responses as to "rules and procedures for the implementation of the United States Supreme Court decision in Communications Workers v. Beck, 487 U.S. 735 (1988)."

***

[Page 8]

§ 103.40 (e) *Obligations of* a *labor organization* to *provide* certain *information* to *all employees (1)*

The Board is correct in placing on a union an obligation (in addition to providing a properly worded union security clause) to notify annually all bargaining unit employees of their rights to refrain from full membership and to pay only for lawfully chargeable activities. The judicial construction that, under the federal labor laws, a union security agreement cannot compel formal membership is "little known, less publicized, and even obscured among employees, the personnel offices of employers, local agents of unions, and, curiously, lawyers specializing in labor law." Dan C. Heldman et al., *Deregulating Labor Relations* 69 (1981).

28

Consequently, many employees are misled into becoming full union members.

***

[ Page 11]

[The description in § 103.40(e)(1)(iii) of a proportionate share payer's obligation should be revised to conform with the corrected definition of "proportionate share payer" in § 103.40(b)(5), *supra* p.7.]

**S 103.40 (e)**
**(2) ₂**

The Board should adopt **Alternative A**, requiring a union to give employees notice of their rights to refrain "by mailing it to each employee at his/her last known address." 57 Fed. Reg. 43,642. Notice by posting or publication, which **Alternative B** would permit, is insufficient as a practical matter and under the duty of fair representation.

The requirements of the "duty of fair representation" are analogous to constitutional limitations on government. *See Steele,*
323 U.S. at 202-03. "An elementary and fundamental requirement of due process * * * is notice reasonably calculated, under all the circumstances, to apprise interested parties of" their rights.

***

29

**[Page 55]**

Respectfully submitted,

Rex H. Reed          ,
Executive Vice President
and Legal Director
National Right to Work
Legal
  Defense Foundation, Inc.
8001 Braddock Rd., Suite
600
Springfield, VA  22160
 (703) 321-8510

**[Page 1]**

COMMENTS OF THE NATIONAL RIGHT TO WORK
FOUNDATION ON THE NATIONAL LABOR RELATIONS
BOARD'SADVANCE NOTICE OF PROPOSED RULEMAXING
ON COMMUNICATIONS WORKERS v. BECK, 487 U.S.
735 (1988).

The National Right to Work Legal Defense Foundation,
Inc. (Foundation) submits these comments in response to the
National Labor Relations Board's advance notice of
proposed rulemaking (ANPR), dated February 27, 1992. The
ANPR solicits responses as to "how labor organizations
subject to the jurisdiction of the National Labor
Relations Act can best fulfill their statutory obligations
under the Beck decision."  The deadline for responses is
April 30, 1992, and this submission is made within the
time allowed.

\* \* \*

[Page 7]

## 1C. Employers' Beck Notices To Employees

On April 13, 1992, President Bush signed Executive Order 12800 (E.O.). The E.O. requires unionized employers having government contracts to post notices of Beck rights on work site bulletin boards. The E.O. does not specifically require employers without government contractors to post the same notices. However, it is clear from the address that the President gave at the time the E.O. was signed, that he intends that all unionized employers meet the same requirements and that all employees be fully informed of their <u>Beck</u> rights.[6] Indeed, he specifically called upon theNLRB to impose equivalent requirements.

[Page 8]

The Board, should, of course, follow the President's directive, and make clear in its final rule that all employers subject to the Act have the responsibilities set forth in the E.O.

---

[6]   § S(a)(3) of the Act, under which <u>Beck</u> was decided imposes obligations upon employers, as does the E.O. This is recognition that it is the employer, not the union that has the power to discharge employees from employment. This same factor results in the employer's duty of fair dealing which must take <u>Beck</u> rights into account.

\*\*\*

31

BEFORE THE
NATIONAL LABOR RELATIONS BOARD

In the Matter of:                               )
                                                )
UNION DUES REGULATIONS                          )
(Proposed Implementation of                     )
Communications Workers v. Beck,                 )
487 U.S. 735 (1988)                             )

Tuesday
March 30, 1993

Hearing Room
National Labor Relations Board
1717 Pennsylvania Avenue
Washington, D.C. 20570

The above-entitled matter came on for
hearing, pursuant to notice, at 10:00 a.m.

BEFORE:      JOHN N. RAUDABAUGH
             DENNIS M. DEVANEY
             JAMES M. STEPHENS
             CLIFFORD R. OVIATT, JR.

BURKE COURT REPORTING CO.
(609) 627-7733

1              P R O C E E D I N G S

2                        (9:40 a.m.)

3      MR. STEPHENS:  Good morning.  This is our third day of hearing

4

5

6

7

8                        ***

9

10

11

12      And without further ado, we will turn to our first part

13   this morning,  Mr. Apruzzese from the Chamber.

14              MR. APPRUZZESE:  Thank you,  Mr. Chairman, and members of

15   the Board.

16                        ***

LAW OFFICES

## Appruzzese, McDermott, Mastro & Murphy

A PROFESSIONAL CORPORATION

SOMERSET HILLS CORPORATE GENTER

25 INDEPENDENCE BOULEVAHD

P.O. *Box* 112

LIBERTY CORNER, N.J. 07938

(908) 58()-1776

FAX: (908) 647-1492

J. APRUZZESE (1)(2)
FRANK X. McDERMOTT (1)(2)
FRANCIS A. MASTRO(1)
FREDERICK T. DANSER, iII
MAURICE J. NELLIGAN, JR. (4)
RICHARD G. MARIANI (2)
BARRY MARELL
RoBERT T. CLARKE
JERROLD J. WoHLGEMUTH (3)
SHARON P. MARGELLO (2)
TARQUIN JAY BROMLEY (2)(3)(5)
DANIEL F. GROWE
JAMES M. CoONEY (1)(6)
CHRISTOPHER P. KELLY
JAMES L.' PLOSIA, JR.

ALSO D.C.(l) N.Y.(2)
PA.(3) MD.(4) C0.(5)
FL.(O)

JAMES F. Murphy
(1938-1990)

521 FIFTH AVENUE
SUITE 1700
New York, N.Y. 10017
(212) 682-5844

IN REPLY PLEASE REFER

To FILENo

March 31, 1993

Honorable James M. Stephens, Chairman
National Labor Relations Board
1717 Pennsylvania Avenue, N.W.
Washington, DC   20570

Re:   Proposed Rule Enforcing
      Beck v. CWA

Dear Chairman Stephens:

During my presentation to the Board on Tuesday, March 30, you observed that the majority opinion in Beck had framed the issue in terms of whether a union security clause permitted a union, over the objection of a dues paying non-member, to expend funds so collected on activities unrelated to collective bargaining.  Thus, given the Court's holding, the Board's proposed rule started with the premise that dues equal to that of a full member may be collected until objection is raised.  ■ thought it might be helpful if I elaborated upon my earlier response to that observation.

34

Until the Supreme Court's decision in <u>Beck,</u> there was no way to raise the issue of improper expenditure except by objection. In that context, the focus was on the propriety of expending dues on a variety of activities unrelated to collective bargaining after objection had been raised.  The Supreme Court's decision in <u>Beck</u> has now established a new foundation.  That decision now states with finality that the only obligation under a union security clause is to be a financial core contributor, thereby requiring the employee to tender in the first instance only that portion of the total dues which is properly allocable to representation activities.  Thus, there is no longer any color of legitimacy to a system which permits a union to collect the full dues from everyone and hold their monies until an employee raises an objection which triggers a refund.  <u>Beck</u> has made crystal clear that the obligation under a union security clause cannot require contribution beyond the "financial core".

> "We conclude that §S(a)(3)...authorizes the e<u>xaction</u> of
> only those fees and dues necessary to performing the
> duties of an exclusive representative of the employees
> in dealing with the employer on labor-management
> issues."  108 S.Ct. 2657.  Emphasis added.

<u>Beck</u> and prior decisions have fairly well identified the larger components of non-representational expenses, and unions will be required to break down their expenditures consistent with

34

these guidelines.  Thus, the union knows what is fairly
attributable to the financial core and knows the basic limits of
the authorized "exaction".  In view of that, there is no basis
for permitting a union to exact initially a larger amount,
knowing that a portion of these monies exceeds the core
obligation of the employee and is subject to refund.  Clearly,
that difference should never have been exacted in the first
place.  This conclusion is confirmed by the lower court's remedy
in Beck.  Once the breakdown was established (only 21% was
attributable to financial core), the court enjoined the future
exaction of any monies in excess of that core number.

        There is one situation in which the procedure of objection
serves a purpose.  That is where the employee believes or knows
that the union's calculation of financial core costs is inflated,
and he wishes to challenge that calculation.  This might properly
be styled a mini-Beck situation where the objection provides the
necessary trigger to inquiry and resolution, and possibly a
refund.  Presumably, this would arise in a limited number of
situations, and the Board's rule could address that in much the
same fashion as the rule under consideration.

        We submit that the Board's proposed rule is fundamentally
flawed because it continues in place the pre-Beck tolerance of
union exactions which exceed the financial core, a tolerance
which the Supreme court has now put to rest.  Accordingly, we

request that the Board reconsider its proposed rule and modify it
consistent with the supreme Court's decision.

                          Respectfully submitted,

                          APRUZZESE, McDERMOTT,
                           MASTRO & MURPHY


                       By:



VJA:ak
cc:  Dennis M. Devaney, Member
     Clifford R. Oviatt, Jr., Member
     John Raudabaugh, Member

 (Federal Express)


(13730)



OFfICE OF THE
CHAIRMAN

93 APR −■ fIH 10:
25

RECEIVED
GTPH.W.C. 20570


36