**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
NATIONAL ASSOCIATION OF                   )
MANUFACTURERS,                            )
                                          )
                Plaintiff,                )
                                          )
        v.                                )     Civil Action No. 11-1629 (ABJ)
                                          )
NATIONAL LABOR RELATIONS                  )
BOARD, *et al.*,                          )
                                          )
                Defendants.               )
_____)

## <u>MEMORANDUM OPINION</u>

Plaintiffs National Association of Manufacturers ("NAM"), *et al.* and National Right to

Work Legal Defense and Education Foundation ("NRTW") *et al.* each brought separate actions

against the National Labor Relations Board ("NLRB," "Board"), and its members and General

Counsel in their official capacities.  They allege that the Board's promulgation of the Final Rule

entitled "Notification of Employee Rights Under the National Labor Relations Act" exceeded its

authority under the National Labor Relations Act ("NLRA" or "the Act") in violation of the

Administrative Procedure Act ("APA"), and that it violated plaintiffs' First Amendment right to

refrain from speaking.  The actions were consolidated [Dkt. # 16], and the motions for

preliminary injunction that originally accompanied the complaints became moot when the Board

extended the effective date of the new rule.  *See* Minute Order dated 10/5/2011.  The parties have

now cross-moved for summary judgment,[1] and the Court has also received several amicus briefs in support of both sides.

The Court holds that the NLRA granted the Board broad rulemaking authority to implement the provisions of the Act, and that the Board did not exceed its statutory authority in promulgating Subpart A of the challenged rule – the notice posting provision.  But it also holds that the provision of Subpart B that deems a failure to post to be an unfair labor practice, and the provision that tolls the statute of limitations in unfair labor practice actions against employers who have failed to post, do violate the NLRA and are invalid as a matter of law.

## BACKGROUND

**Statutory Background**

The National Labor Relations Act is the federal statute that regulates most private sector labor-employer relations in the United States.  29 U.S.C. § 151 *et seq*.  The first version of the National Labor Relations Act, known informally as the "Wagner Act," was passed by Congress in 1935.  Pub. L. No. 74-198, 49 Stat. 449 (1935).  It has since been amended three times, most recently in 1974.  *See* Labor Management Relations Act ("Taft-Harley Act"), Pub. L. No. 80-101, 61 Stat. 136 (1947); Labor Management Reporting and Disclosure Act ("Landrum-Griffin Act"), Pub. L. No. 86-257, 73 Stat. 519 (1959); Health Care Amendments, Pub. L. No. 93-360, 88 Stat. 395 (1974).

The Act begins with an unequivocal declaration of national policy:

It is  hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by

---

1       Both groups of plaintiffs moved separately [Dkts. # 20, 21], and defendants cross-moved [Dkt. # 22].

> workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

29 U.S.C. § 151.  This statement is followed by a number of substantive provisions, including several that are relevant to this case.

Sections 153 to 156 establish the National Labor Relations Board.  Most pertinent here, section 156 grants the Board the "authority from time to time to make, amend, and rescind, in the manner prescribed by [the Act], such rules and regulations as may be necessary to carry out the provisions of this [Act]."  Section 157 is a declaration of the rights that employees "shall have," including, in part, "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively . . .[, and] to refrain from any or all of [those] activities."  The next section of the Act defines unfair labor practices for both employers and labor organizations, and, in particular, it provides:  "[i]t shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1).  Section 158 also specifies that the "expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."  29 U.S.C. § 158(c).

Finally, sections 159, 160, and 161 of the Act establish the Board's authority over bargaining representatives and elections, its authority to adjudicate disputes about unfair labor practices, and its investigatory authority in its adjudicative role.  Under section 160, the Board may only exercise its adjudicatory powers once a charge, alleging that some employer or labor organization has engaged in an unfair labor practice, has been filed.  29 U.S.C. § 160(b).  Section

160 also contains the statute of limitations for the issuance of a complaint: "[N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made . . . ." 29 U.S.C. § 160(b).

**Regulatory Background**

The Board promulgated its Final Rule, "Notification of Employee Rights under the National Labor Relations Act," in the Federal Register on August 30, 2011, after announcing a Proposed Rule and subjecting it to a notice and comment process.[2]  75 Fed. Reg. 80,410 (Dec. 22, 2010); 76 Fed. Reg. 54,006 (Aug. 30, 2011).  One Board member dissented.  76 Fed. Reg. 54,006, 54,037–42.  The text of the Rule is about four pages long.  *Id.* at 54,046–50.  It is divided into three subparts:  Subpart A contains the definitions and notice posting provisions, Subpart B contains the enforcement provisions, and Subpart C contains ancillary provisions.  *Id.*  The relevant provisions are summarized below.

**A.  Notice Posting**

Subpart A requires all employers subject to the NLRA to "post notices to employees, in conspicuous places, informing them of their NLRA rights, together with Board contact information and information concerning basic enforcement procedures."  29 CFR § 104.202(a).  The notice takes the form of an eleven-by-seventeen-inch poster that employers can either download from the NLRB website and print or obtain in hard-copy from any of the Board's regional, subregional, or resident offices.  *Id.* § 104.202(b), (e).  The Board also provides

---

2      The effective date of the Rule was originally November 14, 2011, but has most recently been changed to April 30, 2012.  76 Fed. Reg. 82,133 (Dec. 30, 2011).

translated versions of the posters for employers who are required to post translations.[3]   *Id.*
§ 104.202(d).   Employers who customarily communicate with their employees about personnel
rules or policies using an intranet or internet site are required to also post the notice prominently
on the site.  *Id.* § 104.202(f).

The NLRB seal is prominently displayed on the top left corner of the poster, and the
phrase, "This is an official Government Notice . . ." is printed in bold typeface along the bottom
margin.  *See* Notice, http://nlrb.gov/sites/default/files/documents/1562/employeerightsposter-8-
5x11.pdf.

The notice describes the National Labor Relations Act ("NLRA"), and it states the
following:

Under the NLRA, you have the right to:

- Organize a union to negotiate with your employer concerning your wages, hours, and other terms and conditions of employment.
- Form, join or assist a union.
- Bargain collectively through representatives of employees' own choosing for a contract with your employer setting your wages, benefits, hours, and other working conditions.
- Discuss your wages and benefits and other terms and conditions of employment or union organizing with your co-workers or a union.
- Take action with one or more co-workers to improve your working conditions by, among other means, raising work-related complaints directly with your employer or with a government agency, and seeking help from a union.
- Strike and picket, depending on the purpose or means of the strike or the picketing.
- Chose not to do any of these activities, including joining or remaining a member of a union.

---

3      "Where 20 percent or more of an employer's workforce is not proficient in English and
speaks a language other than English, the employer must post the notice in the language
employees speak."  § 104.202(d), (f)(2).  The Rule also notes that if the notice is unavailable in
the requested language, the requesting employer will not be liable for noncompliance with the
rule until the notice becomes available in that language.  *Id.*

The text then breaks into two columns.  The left column contains a list of items that "it is illegal

for your employer" to do, and the right column consists of a list of items that "it is illegal for a

union or for the union that represents you in bargaining with your employer" to do.  Finally, the

text merges back into a single column where the contact information for the NLRB is provided.

The notice concludes with the instruction:  "If you believe your rights or the rights of others have

been violated, you should contact the NLRB promptly to protect your rights, generally within six

months of the unlawful activity."

### B.  Enforcement

Subpart B lays out the methods by which NLRB will enforce the notice posting

provisions of the Rule.  It begins with the explanation, "The Board has determined that

employees must be aware of their NLRA rights in order to exercise those rights effectively."  29

C.F.R. § 104.210.  It goes on to state that an employer's failure to post the employee notice "may

be found to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed

by NLRA Section 7, 29 U.S.C. 157, in violation of NLRA Section 8(a)(1), 29 U.S.C. 158(a)(1)."

*Id.*

Subpart B also describes the enforcement process from beginning to end.  According to

the regulation, enforcement generally begins when an individual files an unfair labor practice

charge alleging that the employer has failed to post the employee notice.  *Id.*  After an

investigation and an attempt to persuade the employer to comply, a formal complaint may be

issued, triggering a hearing before an administrative law judge and an adjudication process

governed by the Board's customary procedures.  *Id.* § 104.212.  Under the terms of the rule, if

the Board finds that the employer failed to post the notice, the employer will be ordered to cease

and desist from the unlawful conduct and post the required notice, as well as a remedial notice.

Id. § 104.213(1)  The employer may also face additional remedies "in keeping with the Board's remedial authority."  *Id*.

Furthermore, the Rule details two ways in which other Board proceedings might be affected by an employer's failure to post the employee notice.  *Id.* § 104.214.  First, the Board may find it appropriate to toll the statutory six month statute of interpretations for an employee who files an unfair labor practice charge if the employer has failed to post the notice.  *Id.* § 104.214(a).  Second, the Board may consider an employer's "knowing and willful refusal to comply with the requirement to post the employee notice as evidence of unlawful motive in a case in which motive is an issue."  *Id.* § 104.214(b).

## Procedural Background

Plaintiffs NRTW *et al.* are all employers who will be required to post notices under the Board's Final Rule. NRTW Compl. ¶¶ 1–4.  Plaintiffs NAM and Coalition for a Democratic Workplace are both trade associations that represent other such employers, as well as employers themselves.  NAM Am. Compl. ¶¶ 3–5.  Both sets of plaintiffs brought suits against the Board, which the Court consolidated on October 4, 2011 [Dkt. # 1, 11, 16; Case No. 11-1683, Dkt. # 1, 8].  Both complaints allege that the NLRB's promulgation of the Final Rule violates section 706(2)(c) of the APA because the NLRB lacks the authority:  (1) to promulgate and enforce the notice posting rule under section 6 of the NLRA; (2) to require employers to post a notice absent the filing of a charge or petition; (3) to deem the failure to post to be an unfair labor practice; and (4) to toll the statute of limitations for filing an unfair labor practice charge.  NAM Am. Compl. Counts I–V; NRTW Compl. Count I.  Both sets of plaintiffs also argue that the Rule violates the First Amendment of the Constitution of the United States.  NAM Am. Compl. Count VI; NRTW

Compl. Count II.  Plaintiffs NAM *et al.* further argue that the rule is arbitrary and capricious in violation of section 706(2)(A) of the APA.  NAM Compl. Count I.[4]

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  The existence of a factual dispute is insufficient to preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation.  *Id.*; *see also Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion."  *Sherwood v. Wash. Post*, 871 F.2d 1144, 1148 n.4 (D.C. Cir. 1989), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir.

---

4       Count V of the NAM *et al.* complaint restates the concerns that form the substance of Counts I – IV, and as defendants suggest, the count appears to be an attempt to supply a basis for jurisdiction under *Leedom v. Kyne*, 358 U.S. 184 (1958).  *See* Def.'s Mem. in Supp. of Cross-Mot. for Summ. J. and Mot. to Dismiss Pls. NAM/CDW's Am. Compl's Fifth Cause of Action ("NLRB Mem.") at 44 [Dkt. # 22].

1982).  In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party."  *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

## ANALYSIS

This case presents no genuine issues of material fact, and so it may be properly decided on summary judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 323.  The questions presented are:  (1) whether the Board has the authority under the NLRA to promulgate the Final Rule; (2) whether the Board's action was arbitrary and capricious; and (3) whether the Rule violates the First Amendment of the Constitution of the United States.

### I.      The Challenge to the Rule Under the Administrative Procedure Act

#### A.  The Standard for Review of Agency Action

This Court has jurisdiction under the Administrative Procedure Act to hear plaintiffs' claims regarding the authority of the Board to promulgate the Final Rule.[5]  The parties agree that the APA establishes the scope of judicial review of agency action.  NLRB Mem. at 44; *see Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 545–549 (1978).

The standard of review under the APA is quite narrow.  Where, as here, the plaintiffs challenge an agency's authority to act, the Court is required to analyze an agency's interpretation of the authorizing statute by following the two-step procedure set forth in *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  First, the Court must determine "whether Congress has directly spoken to the precise question at issue."  *Id.* at 842.  "If the intent of

---

5      The parties agree that the APA supports jurisdiction here.  NLRB Mem. at 44; *see also Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 659 n.1 (D.C. Cir. 1994) (judicial review of agency's authority to act is available under section 704 of the APA).  It is true that courts have held that Congress precluded review of challenges to the Board's actions in representation proceedings.  *Leedom v. Kyne,* 358 U.S. at 187-88; *Am. Fed'n of Labor v. NLRB*, 308 U.S. 401, 409–12 (1940); *see also White v. Herzog*, 80 F. Supp. 407, 411 (D.D.C. 1948).  But this case does not present a challenge to the Board's actions in a representation proceeding.

Plaintiffs NAM *et al.* have argued that the case falls within the exception recognized in *Leedom*, which permits the courts to act where necessary to "strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act."  *Id.* at 187–88.  But since this action does not fall within the category of cases for which judicial review is excluded, the Court need not consider the applicability of the exception to the exclusion.  The central justification for the Court's exercise of jurisdiction in *Leedom* was that lack of review would have deprived the petitioner of any means of vindicating its rights.  *Id.* at 190; *see also Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991).  But here, the APA provides a remedy, and so a consideration of jurisdiction under *Leedom* is unnecessary. *But see Ry. Labor Execs.' Ass'n*, 29 F.3d at 659 n.1 (granting jurisdiction under *Leedom* even though the APA would have provided a basis for review, but where the case was the type of case subject to the statutory exclusion).

In any event, the DC Circuit has applied the same standard for finding that the Board exceeded its authority whether it was exercising its jurisdiction under *Leedom* or under the APA. *See Ry. Labor Execs.' Ass'n*, 29 F.3d at 664–71 (granting *Leedom* jurisdiction and applying a *Chevron* two-step analysis to assess whether the National Mediation Board exceeded its authority).

Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43.   Courts "use 'traditional tools of statutory construction' to determine whether Congress has unambiguously expressed its intent," *Serono Labs., Inc., v. Shalala*, 158 F.3d 1313, 1319 (D.C. Cir. 1998), including an examination of the statute's text, structure, purpose, and legislative history. *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997).

If the Court concludes that the statute is either silent or ambiguous, the second step of the Court's review process is to determine whether the interpretation proffered by the agency is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.   Once a reviewing court reaches the second step, it must accord "considerable weight" to an executive agency's construction of a statutory scheme it has been "entrusted to administer." *Id.* at 844. Indeed, "under *Chevron*, courts are bound to uphold an agency interpretation as long as it is reasonable – regardless whether there may be other reasonable, or even more reasonable, views." *Serono Labs.*, 158 F.3d at 1321.

## B.   Subpart A:  The Notice Posting Provision

Plaintiffs contend that the Board lacks the authority under the NLRA to promulgate a rule that requires all employers to post a notice of employee rights.  Mem. of NAM and Coalition for a Democratic Workplace in Supp. of Mot. for Summ. J. ("NAM Mem") at 6–17 [Dkt. #21]; Mot. for Summ. J. by Pls. NRTW et al. ("NRTW Mem.") at 9–23 [Dkt. #20].   Defendants acknowledge that Congress did not speak directly to the Board's authority to promulgate this particular sort of rule, but they argue that the Board reasonably interpreted section 156 of the Act to authorize the rulemaking here and that the rule should be upheld under *Chevron* step two. NLRB Mem. at 12–21.  The Court agrees.

1. ***Chevron* Step One**

Section 156 of the NLRA states, "The Board shall have authority from time to time to make, amend, and rescind, in the manner prescribed by [this subchapter], such rules and regulations as may be necessary to carry out the provisions of this subchapter."[6]  Plaintiffs argue that this section authorizes the Board to establish rules for elections and for the adjudication of unfair labor practice charges, and that it does not grant the Board authority to promulgate general rules for the workplace.  *See, e.g.*, NAM Memo at 3–4.  But the section does not limit the Board to enacting rules for carrying out particular duties; rather, it expressly grants the Board the broad rulemaking authority to make rules necessary to carry out any of the provisions of the Act.

Section 151 and 157 are the provisions that the Board contends it is implementing with this rulemaking.  *See* NLRB Mem. at 7–11.  Section 151 articulates a national policy to encourage and protect collective bargaining activity, and section 157 enumerates the rights of employees guaranteed by the Act:

> Employees shall have the right to self-organization, to form, to join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities . . . .

Defendants posit that employees cannot exercise their rights without knowledge of what those rights are, and they submit that the rule simply mandates that employers inform employees of those rights, which furthers the purposes of the Act.  NLRB Mem. at 7–11.

Notwithstanding the breadth of the grant of rulemaking authority in section 156, plaintiffs argue that "the deliberate decision by Congress not to include a penal notice posting requirement anywhere in the NLRA must be interpreted as a *prohibition* on the Board's attempt to assert that

---

6        "This subchapter" refers to the entire NLRA.  *See* 29 U.S.C. § 156.

power here."   NAM Mem. at 10.   But plaintiffs read too much into Congress's silence on the subject, and their vehemence alone is not enough to make their position consistent with the guidance provided by the Court of Appeals in this circuit.   *See Serono,* 158 F.3d at 1319.   In *Serono,* the court rejected as a matter of law the district court's conclusion that the Food, Drug, and Cosmetic Act barred certain types of testing in an abbreviated new drug application because "while the court was correct in noting that nothing in the statute *permits* the use of animal assays, the important point is that nothing in the statute *prohibits* their use."   *Id.* (emphasis in original). That is an important point here, as well.   The court in *Serono* was also persuaded by the fact that the statute, as here, granted "broad . . . discretion to the agency."   *Id.*

Plaintiffs argue that their reading of the rulemaking provision is compelled by the D.C. Circuit's ruling in *American Bar Ass'n ("ABA") v. FTC,* 430 F.3d 457 (D.C. Cir. 2005).   Brief in Opp. to NLRB's Cross-Mot. for Summ. J. ("NRTW Opp.") at 3 [Dkt. #32].   In *ABA,* the court reviewed an FTC rule promulgated under the Gramm-Leach-Bliley Act ("GLBA").   *ABA,* 430 F.3d at 458.   The GLBA authorized the FTC to regulate institutions engaging in the business of financial activities.   *Id.* at 465.   The challenged rule purported to regulate attorneys engaged in the practice of law under that grant of authority.   *Id.* at 466.   Although the court determined that the GLBA was ambiguous as to whether it authorized the FTC to regulate attorneys, it refused to accord the agency's interpretation any deference.   *Id.* at 468–71.   Instead, it found that "[w]hen we examine a scheme of the length, detail, and intricacy of the one before us, we find it difficult to believe that Congress, by any remaining ambiguity, intended to undertake the regulation of the profession of law – a profession never before regulated by 'federal functional regulators' – and never mentioned in the statute."   *Id.* at 469.   In other words, the agency's "attempted turf

expansion," *id.* at 467, was such a "poor fit" with the language and purpose of the statute that the agency's claim of authority failed under *Chevron* step one, *id.* at 470.

This case is easily distinguished from the FTC's failed grab for power over the legal profession.  The NLRA places the Board squarely at the heart of labor-management relations, and the Board did not have to engage in the tortured reading of the law and mental gymnastics condemned by the court in *ABA* to find that the dissemination of information about employee rights is well within its bailiwick.  The Board is not attempting to regulate entities or individuals other than those that Congress expressly authorized it to regulate, and it is not extending its reach to cover activities that do not fall within the ambit of the Act.  The stated purpose of the Rule is directly related to the policy behind the NLRA that is set forth in section 151, and the notice posting requirement can hardly be described as a "poor fit" with the language of section 157.

More relevant to this decision, then, is the Supreme Court's decision in *American Hospital Ass'n v. NLRB*, 499 U.S. 606 (1991).  There, the Board promulgated a rule defining the employee units appropriate for collective bargaining in certain acute care hospitals.  *Id.* at 608. Petitioners challenged the rule, in part asserting that the express language in section 159(b) of the Act, which required the Board to determine the appropriate collective bargaining units "in each case," prohibited it from enacting rules that define collective bargaining units for entire categories of cases.  *Id.* at 608–09.

Rejecting that argument, the Court explained that the section 156 grant of rulemaking authority "was unquestionably sufficient to authorize the rule at issue in this case unless limited by some other provision in the Act."  *Id.* at 609–10.  It then concluded that the phrase "in each case" was not a limiting provision.  *Id.* at 613–14.  "The more natural reading of these three words is simply to indicate that whenever there is a disagreement about the appropriateness of a

unit, the Board shall resolve the dispute." *Id.* at 611; *see also Clifton v. FEC*, 114 F.3d 1309, 1312 (5th Cir. 1997) ("Agencies often are allowed through rulemaking to regulate beyond the express substantive directives of the statute, so long as the statute is not contradicted."). Applying those principles, the notice posting rule at issue is authorized unless some other provision of the Act limits the Board's authority to impose such a requirement on employers. Plaintiffs complain loudly about the lack of Board authority here, but they fail to point to any limiting provision.[7]

Instead, plaintiffs attempt to distinguish the instant case from *American Hospital*. They argue that the NLRB is a "quasi-judicial body" with only the election and adjudicatory powers specifically enumerated in the NLRA – specifically in sections 159, 160, and 161 of the NLRA. NRTW Mem. at 9–16; NAM Mem. at 1, 6–10. They point out that in exercising its adjudicatory functions, the Board is only authorized to act once an unfair labor practice charge or election petition has been filed, and so they reason that the Board can only invoke its section 156 rulemaking powers to carry out its express post-charge or election petition duties. NRTW Mem. at 9–16, NAM Mem. at 1, 12–13. Because the rule in *American Hospital* was promulgated in furtherance of the Board's express section 159(b) duty to determine appropriate bargaining units, and the notice posting rule does not further such an express duty of the Board, they assert that *American Hospital* is inapplicable. NRTW Mem. at 17–19; NAM Mem. at 15.

---

7       Plaintiffs also argue that if the Court were to find *American Hospital* controlling, the Board's rulemaking authority is limited by some other provision of the Act "because Congress never granted the Board authority to order persons or entities against whom no unfair labor practice charge or election petition has been filed to do anything, to notify anyone, or to post anything." NRTW Mem. at 18 n.10. But the absence of express direction is not the equivalent of an express prohibition or a limiting provision. The D.C. Circuit did say in the *ABA* opinion that an agency cannot *presume* the existence of a claimed administrative power simply because the statute does not expressly negate it, 430 F.3d at 369, but that does not go so far as to support plaintiffs' contention that the absence of an express authorization must *always* be viewed as a definitive congressional statement that the power does not exist.

Yet the Court finds no grounds to conclude that a rule aimed at carrying out section 157 of the Act is any less valid than a rule aimed at carrying out section 159.  In assessing the validity of agency rulemaking, the Court must first look to the language of the statute, *CSX Transp., Inc. v. Ala. Dep't of Revenue*, -- U.S. --, 131 S. Ct. 1101, 1107 (2011), and here, the language expressly extends rulemaking authority "as may be necessary to carry out *the provisions of this subchapter*," 29 U.S.C. § 156 (emphasis added).  If Congress wanted to limit the Board's authority to promulgate only those rules needed to carry out its section 159, 160, and 161 powers, it could have expressly extended rulemaking authority only "as may be necessary *to carry out its duties under sections 159, 160, and 161 of this subchapter*."  *See Chisom v. Roemer*, 501 U.S. 380, 395–96 (finding that if Congress had wanted to exclude elected judges from the term "representatives" in the provision "to elect representatives of their choice," Congress would have "made it explicit in the statute").[8]  In fact, Congress did exactly that in section 161 of the

---

[8]     Plaintiffs also embrace this tenet of statutory interpretation, but for the proposition that if Congress wanted to insert a provision granting the Board the authority to require employers to post notices, it would have expressly done so.  NAM Mem. 10–13.  They cite several statutes that were enacted at around the same time as the NLRA, which, unlike the NLRA, all have express notice posting provisions.  *See* NAM Mem. at 11–12.  However, there are plenty of reasons why Congress might not have inserted an express notice posting provision here besides plaintiffs' conclusion that Congress intended to not give the Board such authority.  *See Chevron*, 467 U.S. at 865 ("Perhaps [Congress] consciously desired the [agency] to strike the balance at this level . . . ; perhaps it simply did not consider the question at this level; and perhaps Congress was unable to forge a coalition on either side of the question . . . .");  *Cheney R.R. Co. v. ICC*, 902 F.2d 66, 69 (D.C. Cir. 1990) ("[T]he contrast between Congress's mandate in one context with its silence in another suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, i.e., to leave the question to agency discretion.").   Furthermore, if Congress intended the broad grant of rulemaking authority in section 156 to include the authority to require notice posting, then an express provision would be unnecessary.  *See Pub. Serv. Comm'n of NY v. FPC*, 327 F.2d 893, 897 (D.C. Cir. 1964) ("All authority of the Commission need not be found in explicit language.  Section 16 [the general rulemaking provision] demonstrates a realization by Congress that the Commission would be confronted with unforeseen problems of administration in regulating this huge industry and should have a basis for coping with such confrontation.  While the action of the Commission must conform with the

statute, which grants the Board the powers to obtain evidence and summon and examine witnesses "[f]or the purpose of all hearings and investigations, which . . . are necessary and proper *for the exercise of the powers vested in it by sections 159 and 160 of this title* . . . ."  29 U.S.C. § 161 (emphasis added).  So it is significant that Congress did not similarly limit the scope of the Board's rulemaking power under section 156.  *See Russello v. United States*, 464 U.S. 16, 23–24 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (Internal quotation marks omitted).

There has been extensive briefing on this matter, but plaintiffs' argument that the Board lacks the authority to promulgate rules for employers is not aided by the authority they advance; the cases they cite are narrower than described, and they do not actually stand for that proposition.  *See* NRTW Mem. at 9–16; NAM Mem. at 9–10.  The cases speak only to the Board's authority when carrying out its adjudicative functions.  They address the limits on the

---

terms, policies and purposes of the Act, it may use means which are not in all respects spelled out in detail.").

And, if Congress expressly intended to prevent the Board from asserting this kind of authority, one would expect some mention of it in the legislative history; yet, the legislative history is silent.  The only mention of a notice provision in the legislative history that this Court is aware of is a proposed provision in the earliest-introduced version of the Wagner Act, which required employers to notify employees if they were party to a contract which would be abrogated because it conflicted with a provision of the NLRA and made it an unfair labor practice to fail to so notify employees. S. 2926, 73d Cong. (1934), *reprinted in* 1 NLRB, *Legislative History of the National Labor Relations Act*, 1935, at 3, 14 (1935) ("Leg. Hist."); H.R. 8423, *reprinted in* 1 Leg. Hist. 1140.  This notice provision is completely different from the general notice provision in the Final Rule at issue here, as evidenced by the fact that the same early version of the Wagner Act also contained the same general notice posting provision that is contained in Section 156 of the current NLRA, and which remained when the law was passed.  1 Leg. Hist. at 13 (§ 209).  Furthermore, objections to this provision by senators and other interested parties, which ultimately led to its omission, focused on the abrogation portion of the provision, not on the notice posting portion.  *See* 1 Leg. Hist. at 187, 394–95, 690–91, 694.

Board's authority to fashion a remedy once a violation has been found, and none of them purport to consider the scope of the Board's general rulemaking authority, so they are not apposite or instructive here.

For example, in *Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197 (1938), the Court held that, in adjudicating unfair labor practice cases, the NLRB could only impose remedial remedies and it had no express authority to order punitive sanctions.  *Id.* at 220. Similarly, in *Republic Steel Corp. v. NLRB,* 311 U.S. 7 (1940), the Court held that the Board cannot fashion a remedy designed to redress a perceived injury to the public arising out of an employer's conduct; it is restricted to redressing the employees' grievances and imposing a remedy that secures their collective bargaining rights and makes them whole.  *Id.* at 10–13; *see also Sure-Tan, Inc. v. NLRB,* 467 U.S. 883, 900–05 (1984) (backpay award exceeded Board's authority to impose "tailored" remedies); *NLRB v. Fin. Servs. Emps.,* 475 U.S. 192 (1986) (union brought unfair labor practices charge against an employer that refused to bargain with it, but NLRB responded by invalidating the union affiliation; the Court found the decertification to be unlawful and held that the statute only authorizes the Board to step into an election where affiliation raises a question of representation).

Finally, the Court is not persuaded by plaintiffs' argument that the fact that the Board has never before invoked its rulemaking authority in furtherance of provisions of the Act other than those establishing its adjudication and election powers is evidence that the Board lacks such authority.  *See Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 693 (D.C. Cir. 1973)  "The fact that powers long have been unexercised well may call for close scrutiny as to whether they exist; but if granted, they are not lost by being allowed to lie dormant, any more than nonexistent

powers can be prescripted by an unchallenged exercise." *Id.* at 694, quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 647–48 (1950).

Therefore, the Court cannot find that in enacting the NLRA, Congress unambiguously intended to preclude the Board from promulgating a rule that requires employers to post a notice informing employees of their rights under the Act.  Neither the text of the statute nor any binding precedent supports plaintiffs' narrow reading of a broad, express grant of rulemaking authority.[9]

---

9       Although it is not the basis for the Court's ruling, the Court takes note of the fact that in 1992, plaintiffs in this case supported the Board's authority to promulgate a different notice posting rule which would have required all unions to provide certain employees with informational notices about union conduct that constitutes an unfair labor practice.  *See* 29 CFR pt. 103 (Sept. 22, 1992) [Dkt. # 39]; Letter from NAM to John C. Truesdale, Exec. Sec'y, National Labor Relations Board, *Notice of Proposed Rulemaking for the Implementation of the U.S. Supreme Court's Decision in* Communications Workers of America v. Beck [Dkt. # 39]; Hearing Transcript, *In re: Union Dues Regulations*, N.L.R.B. (March 16, 1993) [Dkt. # 39]; Letter from NRTW to John C. Truesdale, Exec. Sec'y, National Labor Relations Board, Beck *Comments* (Dec. 3, 1992) [Dkt. # 39]. This position directly contradicts the position that plaintiffs take here.

Thus, the Court must proceed to *Chevron* step two.[10]

### 2. *Chevron* Step Two

Under *Chevron* step two, the Court defers to the agency's interpretation of the statute so long as it is reasonable. *Serono*, 158 F.3d at 1321. The Board provides a reasonable explanation for why the Final Rule is "necessary" to carry out the provisions of this statute: it concluded that in order for employees to fully exercise their NLRA rights, as they have the absolute right to do under section 157 of the Act, they must know that those rights exist. 76 Fed. Reg. at 54,006. And requiring employers to post notices of employee rights raises employee awareness. *Id.* at 54,007. As the Board explains, "[g]iven the direct relationship between employees' timely awareness of their rights under the NLRA and the Board's ability to protect and enforce those rights, this rule is 'necessary' for purposes of Section 6." *Id.* at 54,010–11. This is so clearly a

---

10      Prior to the Supreme Court's decision in *Chevron*, there was a line of cases confirming that grants of rulemaking authority like the one at issue here, should be construed broadly. *See, e.g.*, *Am. Trucking Ass'ns, Inc. v. United States*, 344 U.S. 298, 311–13 (1953) (construing a statutory provision granting the Interstate Commerce Commission the authority "'[t]o administer, execute, and enforce all provisions of this part, to make all necessary orders in connection therewith, and to prescribe rules, regulations, and procedure for such administration[,]'" broadly as imbuing it with the power to promulgate regulations that further the purpose of the Act); *Thorpe v. Hous. Auth. of Durham*, 393 U.S. 268, 277, 280–81 (1969) (construing a statutory provision authorizing the Department of Housing and Urban Development "'from time to time [to] make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this Act[,]'" broadly as authorizing it to promulgate rules that are "reasonably related to the purposes of the enabling legislation under which it was promulgated"); *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 369 (1973) ("Where the empowering provision of a statute states simply that the agency may 'make . . . such rules and regulations as may be necessary to carry out the provisions of this Act,' we have held that the validity of a regulation promulgated thereunder will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation[,]'" quoting *Thorpe*, 393 U.S. at 280–81). However, they do not stand for the proposition that the agency's interpretation controls for the purpose of *Chevron* step one. *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 383 F. Supp. 2d 123, 144–45 (D.D.C. 2005) (stating that the *Mourning* line of cases describe "a heightened level of deference that is due the agency's interpretation of an ambiguous statute under *Chevron* step two, rather than a warrant to override a clear statute under *Chevron* step one"), citing *Am Fed'n of Labor & Cong. of Indus. Orgs. v. Chao*, 409 F.3d 377, 384 (D.C. Cir. 2005); *Natural Res. Def. Council v. Jamison*, 815 F. Supp. 454, 471 (D.D.C. 1992).

reasonable interpretation, that plaintiffs do not even proffer an argument for why the Court

should find it to be unreasonable should it reach *Chevron*'s second stage.

### 3.   The Arbitrary and Capricious Standard

"Even where [an agency's] construction satisfies *Chevron*, we must still ensure that its

action is not otherwise arbitrary and capricious." *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489

F.3d 1221, 1228 (D.C. Cir. 2007).   The agency action will be upheld if "has considered the

relevant factors and articulated a 'rational connection between the facts found and the choice

made.'"   *Id.*, quoting *Allied Local & Req'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 68 (D.C. Cir.

2000).   The review is "[h]ighly deferential" and "presumes the validity of agency action."  *Id.*,

citing *AT&T Corp. v. FCC*, 349 F.3d 692, 698 (D.C. Cir. 2003).   The agency may rely on

comments submitted during the notice and comment period as justification for the rule, so long

as the submissions are examined critically.   *See Nat'l Ass'n of Regulatory Utility Comm'rs v.*

*FCC*, 737 F.2d 1095, 1125 (D.C. Cir. 1984).   But it "need not, indeed cannot, base its every

action upon empirical data; depending upon the nature of the problem, an agency may be

'entitled to conduct . . . a general analysis based on informed conjecture.'"   *Chamber of*

*Commerce of U.S. v. SEC*, 412 F.3d 133, 142 (D.C. Cir. 2005), quoting *Melcher v. FCC*, 134

F.3d 1143, 1158 (D.C. Cir. 1998).

Without any specificity, plaintiffs NAM *et. al.* argue that the Board's promulgation of the

Final Rule is arbitrary and capricious because its justifications "are not supported by substantial,

or in this case any, empirical evidence."[11]   Reply Mem. of NAM and Coalition for a Democratic

Workplace ("NAM Reply") at 13 [Dkt. #33]; *see also* NAM Mem. at 17–18.  Defendants counter

---

11      The Court will review only Subpart A (the mandatory notice posting provision) under the
arbitrary and capricious standard since it will overturn sections 104.210 (declaring failure to post
an unfair labor practice) and 104.214(a) (allowing equitable tolling) based on the Board's lack of
authority to promulgate them.

that the Board was not required to provide the comprehensive empirical evidence that plaintiffs demand, and that the Board considered all the relevant factors and supported its choice with sufficient empirical and anecdotal evidence.  Defs.' Cross-Opp. to Pls.' Cross-Mots. For Summ. J. ("NLRB Reply") at 29–30 [Dkt. #34].

In justifying the notice-posting provision, the Board reasoned that "many employees are unaware of their NLRA rights and . . . a notice posting requirement is a reasonable means of promoting greater knowledge among employees" so that they can freely exercise their rights.  76 Fed. Reg. at 54,015.  So, the Court must determine whether the Board considered the relevant factors for both of these assertions and whether it articulated a rational connection between the facts found and the choice the Board made to require employers to post the notice.

1.   Employees lack awareness of their rights

The Board determined that many employees are unaware of their NLRA rights, and therefore cannot effectively exercise those rights, based on the following factors:

- The comparatively small percentage of private sector employees who are represented by unions and thus have ready access to information about the NLRA;

- The high percentage of immigrants in the labor force, who are likely to be unfamiliar with workplace rights in the United States;

- Studies indicating that employees and high school students about to enter the work force are generally uninformed about labor law; and

- The absence of a requirement that, except in very limited circumstances, employers or anyone else inform employees about their NLRA rights.

76 Fed. Reg. at 54014–18.  The Board cited studies, law review articles, and comments submitted during the notice and comment period in support of its conclusion.  *Id.* at 54,006–7, 54,014–18; AR 47–608.  While the Board did not commission studies to determine exactly how many employees are unaware of their NLRA rights, it did cite outside studies, and it gave the

public the opportunity to bring any evidence that disputed its findings to its attention by subjecting the rule to a notice and comment period. *See Chamber of Commerce*, 412 F.3d at 142 (construing the D.C. Circuit's holding in *Nat'l Ass'n of Regulatory Util. Comm'rs*, 737 F.2d 1095, as "failure to conduct independent study not violative of APA because notice and comment procedures 'permit parties to bring relevant information quickly to the agency's attention'").   After notice and comment, the Board found that "[f]ew if any of the comments contending that employees know about their NLRA rights assert that employees are aware of the right to engage in such protected concerted activities in the nonunion setting." [12]  76 Fed. Reg. at 54,016.   It also found that no submissions credibly debunked its findings or presented any evidence that employees are largely aware of their NLRA rights.   *Id.* at 54016–17.   While plaintiffs call this analysis inadequate, they do not point to any evidence, let alone any evidence that was before the Board, that contradicts these findings or that should have led the Board to a different conclusion.

Some commenters did contend that employees should actually be more informed of their rights now than ever before because the availability of the Internet makes information more

---

[12]     In fact, the Board found that some of the comments opposing the rule actually demonstrated the widespread ignorance about employees' rights to join a union, including employer comments that "If they don't like the way I treat them, then go get another job.  That is what capitalism is about[,]" and "Belonging to a union is a privilege and a preference – not a right."  Fed. Reg. at 54017, quoting Comments by Montana Records Management, LLP, and OKC Tea Party.

readily accessible.[13]  The Board responded that "an employee who has no idea that he or she has

a right . . . would be less likely to seek such information than one who is aware of such rights and

wants to learn more about them."  *Id.* at 54,017.  In other words, the Board posited that even if

information about employee rights is available to be found, the employee has to be aware that the

rights exist before she will seek it out.  The Board also cited statistics showing that the

percentage of the private sector workforce represented by unions has declined since the 1980s.

*Id.* at 54,016.  Since unions have traditionally been important for spreading awareness about

employee rights, their decline suggests that it has become more difficult for employees to

become aware of their rights.  *Id.*  And the Board pointed to "the increasing proportion of

immigrants in the work force, who are unlikely to be familiar with their workplace rights; and

lack of information about labor law and labor relations on the part of high school students who

are about to enter the labor force."  *Id.* at 54,006 (citing three law review articles).

Given the Board's thorough consideration of the comments that it received, and

plaintiffs' inability to point to any specific factor that counsels against the Board's conclusion or

---

13    The Court notes that the relative number of people who are uninformed about their labor
rights now versus when the NLRA was enacted is not of particular importance.  All that matters
for purposes of whether the rule is arbitrary and capricious is whether it is reasonable to think
that there are a significant number of employees who are uninformed about their rights under the
NLRA now and whether it is reasonable to believe that the notice posting rule will decrease that
number.  *See Air Transport Ass'n of America v. Nat'l Mediation Bd.*, 663 F.3d 476, 484 (D.C.
Cir. 2011) ("The APA allows an agency to adopt an interpretation of its governing statute that
differs from a previous interpretation and . . . such a change is subject to no heightened judicial
scrutiny.").

any piece of evidence that the Board failed to address, the Court cannot find the Board's conclusion that employees lack awareness of their NLRA rights to be arbitrary and capricious.[14]

2.   <u>The notice posting rule is a reasonable means of promoting awareness</u>

The Board next determined that the notice posting rule was a reasonable means of promoting greater knowledge among employees.   In making that determination, it referred to the following:

- The potential benefit of a notice posting requirement to employees;

- The modest cost of the notice posting requirement to employers;

- The content of the notice and manner of posting.

76 Fed. Reg. at 54,015, 54,017–21.   This is a textbook example of a circumstance where factual determinations are primarily of a judgmental or predictive nature, and thus, "complete factual support in the record for the [agency's] judgment or prediction is not possible or required; a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency."   *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 814 (1978) (internal quotation marks omitted).

To ensure that the rule addressed the specific reasons that it had found for why employees' lack of awareness of their rights, the Board drafted the mandatory language of the notice in a way that conveyed the information of which employees were likely to be unaware. *See* 76 Fed. Reg. at 54,018–27.   It also mandated the size and placement of the notices (including the placement on internet and intranet sites) to ensure that employees were likely to see them.

---

14      Plaintiffs do not even attempt in any substantial way to debunk the connection between the facts that the Board cites in support of the Rule and the choice it made.   Rather they launch a series of conclusory allegations.   *See* NAM Mem. at 18 ("Substantive empirical evidence and analyses of rigorous scholarly merit are completely lacking.   The Board, without a shred of credible evidence, contends that the Rule is necessary because employees are unaware of their NLRA rights.").

*See id.* at 54017–18.  And while it acknowledged the argument raised by commenters that some employees will not read the notices, it noted that "not every employee has to read workplace notices for those notices to be effective."  *Id.* at 54,017.  The Board made the notice readily available to employers and made compliance uncomplicated.  Given the deferential standard of review that applies here, the Court declines to find the Board's promulgation of the notice posting provision to be arbitrary and capricious.

### C.  Subpart B, Section 104.210:  The Unfair Labor Practice Provision

Plaintiffs next challenge the Board's authority to promulgate section 104.210 of the Final Rule.  That section reads, in relevant part:  "Failure to post the employee notice may be found to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by NLRA Section 7, 29 U.S.C. 157, in violation of NLRA Section 8(a)(1), 29 U.S.C. 158(a)(1)."  76 Fed.

Reg. at 54,049.  Plaintiffs maintain, and the Court agrees, that the agency lacked the authority to deem a failure to post to be an unfair labor practice under the Act. [15]

    To determine whether the Board exceeded its authority by designating an employer's failure to post to be an unfair labor practice, the Court returns to *American Hospital Ass'n v. NLRB*, 499 U.S. 606 (1991).  As described above, the Board's authority to promulgate a rule that aids it in carrying out a provision of the NLRA survives *Chevron* step one "unless limited by some other provision of the Act."  *Id.* at 609–10.  The Court finds that the unfair labor practice provision of the Rule, section 104.210, is expressly limited by NLRA sections 158(a) and 160(a), in which Congress specifically defined and limited the conduct that could constitute an unfair labor practice.

    It is true that Congress did not enumerate every conceivable practice that the Board could find to be an unfair labor practice.  *See Republic Aviation v. NLRB*, 324 U.S. 793, 798 (1945)

---

15    While section 104.210 of the regulation uses the word "may," it is clear from section 104.213 and the summary of the rule set out in Fed. Reg. Vol. 76, No. 168 (8/30/2011), at 54006 *et. seq.*, that in issuing the rule, the Board made the finding that non-posting *is* "interference." On page 54,031, the Board reviews the three methods of enforcing the new regulation that it considered, and one is "finding" the failure to post to be an unfair labor practice.  On page 54,032, the Board rejects the notion that it does not have the authority to make this "finding," and it asserts: "Because, as described in detail above, notice posting is necessary to ensure effective exercise of Section 7 rights, a refusal to post the required notice is at least an interference with employees' exercise of those rights.  For these reasons, in finding that an employer's failure to post the required notice interferes with, restrains, or coerces employees in the exercise of the NLRA rights, in violation of Section 8(a)(1), the Board is acting consistently with its settled practice."  Also, the Board cites Family and Medical Leave Act cases where a failure to post a notice was considered to be prima facie evidence of interference, and it concludes, "Accordingly, the Board finds no impediment to declaring that an employer's failure to post the required notice will violate Section 8(a)(1)." *Id.*  Since the Board has expressly purported to find any failure to post to be an unfair labor practice, the Court will therefore construe the provision as one that permits the Board to find an unfair labor practice based upon the showing – without more – that an employer has failed to post the notice.  Indeed, the NLRB did not argue at the hearing that the rule was permissive, or that it would be up to the Board to adjudicate future cases on a case by case basis. Moreover, the preamble to the regulation makes it clear that the Board expects the General Counsel to enforce the regulation. *See id.* at 54,033.

("[The Wagner] Act left to the Board the work of applying the Act's general prohibitory language in the light of the infinite combinations of events which might be charged as violative of its terms."). However, it did establish bounds. Section 160(a) empowers the Board "to prevent any person from engaging in any unfair labor practice (listed in section 158 of [title 29]) affecting commerce." 29 U.S.C. § 160(a). This section has been interpreted as limiting the unfair labor practices that the Board may prohibit to only those enumerated under section 158. *Local 357, International Brotherhood of Teamsters v. NLRB*, 365 U.S. 667, 676 (1961) ("Where, as here, Congress has aimed its sanctions only at specific discriminatory practices, the Board cannot go farther and establish a broader, more pervasive regulatory scheme."); *see* 76 Fed. Reg. at 54,032 (concession by the Board that section 160(a) "specifically limits the NLRB's powers to preventing only the unfair labor practices listed in [section 158] of the Act.").

Defendants contend that failure to post the employee rights notice qualifies as an unfair labor practice under section 158(a)(1), which provides that "[i]t shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." The Final Rule explains that "[b]ecause . . . notice posting is necessary to ensure effective exercise of Section [157] rights, a refusal to post the required notice is at least an *interference* with employees' exercise of those rights." 76 Fed Reg. at 54,032 (emphasis added). Plaintiffs counter that failing to post a notice of employee rights does not "interfere with" an employee's exercise of his section 157 rights, and therefore, the Court must find under *Chevron* step one that the Board is unambiguously barred from designating it an unfair labor practice.

The Court must begin with the language of the statute. *CSX Transp., Inc. v. Alabama Dept. of Revenue*, -- U.S. --, 131 S. Ct. 1101, 1107 (2011). The Oxford English Dictionary

defines the word "interfere," in the context "of things generally," as "[t]o strike against each other; to come into physical collision; to collide or clash, so as to hamper or hinder each other; to get in each other's way, cross each other's path." *See* Oxford English Dictionary online at 2(a), http://www.oed.com/view/Entry/97761?rskey=aLZ2wl&result=2#eid (last visited Feb. 29, 2012).  In the context of persons, to interfere means "[t]o meddle *with*; to interpose and take part in something, esp. without having the right to do so; to intermeddle."  *Id.* at 4(b) (emphasis in original).  An alternative definition indicates that the term means "to interpose, take part, so as to affect some action; to intervene."  *Id.* at 5.  Similarly, the Merriam-Webster dictionary defines "interfere," in relevant part, as "to interpose in a way that hinders or impedes:  come into collision or be in opposition[;] . . . to enter into or take a part in the concerns of others." Meriam-Webster Dictionary online at 1, 3, http://www.merriam-webster.com/dictionary/interfere; *see also N.L.R.B v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 243 n.* (1978) (Stevens, J., concurring) (adopting the Webster's Third New International Dictionary definition of "interference":  "the act of meddling in or hampering an activity or process").

In other words, section 158(a)(1) prohibits employers from getting in the way – from doing something that impedes or hampers an employee's exercise of the rights guaranteed by section 157 of the statute.  It does not prohibit a mere failure to facilitate the exercise of those rights.  Yet, section 104.210 does not distinguish between a situation where an employer's failure to post was intended to or did exert influence over an employee's organizational efforts, and where the employer merely declined or failed to post the information publicizing those rights.  It allows the Board to deem the failure to post to be an unfair labor practice in every situation.

Even if the Court were to find that the definition of the word "interfere," read in isolation, leaves some ambiguity as to whether a failure to post can be universally classified as an unfair labor practice, the need for something more becomes clear when the word is read in the context of the rest of the provision.  The fact that section 158(a)(1) makes it an unfair labor practice "to interfere with, restrain, or coerce" further demonstrates that Congress intended some act of meddling or interposition by the employer.  *See Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990) ("'words grouped in a list should be given a related meaning'"); *Neal v. Clark*, 95 U.S. 704, 708-09 (1877) ("the coupling of words together shows that they are to be understood in the same sense")*; Valdes v. U.S.,* 475 F.3d 1319, 1324 (D.C. Cir. 2007) ("[R]elying on the canon of *noscitur a sociis,* we believe the words 'question' and 'matter' are known by the company that they keep.").  The common thread among the three words is an act of obstruction, which is not fulfilled by a mere unwillingness to help.

Second, section 158(c), which prohibits the Board from construing "[t]he expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form" as an unfair labor practice or as evidence of an unfair labor practice "if such expression contains no threat of reprisal or force or promise of benefit," also suggests that Congress had a narrow reading of the word "interfere" in mind.  *See Chemehuevi Tribe of Indians v. FPC*, 420 U.S. 395, 403 (1975) (all parts of a statute must be read together).  Since Congress prohibited the Board from considering an employer's express statement of its views to

be an unfair labor practice, it follows that it did not intend that an employer's mere failure to supply information would be designated as one.[16]

The Court points out that nothing in this decision prevents the Board from finding that a failure to post constitutes an unfair labor practice in any individual case brought before it.  But the ruling does mean that the Board must make a specific finding based on the facts and circumstances in the individual case before it that the failure to post interfered with the employee's exercise of his or her rights.  The Court is not making an absolute statement that inaction can never be interference; rather this memorandum opinion simply holds that the Board cannot make a blanket advance determination that a failure to post will always constitute an unfair labor practice.

Contrary to defendants' assertions, the Court's reading of the word "interfere" does not contravene the ruling in *NLRB v. Truitt Manufacturing Co.*, 351 U.S. 149 (1956).  In that case, the Supreme Court held that an employer's inaction – its refusal to submit financial information to a union, which the union had requested in order to assess the truthfulness of the employer's statement that it could not afford to pay employees higher wages – constituted a failure to bargain in good faith with respect to wages in violation of section 8(a)(5) of the NLRA.  *Id.* at 150–52.  However, the Court was assessing the employer's failure to submit the financial information under section 8(a)(5), which makes it an unfair labor practice "to refuse to bargain collectively with the representatives of his employees," not under section 8(a)(1).[17]  The question

---

16    Furthermore, one could argue that by deeming non-posting to be evidence of anti-union animus, the Board is characterizing the act of failing to post as an expression of the employer's intent, and section 158(c) specifically establishes a higher bar for when mere expression can be an unfair labor practice.

17    Although the Board found violations of section 8(a)(1) as well, the Supreme Court discussed only section 8(a)(5).

whether inaction may qualify as a "refusal" – which is another form of inaction – is distinguishable from the question of whether inaction may qualify as "interference."  And, in that case, the Board made its determination in the context of a specific adjudication.  It weighed the specific facts of the case and determined that the employer's conduct constituted a refusal to bargain collectively.  As noted above, the Court's decision in the instant case would not prevent the Board from making an individualized determination under section 8(a)(1) in the future.

Similarly, defendants' argument that failure to provide notice has been construed as "interference" under the Family and Medical Leave Act ("FMLA") is unpersuasive.  *See* 76 Fed. Reg. 54,032.  The FMLA requires employers to notify employees that FMLA coverage may apply whenever the employer is put on notice that the employee qualifies for FMLA benefits. *See, e.g.*, *Greenwell v. Charles Machine Works Inc.*, No. CIV-10-0313-HE, 2011 WL 1458565, at *4 (W.D. Okla. April 15, 2011).  Department of Labor regulations state that an employer's failure to follow the notice requirements "may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights."  29 C.F.R. § 825.300(e).  There, however, the employer is only required to notify a specific employee when it knows that the employee qualifies for the benefits. *See id.* § 825.300(a)–(d).  In that context, the assumption that an employer's failure to notify qualifies as interference with the employee's exercise of his rights is more individualized than the broad finding incorporated in subpart B.  In the FMLA context, the employer has information that the employee lacks, it knows that the employee would benefit from receiving the information, and yet fails to provide it.  Under the NLRB Rule, a mere failure

to post a generic notice of employee rights, no matter what the context, would qualify as "interference" with the exercise of those rights.[18]

Thus, the Court finds under *Chevron* step one that Congress has expressed its unambiguous intent and that the Board exceeded its authority under the NLRA when it promulgated a rule that labels any failure to post the required notice to be an unfair labor practice.

### D.  Subpart B, Section 104.214(a):  Equitable Tolling Provision

Similarly, the NLRA does not authorize the Board to enact a rule which permits it to toll the statute of limitations in any future unfair labor practice action involving a job site where the notice was not posted.  The challenged provision, section 104.214(a) states:  "When an employee files an unfair labor practice charge, the Board may find it appropriate to excuse the employee from the requirement that charges be filed within six months after the occurrence of the allegedly unlawful conduct if the employer has failed to post the required employee notice unless the employee has received actual or constructive notice that the conduct complained of is unlawful." 76 Fed. Reg. 54,049.  This provision not only extends the statute of limitations for unfair labor practice proceedings arising out of the failure to post, it applies to *all* unfair labor practice actions against employers where the notice was not posted.  The Court concludes, as in the case of the unfair labor practices provision, that Congress did not leave a gap for the agency to fill with respect to the statute of limitations.  Instead, in section 160(b), Congress plainly mandated a short time period during which an aggrieved person must file a charge.  29 U.S.C. § 160(b) ("[N]o complaint shall issue based upon any unfair labor practice occurring more than six

---

18      In addition, to this Court's knowledge, the Labor Department's authority to promulgate the regulation has never been challenged.

months prior to the filing of the charge with the Board . . . .").  The challenged provision of the rule upends that requirement.

The statute of limitations in section 160(b) was the focus of significant attention when it was introduced as part of the Taft-Hartley Amendments in 1947.  *See Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 424–29 (1960).  Opponents of the amendment called it "the shortest statute of limitations known to the law."  S. Rep. No. 105 (pt. II), 80th Cong., 1st Sess., at 5; *see also Local Lodge No. 1424*, 362 U.S. at 429 n.19.  Despite criticism that it gave "unjust assistance to employers or unions which commit those types of practices which are easily concealed and difficult to detect," the amendment was adopted.  93 Cong. Rec. 4905 (remarks of Sen. Murray); *see also Local Lodge No. 1424*, 362 U.S. at 429 n.19.

The Supreme Court has recognized that courts may apply equitable doctrines, such as equitable tolling, to the statute of limitations under the NLRA.  *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 395 n.11 (1982).[19]  Equitable tolling is a defense to a defendant's argument that the plaintiff failed to bring a claim within the relevant statute of limitations.  *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 579 (D.C. Cir. 1998).  It is an exceptional defense, which courts grant "'only in extraordinary and carefully circumscribed instances,'" *id.* at 579–80, quoting *Mondy v. Sec'y of the Army*, 845 F.2d 1051, 1057 (D.C. Cir. 1988), such as where "despite all due diligence [a plaintiff] is unable to obtain vital information bearing on the existence of her claim" or where "the complainant has been induced or tricked by his adversary's

---

19    The Board may also apply equitable doctrines, such as tolling the statute of limitations, in the cases before it under the NLRA.  *See NLRB v. Seven-Up Bottling Co. of Miami, Inc.*, 344 U.S. 344, 346–47 (1953); *see also Int'l Ass'n of Machinists and Aerospace Workers v. NLRB*, 50 F.3d 1088, 1093–95 (D.C. Cir. 1995) (reinstatement after statute of limitations passed), *Dist. Lodge 64 v. NLRB*, 949 F.2d 441 (D.C. Cir. 1991) (laches); *see, e.g., Brown & Sharpe Mfg. Co.*, 312 N.L.R.B. 444, 444 (1993) (equitable tolling); *Strawsine Mfg. Co., Inc.*, 280 N.L.R.B. 553, 553 (1986) (same); *Don Burgess Constr. Co.*, 227 N.L.R.B. 765, 766 (1977) (same).

misconduct into allowing the filing deadline to pass." *Id.* at ,579; *see also Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990); *Norman v. U.S.*, 467 F.3d 773, 775–76 (D.C. Cir. 2006). The plaintiff bears the burden of proving facts that support an equitable tolling defense. *See Smith-Haynie*, 155 F.3d at 579; *see also Johnson v. Holder*, 598 F. Supp. 2d 50, 56 (D.D.C. 2009).

Defendants justify the equitable tolling provision of the Rule by pointing to a series of Title VII and ADEA cases where the courts equitably tolled statutes of limitations for employees' causes of action based on their employers' failures to post mandatory notices of employee rights.[20] NLRB Mem. at 41 & n.180. But these precedents are inapposite for several reasons. First, it is important to point out that it was Congress that expressly mandated the notice posting under the employment discrimination statutes, whereas here, it was the Board that crafted the notice posting rule. Thus, a key justification for the application of the tolling rule under the employee discrimination statutes – that Congress recognized the importance of employees being informed of their rights – does not apply here. *See, e.g.*, *Bonham v. Dresser Indus., Inc.*, 569 F.2d 187, 193 (3d Cir. 1977) (justifying equitable tolling based on an

---

[20] There appears to be a circuit split regarding whether failure to post a notice of employee rights is itself sufficient to warrant the tolling of the statute of limitations for bringing charges for violations of those rights or whether an intent to actively mislead the employee respecting the cause of action is also necessary. *Compare Mercado v. Ritz-Carlton San Juan Hotel, Spa & Casino*, 410 F.3d 41, 46–47 (1st Cir. 2005) (finding employer's violation of EEOC posting requirement sufficient to toll statute of limitations); *EEOC v. Ky. State Police Dep't*, 80 F.3d 1086, 1094–96 (6th Cir. 1996); *Beshears v. Asbill,* 930 F.2d 1348, 1351–52 (8th Cir. 1991); *McClinton v. Ala. By-Prods. Corp.*, 743 F.2d 1483, 1485–86 (11th Cir. 1984); *Elliot v. Grp. Med. & Surgical Serv.*, 714 F.2d 556, 563–64 (5th Cir. 1983); *Vance v. Whirlpool Corp.*, 716 F.2d 1010, 1012–13 (4th Cir. 1983); *Posey v. Skyline Corp.*, 702 F.2d 102, 104–05 (7th Cir. 1983); *Bonham v. Dresser Indus., Inc.*, 569 F.2d 187, 193 (3d Cir. 1977), *with Wilkerson v. Siegfried Ins. Agency, Inc.*, 683 F.2d 344, 347 (10th Cir. 1982) (finding failure to post insufficient to toll statute without employer's "intent to actively mislead the plaintiff"); *Krish v. Conn. Ear, Nose & Throat, Sinus & Allergy Specialists, P.C.*, 607 F. Supp. 2d 324, 328–29 (D. Conn. 2009). This Court need not express a view on that controversy, but the split suggests that even the tolling under Title VII and the ADEA is not automatic.

employer's failure to post an EEOC notice because it was necessary in order to redress a violation of a "requirement [that] was undoubtedly created because Congress recognized that the very persons protected by the Act might be unaware of its existence").

More importantly, the tolling in the Title VII context is applied on a case by case basis; nearly all of the courts that have considered whether failure to post a notice can trigger equitable tolling have focused on the case-specific nature of the doctrine.  For example, in *Mercado v. Ritz-Carlton San Juan Hotel, Spa & Casino*, 410 F.3d 41 (1st Cir. 2005), the Court held that an employee meets the threshold requirements for equitable tolling of a Title VII case where he alleges that his employer failed to post EEOC notices of employee rights as mandated by Title VII and that he had no actual knowledge of his legal rights.  *Id.* at 48.  It would refuse to toll the statute of limitations, however, if other factors weighed against it, such as whether the employee had actual or constructive knowledge of the filing requirement, whether the employee was actually prejudiced by the employer's failure to post, and the employee's reasonableness in remaining ignorant of the filing requirement.  *Id.*  The court noted that "[i]t is in the nature of equity to entertain case-specific factors that may counsel in favor of tolling."  *Id.*, quoting *Kale v. Combined Ins. Co. of Am.*, 861 F.2d 746, 753 n.9 (1st Cir. 1988).

The Final Rule strips away the case-specific nature of the equitable tolling doctrine by imposing it as the rule rather than the exception.  Defendants brush off this consequence, arguing that "the Final Rule's use of the discretionary 'may' – stating that 'the Board may find it appropriate' to toll section [160](b) – emphasizes that the Board's tolling doctrine is likewise flexible, discretionary, and grounded in equitable practice, including the factors cited by the courts in *Mercado* and other cases."  NLRB Mem. at 43.  But as the preamble to the rule

demonstrates, the rule establishes tolling as the standard practice unless the employer can prove

to the Board that it should not be applied:

> The Board emphasizes, however, that failure to post the required notice will not automatically warrant a tolling remedy.  If an employer proves that an employee had actual or constructive knowledge of the conduct alleged to be unlawful, as well as actual or constructive knowledge that the conduct violated the NLRA, and yet failed to timely file an unfair labor practice charge, the Board will not toll the [160](b) period merely because of the employer's failure to post the notice.

76 Fed. Reg. at 54,035.  This turns the burden of proof on its head.  The plaintiff generally bears

the burden of proving that equitable tolling should apply in an individual case, but the rule

demands that the employer prove that across the board, unlimited extension should *not* apply.

Thus, section 104.214(a) is not simply a restatement of the Board's unquestionable right

to apply the doctrine of equitable tolling in an appropriate case.  *See* NLRB Mem. at 43 ("[T]he

rule is nothing more than a brief summary, for the benefit of the public, of some of the equitable

considerations that may be weighed by the Board in determining whether an 'extraordinary

circumstance' prevented timely filing.").  The rule substantially amends the statute of limitations

that Congress expressly set out in the statute.  And because Congress left no ambiguity as to the

appropriate statute of limitations under section 160(b), the Board's promulgation of this

provision exceeds its statutory authority under *Chevron* step one.[21]

## II.    The Challenge to the Rule Under the First Amendment

Finally, plaintiffs argue that the Final Rule violates the First Amendment of the United

States Constitution because it compels employers to speak against their will.  NRTW Mem. at

33–34; NAM Mem. at 22–24;.  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) ("[T]he right of

freedom of thought protected by the First Amendment against state action includes both the right

---

21    This does not prevent the Board from considering an employer's failure to post the employee rights notice in evaluating a plaintiff's equitable tolling defense in an individual case before it.

to speak freely and the right to refrain from speaking at all."); *Rumsfeld v. Forum for Academic and Institutional Rights, Inc. ("FAIR")*, 547 U.S. 47, 61 (2006) ("[F]reedom of speech prohibits the government from telling people what they must say.")

But the Board's notice posting requirement does not compel employers to say anything. The poster that the regulation prescribes for the workplace is "government speech," which is "not subject to scrutiny under the Free Speech Clause." *See Pleasant Grove City v. Summum*, 555 U.S. 460, 464 (2009). A message dictated by the government will be considered government speech if it is sufficiently controlled by the government. *See Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 562 (2005) (stating that speech may be considered government speech "[w]hen, as here, the government sets the overall message to be communicated and approves every word that is disseminated"); *see also FAIR*, 547 U.S. 47, 61 n.4 (speech by military recruiters during interviews conducted on law school campuses "is clearly Government speech").

The poster at issue here fits squarely into the requirements for government speech because its content is entirely a message from the government. The poster makes the source of its content clear: it bears a large NLRB logo at the top and text running across the bottom in bold that states, "This is an official Government Notice[.]" It contains the contact information for the NLRB and directs employees to contact the NLRB with questions about specific rights that might apply to them. Furthermore, the text of the poster is written by a government agency and may not be altered by any private individual.

In making their compelled speech argument, plaintiffs rely on decisions in which the Supreme Court has found unconstitutional government laws or regulations forcing one speaker to

host or accommodate another speaker's message. *See* NRTW Mem. at 33–34; NAM Mem. at 23; NRTW Opp. at 18–20. But those cases are inapposite here.

In the recent *FAIR* case, the Supreme Court distilled its precedent regarding compelled speech violations of the First Amendment. It determined that in prior cases where it had found violations, they "resulted from the fact that the complaining speaker's own message was affected by the speech it was forced to accommodate." *FAIR*, 547 U.S. at 63. Thus, the Court found compelled speech where the State of New Hampshire required all cars to display a license plate with the motto "Live Free or Die" because it interfered with the desired religious message of the complaining speaker, a Jehovah's Witness. *Id.* at 61–62, citing *Wooley*, 430 U.S. at 717. Similarly, it found compelled speech where the state of Florida required newspapers to print a reply by any candidate for nomination or election who was assailed in the newspaper regarding his personal character or official record because the reply would take up space "that could be devoted to other material the newspaper may have preferred to print." *Id.* at 63–64, citing *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974).

Based on this precedent, the Court found that a government regulation requiring law schools who allow on-campus recruitment by employers to also allow the military to recruit on campus did not constitute compelled speech, despite the law schools' argument that such permission could be construed as condoning the military's policies toward homosexuality, which the schools did not support. *Id.* at 52, 62. "Nothing about recruiting suggests that law schools agree with any speech by recruiters, and nothing in the [regulation] restricts what the law schools may say about the military's policies." *Id.* at 65.

Similarly here, nothing in the notice posting suggests that employers favor collective bargaining activities, and nothing in the regulation restricts what the employers may say about

the Board's policies.  Since the notice simply recites what the law is, employers could not possibly have an alternative message that posting the notice could affect.  The notice, which is clearly stamped with a government seal, does not call for the employer to take a position or express a view on the law.  *See Prune-Yard Shopping Ctr. v. Robbins*, 447 U.S. 74, 88 (1980) (no compelled speech where the complaining speaker is "not . . . being compelled to affirm [a] belief in any governmentally prescribed position or view"); *cf. Pacific Gas and Elec. Co. v. Public Utilities Comm'n of Cal.*, 475 U.S. 1, 16 n.12 (1986) (distinguishing a government requirement that a utility company include a third-party's newsletter in its bill mailings from "orders requiring appellant to carry various legal notices, such as notices of upcoming Commission proceedings or of changes in the way rates are calculated.  The State, of course, has substantial leeway in determining appropriate information disclosure requirements for business corporations.").

In its motion for summary judgment, plaintiffs NAM *et al.* also seem to reach for the commercial speech standard for First Amendment protection.  *See* NAM Mem. at 23–24.  The Court has serious doubts about whether the commercial speech standard applies here,[22] but even if the Court adopts the Supreme Court's standard for compelled disclosures that are "purely

---

22      To this Court's knowledge, neither the Supreme Court nor the DC Circuit has applied the commercial speech standard of review outside of the commercial speech context.  Commercial speech is "usually defined as speech that does no more than propose a commercial transaction," such as a commercial advertisement or the packaging of a commercial good.  *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001).  A poster meant to educate employees in a workplace is not proposing a commercial transaction and therefore cannot qualify as commercial speech.  Nevertheless, the justification defendants advance for the notice posting – legal notices serve to educate employees about the law in order to dissipate the possibility of employee unawareness or deception – is similar to the justification courts have adopted for government mandated writings and disclaimers in the commercial context – "warning[s] or disclaimer[s] might be appropriately required . . . in order to dissipate the possibility of consumer confusion or deception."  *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 651 (1985) (internal quotation marks omitted).

factual and uncontroversial" in the commercial speech context, the Board's notice posting requirement survives. In *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985), the Supreme Court held that mandated disclosures or disclaimers that are "purely factual and uncontroversial" are valid "as long as the disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."[23] *Id.* at 251. If we apply that standard to the context of legal notices, the Board's posting requirement will be valid so long as it is reasonably related to the Board's interest in raising awareness among employees of their rights. A requirement that an employer post a notice in the workplace containing information about employee rights is certainly reasonably related to the interest in raising awareness among employees of their rights. There may be other or better ways of raising awareness, but such heightened scrutiny is not required here. *See id.* at 251 n.14.

        This is not the first court to reach the conclusion that regulations requiring employers to post legal notices do not violate the First Amendment. The D.C. Circuit, in dicta, noted that "an employer's right to silence is sharply constrained in the labor context, and leaves it subject to a

---

23      The poster is "purely factual and uncontroversial" as it is simply a statement of employee rights under the law. The fact that it contains only certain provisions of the law and not others does not matter. *See Zauderer*, 471 U.S. at 651 n.14; *NY State Restaurant Ass'n v. NY City Bd. Of Health*, 556 F.3d 114, 134 (2d Cir. 2009) ("[T]he First Amendment does not bar the City from compelling such 'under-inclusive' factual disclosures . . . ."). This is not a case like *R.J. Reynolds Tobacco Co. v. FDA*, No. 11-1482, slip op. (D.D.C. Feb. 29, 2012), where the FDA required cigarette manufacturers to include a graphic warning on the top 50% of the front and back panels of cigarette packages – some of which included technologically altered photographs and cartoons – designed to evoke emotion about the harmful effects of smoking. There, the Court invoked the less deferential standard of review because it found that the images constituted "anti-smoking advocacy," which was "neither designed to protect the consumer from confusion or deception, nor to increase consumer awareness[.]" *Id.* at *11. The poster at issue here, however, was expressly designed to protect employees from confusion or deception about their rights, and to increase their awareness of their rights. Furthermore, it sets out what both employers *and unions* can and cannot do, and it clearly sets out the employee right not to organize. It is worth further noting that the *R.J. Reynolds Tobacco* opinion does not question the ability of the government to mandate the standard Surgeon General's warnings, which are even less neutral than the poster at issue here.

variety of burdens to post notices of rights and risks." *UAW-Labor Emp't & Training Corp. v. Chao*, 325 F.3d 360, 365 (D.C. Cir. 2003).   And the Fifth Circuit upheld the constitutionality of an employer notice posting requirement under the Occupational Safety and Health Act for a poster similar to the one at issue here.   *Lake Butler Apparel Co. v. Sec'y of Labor*, 519 F.2d 84, 89 (5th Cir. 1975).   The court found that "the First Amendment which gives [the employer] the full right to contest [the] validity [of the law] to the bitter end cannot justify his refusal to post a notice Congress thought to be essential."[24]  *Id.*

Therefore, the Court refuses to overturn the notice posting rule on First Amendment grounds.[25]

### III.      The Severability of the Rule

Given that the Court finds some provisions of the Final Rule valid and others invalid, the final step is to determine whether the valid parts are severable or whether the entire Rule should be overturned.   Partial affirmance is proper unless "there is 'substantial doubt' that the agency would have adopted the severed portion on its own."  *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008).   This in turn depends on the issuing agency's intent.    *Id.*   Courts look to whether the agency has justified the regulation as a comprehensive scheme.  *See id.*   (refusing to sever sections of a comprehensive cap and trade air pollution regulatory scheme that dealt with two different pollutants in part because the EPA relied on models that assumed trading of all pollutants).   They also look to how "intertwined" the sections are or whether the remainder of the regulation could function sensibly without the stricken provision.  *Davis Cnty. Solid Waste*

---

24      Contrary to the assertions of plaintiffs NRTW *et al.*, it makes no difference that this notice posting requirement was promulgated by the Board and not by Congress.   The First Amendment applies equally in both cases.

25      The Court also rejects plaintiffs' argument that the Rule violates section 158(c) of the NLRA for the same reasons.

*Mgmt. & Recovery Special Serv. Dist. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997) (severing standards for small municipal waste combustor units from standards for large units in an EPA regulation because the two standards were not "intertwined;" they worked entirely independently of one another); *MD/DC/DE Broadcasters Ass'n v. FCC*, 253 F.3d 732, 734 (D.C. Cir. 2001) (determining whether the remainder of the regulation could function sensibly without the stricken provision).

The Final Rule expressly provides that the Board expected the notice posting provision in Subpart A to be able to stand alone, but that the enforcement provisions under Subpart B were adopted for the minority of cases where Subpart A alone would be ineffective. 76 Fed. Reg. 54,031 ("[T]he Board expects that most employers that fail to post the required notice will do so simply because they are unaware of the rule, and that when it is called to their attention, they will comply without the need for formal administrative action or litigation."). This acknowledgment that the various provisions under Subpart B were intended only to provide some teeth to the otherwise standalone provisions of Subpart A is sufficient evidence of the Board's intent for Subpart A to stand on its own. At the very least, it relieves the Court of any "substantial doubt" that the Board would have adopted Subpart A on its own. *North Carolina*, 531 F.3d at 929. The statement in the Final Rule is also persuasive evidence that the Rule satisfies the *Davis County* and *MD/DC/DE Broadcasters Ass'n* severability test because it shows that the Board believed that Subpart A could function sensibly without the remedial provisions in Subpart B. *See Davis County*, 108 F.3d at 1459–60; *MD/DC/DE Broadcasters Ass'n*, 253 F.3d at 734–36. And this is particularly true, given that even without Subpart B, the Board could still find failure to post to be evidence of an unfair labor practice or justification for equitable tolling in individual cases.

So, severing Subpart A from the enforcement provisions of Subpart B would not completely deprive it of the bite that the Board wanted.

In the preamble to the Final Rule, the Board also explained that it "has decided not to rely on voluntary compliance. . . . [The provisions in subpart B] have two purposes: to ensure that any violations of the notice-posting requirement that occur may be remedied where necessary, and to describe how violations of the notice-posting requirement may affect other Board proceedings." 76 Fed. Reg. at 54,031. Unlike plaintiffs, the Court does not read this as an expression of the Board's intent to inextricably link the two subparts. Instead, it merely shows that the Board was seeking to add bows to its quiver in the event it was unable to achieve voluntary compliance. Indeed, the fact that the Board promulgated subpart B at all suggests that the Board considered the notice posting provision to be so crucial that it decided to develop means to support and strengthen it. This leads to the conclusion that the Board would have wanted Subpart A to remain standing if the remedies under Subpart B were overturned – not that it would have shrugged and walked away from the entire exercise. And in the face of this evidence of the Board's intent, the Rule's lack of a severability clause is insignificant. *United States v. Jackson*, 390 U.S. 570, 585 n.27 (1968) ("[T]he ultimate determination of severability will rarely turn on the presence or absence of such a [severability] clause.")

In addition, each of the specific remedies under Subpart B stands alone and is not intertwined with the others. The Board considered them separately and it reserved the power to invoke each of them separately. *See* 76 Fed. Reg. at 54,031–37. The Court has no substantial doubt that the Board would have adopted section 104.214(b), authorizing it to consider failure to

post as evidence of an employer's unlawful motive, without the other provisions under Subpart

B.  Since plaintiffs do not specifically challenge section 104.214(b), it remains valid.[26]

---

[26]     Plaintiffs filed a supplemental statement stating that they do challenge section 104.214(b) because the "Amended Complaint challenges the validity of the entire Rule."  Pl.s' Statement Regarding the Animus Enforcement Provision of the R. ("Pl.'s Stmt") [Dkt. # 50] at 1.  Section 104.214(b) states:  "The Board may consider a knowing and willful refusal to comply with the requirement to post the employee notice as evidence of unlawful motive in a case in which motive is an issue."  76 Fed. Reg. at 54,049.  However, neither the NRTW Complaint nor the NAM Amended Complaint specifically challenges that provision the way they both target the notice posting requirement, the unfair labor practice provision, or the equitable tolling provision. And neither proffers an argument as to why that provision is invalid in any of their pleadings. But even if the Court were to find that these actions question the authority of the Board to issue that provision, it would find that the Board had authority under *Chevron* step one because no provision of the NLRA limits the Board's broad authority to promulgate this provision of the Rule.  Unlike the two provisions struck down in this opinion, the Rule does not make a blanket finding that will govern future individual adjudications or create a presumption of anti-union animus wherever an employer fails to post the provision.  In fact, the preamble to the Rule makes clear that "to be considered as evidence of unlawful motive, an employer's failure to post the notice must be both knowing and willful – *i.e.*, the employer must have actual (as opposed to constructive) knowledge of the rule and yet refuse, on no cognizable basis, to post the notice." 76 Fed. Reg. 54,036.  Thus, unlike the unfair labor practice and tolling provisions, the animus provision neither creates an unfair presumption nor relieves the Board of making a case by case determination.

**CONCLUSION**

In sum, the Board lawfully promulgated Subpart A of its Final Rule, which requires employers to post a notice of employee rights, but exceeded the authority granted to it by Congress under the NLRA by promulgating the two provisions under Subpart B that permit the Board to deem failure to post an unfair labor practice and to toll the statute of limitations for claims brought by employees against employers who failed to post the notice. Therefore, the Court will grant in part and deny in part plaintiffs motions for summary judgment [Dkt. # 20, 21] and grant in part and deny in part defendants' cross-motion [Dkt. # 22]. A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE:  March 2, 2012